## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE EYEWEAR ANTITRUST LITIGATION<br><br>This Document Related To:<br>ALL DIRECT PURCHASER ACTIONS | Case No.: 1:24-cv-04826-MKV<br><br>**DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Mary Kay Vyskocil |

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................. 1

PARTIES ............................................................................................................. 7

   I.   Plaintiffs .................................................................................................. 7

  II.  Defendants ............................................................................................ 10

 III.  Co-conspirators .................................................................................... 21

JURISDICTION AND VENUE ........................................................................ 24

ESSILORLUXOTTICA'S MONOPOLISTIC SCHEME, ANTICOMPETITIVE
AGREEMENTS, AND UNLAWFUL EXCLUSIONARY CONDUCT ................... 26

   I.   EssilorLuxottica has carried on its predecessors' practice of aggressively eliminating
      vertical and horizonal competition ......................................................... 28

    A.  Luxottica Consumed the Premium Eyewear Market. ............................. 28

       i.   Luxottica acquired some of the most recognizable Premium Eyewear Brands. ....... 28

      ii.   Luxottica seized some of the most well-known eyewear retail chains ..................... 29

     iii.   Luxottica spreads into vision benefits. ...................................................... 33

    B.  Essilor sought to consolidate and dominate the market for Custom Lenses. ................ 33

       i.   Essilor becomes the global power in Custom Lens manufacturing. ......................... 33

      ii.   Essilor spreads its control over lens processing laboratory services in the U.S and
         lens laboratory equipment ......................................................................... 34

     iii.   Essilor Acquires Optometric Groups. ........................................................ 35

     iv.   Essilor lenses dominate the Custom Lens Market. ...................................... 36

    C.  Post-merger, EssilorLuxottica continued its expansion in, and monopolization of, the
      Relevant Markets. ................................................................................... 37

       i.   EssilorLuxottica's acquisition of GrandVision broadens its brand and retail footprint.
         ....................................................................................................... 38

      ii.   EssilorLuxottica further solidifies its monopoly in the Relevant Markets by
         expanding into other segments. ................................................................. 38

     iii.   EssilorLuxottica's acquisition and expansion of frame and lens manufacturing. ..... 39

     iv.   EssilorLuxottica's continued dominance of U.S. lens laboratories and lens
         processing. ..................................................................................... 40

  II.  EssilorLuxottica imposes vertical and horizontal restraints on retail sale of Premium
     Eyewear ................................................................................................. 43

    A.  EssilorLuxottica's Exclusive Licensing Agreements with Fashion Houses eliminate
      retail price competition in the Premium Eyewear Market. ............................. 44

B.  EssilorLuxottica's sales agreements with Premium Eyewear Competitors restrict retail price competition for Premium Eyewear Competitor Brands. ....................................... 50

C.  EssilorLuxottica's distribution agreements with third-party sellers restrict retail price competition for Proprietary Brands and Fashion House Brands. ................................... 50

D.  EssilorLuxottica imposes retail price controls on Premium Eyewear through EyeMed.53

E.  EssilorLuxottica exerts monopolistic control over Premium Eyewear. ........................ 54

III.  EssilorLuxottica engages in steering and exclusive conduct as part of an overarching scheme to monopolize the Custom Lens Market. .............................................. 56

A.  EssilorLuxottica uses EyeMed to steer 72 million patients to EssilorLuxottica-controlled eyecare professionals, laboratories, and products. ......................................... 56

B.  EssilorLuxottica has significant influence over patient lens choices through Vision Source. ................................................................................. 58

C.  EssilorLuxottica engages in exclusive arrangements with horizontal and vertical optical competitors. ................................................................... 59

IV.  Foreign competition authorities have scrutinized and imposed penalties on EssilorLuxottica for similar anticompetitive and exclusionary practices. ....................... 60

A.  The French Competition Authority fined Luxottica €125,174,000 for price fixing and prohibiting online sale of Premium Eyewear. ............................................... 60

B.  The French Competition Authority fined Essilor International SAS and EssilorLuxottica for discriminatory practices by hindering online lens sales. ........................................... 65

C.  The Turkish Competition Board fined EssilorLuxottica for breaching merger commitments through bundling practices. ................................................................. 67

RELEVANT MARKETS ............................................................................... 68

I.   Relevant Product Markets. ....................................................................... 68

A.  Premium Eyewear Market. ................................................................. 68

i.   EssilorLuxottica, its competitors, Fashion Houses, and consumers treat Premium Eyewear as a distinct product market. ........................................... 69

ii.  Premium Eyewear are not reasonably interchangeable with value-priced, mass consumer spectacle frames and sunglasses. ................................................. 73

iii. Premium spectacle frames and premium sunglasses are distinct submarkets. ......... 74

B.  Custom Lens Market. ....................................................................... 76

II.  Relevant Geographical Market. .................................................................. 77

ESSILORLUXOTTICA'S MONOPOLY POWER ........................................................... 77

I.   EssilorLuxottica has monopoly power in the Premium Eyewear Market. ....................... 78

II.  EssilorLuxottica's has monopoly power in the Custom Lens Market. ............................ 82

III. EssilorLuxottica enjoys high barriers to entry in the Relevant Markets. .......................... 84

ANTICOMPETITIVE EFFECTS ................................................................................... 86

    I.   EssilorLuxottica's anticompetitive scheme allows it to raise prices above competitive
        levels in the Relevant Markets. ..................................................................... 87

    II.  EssilorLuxottica's anticompetitive scheme allows it to restrict output and limit consumer
        choice in the Relevant Markets. ..................................................................... 90

ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE ............................. 91

CLASS ALLEGATIONS ............................................................................................ 92

CAUSES OF ACTION ............................................................................................... 95

COUNT ONE ........................................................................................................... 95

COUNT TWO ........................................................................................................... 96

COUNT THREE ........................................................................................................ 98

COUNT FOUR ........................................................................................................ 101

COUNT FIVE .......................................................................................................... 102

COUNT SIX ............................................................................................................ 103

COUNT SEVEN ...................................................................................................... 105

COUNT EIGHT ....................................................................................................... 107

COUNT NINE ......................................................................................................... 108

PETITION FOR RELIEF .......................................................................................... 109

REQUEST FOR A JURY TRIAL ................................................................................ 110

Plaintiffs Kelly Brown, Isha Fathmath, Tara Foster, Rebecca Froehlich, Sally A. Jaroszynski, Jenny Jeltes, Monet Jonas, Michelle Morgan, Alan Peterson, Frederick Rozo, and Maureen Schmidt ("Plaintiffs"), on behalf of themselves and all others similarly situated (the "Class" defined below), upon personal knowledge as to the facts pertaining to themselves, upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action against EssilorLuxottica S.A., Luxottica S.p.A., Luxottica of America Inc. (f/k/a Luxottica Retail North America) d/b/a LensCrafters, Pearle Vision, Target Optical, Sunglass Hut, Oakley retail stores, and Ray-Ban retail stores, EyeMed Vision Care, LLC, Essilor International SAS, Vision Source, LLC, Essilor of America Inc., Essilor Laboratories of America, Inc., Grand Vision B.V., and For Eyes Optical Company (collectively "Defendants" or "EssilorLuxottica") for damages, injunctive relief, and other relief pursuant to the federal antitrust laws, demand a trial by jury on matters so triable, and allege as follows:

### NATURE OF THE ACTION

1.      Over sixty percent of adult Americans wear prescription eyeglasses, and over eighty-five percent wear nonprescription sunglasses. Consumers gravitate towards eyewear that mirrors their style, fashion, and individuality. They perceive brands like Ray-Ban, Persol, Oakley, Oliver Peoples, or Vogue Eyewear as vying for their attention, just as retailers such as Sunglass Hut, Target Optical, LensCrafters, Pearle Vision, or For Eyes seem to compete for their patronage. Yet, unbeknownst to many, all of these brands and retailers are owned by EssilorLuxottica, the optical behemoth monopolist that has created an illusion of choice in a competition-free ecosystem.

2.      This action arises from EssilorLuxottica's anticompetitive scheme to monopolize two markets: the **Premium Eyewear Market** and the **Custom Lens Market** in the United States

(together, the "Relevant Markets," as defined below). As part of this anticompetitive scheme, EssilorLuxottica has:

    a.  engaged in serial acquisitions to take ownership and control of many famous premium spectacle frames and premium sunglasses brands ("Proprietary Brands");[1]

    b.  entered into long-term exclusive licensing agreements with fashion houses for the design, production, and worldwide distribution of premium spectacle frames and premium sunglasses ("Fashion House Brands");[2]

    c.  maintained minimum price floors for its Proprietary Brands, Fashion House Brands, and the premium spectacle frames and premium sunglasses brands for which EssilorLuxottica does not own or hold exclusive rights ("Premium Eyewear Competitor Brands");[3] and

    d.  engaged in steering tactics to channel consumers to EssilorLuxottica-controlled eyecare professionals, and EssilorLuxottica lenses and lens finishing laboratories.

    3.    In 2018, Defendant Luxottica Group S.p.A, the leading eyewear frame conglomerate, merged with Defendant Essilor International SAS ("Essilor International"), the world's largest optical lens firm, creating EssilorLuxottica S.A. This merger solidified EssilorLuxottica's dominance both nationally and globally, continuing a long-standing anticompetitive scheme to monopolize the markets for Premium Eyewear and Custom Lenses. The company's tactics include serial acquisitions, exclusive licensing, price-maintenance

---

[1] This includes Alain Mikli, Arnette, Bliz, Bolon, Costa, DbyD, Luxottica, Molsion, Native, Oakley, Oliver Peoples, Persol, Ray-Ban, Seen, Sferoflex, Unofficial, and Vogue Eyewear.

[2] This includes Giorgio Armani, Emporio Armani, Armani Exchange, Brooks Brothers, Brunello Cucinelli, Burberry, Chanel, Coach, Dolce & Gabbana, Ferrari, Scuderia Ferrari, Jimmy Choo, Michael Kors, Moncler, Prada, Prada Linea Rossa, Miu Miu, Ralph Lauren, Polo Ralph Lauren, Ralph Eyewear, Chaps, Starck Biotech Paris, Swarovski, Tiffany, Tory Burch, and Versace.

[3] This includes Maui Jim, Gucci, Saint Laurent, Balenciaga, Chloé, Dior, Fendi, Celine, Loewe, Bulgari, and Tom Ford, among others.

agreements, and steering tactics. EssilorLuxottica—continuing the pre-merger legacy of Luxottica and Essilor International—has developed a monopolistic stranglehold over the Premium Eyewear Market which includes the submarkets for premium spectacle frames[4] and premium sunglasses, as well as the Custom Lens Market.

4.      EssilorLuxottica's multi-dimensional scheme aims to preserve, extend, and expand its monopoly by deliberately eliminating vertical and horizontal competition for the most popular and well-known eyewear brands, lens brands, and lens lab processing in the United States, thereby keeping prices for Premium Eyewear and Custom Lenses at artificially inflated levels far above what a competitive market would dictate.

5.      EssilorLuxottica also owns and controls the most well-known optical retail outlets in the United States where Premium Eyewear and Custom Lenses are sold to consumers and where EssilorLuxottica sets and fixes the prices for Premium Eyewear. Competitors that wish to sell EssilorLuxottica owned or controlled brands in their own stores must follow EssilorLuxottica's minimum resale prices for those brands. Likewise, Premium Eyewear Competitors that wish to sell their Premium Eyewear in EssilorLuxottica retail stores must abide by EssilorLuxottica's pricing decisions. As one Premium Eyewear competitor has bemoaned: "[I]f you make glasses, you want to be in [EssilorLuxottica's] stores; and if you have stores, you want to sell Ray-Bans! *So [EssilorLuxottica] can set the prices as high as it wants*."[5]

---

[4] "Spectacle frames" are the device in which vision corrective lenses are mounted, *i.e.*, the eyewear frame itself.

[5] Transcript, *Sticker Shock: Why are Glasses so Expensive*, CBS NEWS: 60 MINUTES (June 15, 2014), https://www.cbsnews.com/news/luxottica-eyewear-why-are-glasses-expensive/ (Originally aired on Oct. 7, 2012) (emphasis added) (hereinafter "Sticker Shock").

6.    The figure below illustrates the web of EssilorLuxottica's anticompetitive agreements, enabling the company to engage in price-fixing and pricing control of Premium Eyewear:



**Figure 1**

7.    EssilorLuxottica can, in part, force compliance with its retail price maintenance requirement for Premium Eyewear through EyeMed, a wholly-owned vision insurance care company, wherein participating eyecare providers must abide by retail price constraints on Premium Eyewear, and through Vision Source, LLC ("Vision Source"), a network of purportedly independent optometrists and leading optical retailer, among other entities. As a result,

EssilorLuxottica exerts pricing control over Premium Eyewear sold by approximately 4,500 eyecare providers and 3,000 supposed "independent" optometry practices.

8.      In 2023, the sale of Premium Eyewear, *i.e.*, premium spectacle frames and premium sunglasses, generated approximately $8.5 billion in retail revenue in the United States, with EssilorLuxottica capturing at least 80 percent, or $6.8 billion.[6] The success of EssilorLuxottica's anticompetitive scheme is evident as it has been able to sustain markups on Premium Eyewear of 1,000 percent and far higher *while increasing market share and operating margins*. Thus, a substantial portion of EssilorLuxottica's $6.8 billion Premium Eyewear revenue in 2023 is the result of its anticompetitive practices.

9.      EssilorLuxottica's monopolistic scheme is not limited to Premium Eyewear. Before merging in 2018, EssilorLuxottica's predecessor Essilor International aggressively expanded into the lesser-known optical sectors, securing a global stronghold in lens manufacturing, monopolizing U.S. lens finishing capacity, and acquiring exclusive rights to prominent lens brands alongside its extensive, proprietary lens brand portfolio. Now, through EyeMed—previously a Luxottica subsidiary that controls a network of over 83 percent of U.S. optometry practices—EssilorLuxottica steers over 72 million consumers to its lenses and lens finishing labs, further entrenching its market dominance in this approximate $13 billion annual market.[7] As a result, EssilorLuxottica sustains markups on Custom Lenses ranging from 4,200 to 24,000 percent *while*

---

[6] Luxury – Eyewear, STATISTA, https://www.statista.com/outlook/cmo/luxury-goods/luxury-eyewear/worldwide (last accessed Aug. 7, 2023) (hereinafter "Statista Luxury").

[7] Spectacle Lenses – United States, STATISTA, https://www.statista.com/outlook/cmo/eyewear/spectacle-lenses/united-states (last accessed May 31, 2024) (hereinafter "Statista Spectacle Lenses").

*increasing market share and operating margins*. Thus, much of the revenue EssilorLuxottica captures within the Custom Lens Market is also ill-gotten gains.

10.    Fueled by its desire to maximize retail pricing power, EssilorLuxottica's relentless pursuit to dominate every corner of the eyewear industry continues unabated. For example, in 2019, EssilorLuxottica acquired Barberini S.p.A. In 2021, it further solidified its control over retail chains and Premium Eyewear brands by acquiring GrandVision, one of its largest competitors. In 2022 alone, the company acquired Giorgio Fedon & Figli S.p.A., a manufacturer of optical cases and accessories;[8] Shamir Optical, a leading manufacturer of high-performance lenses; and Walman Labs, the largest (formerly) independent wholesale lens laboratory in the United States. Currently, EssilorLuxottica is vying to acquire Marcolin, the third largest Premium Eyewear maker by overall retail revenue. Marcolin's brands include Tod's, Ermenegildo Zegna, PUCCI, Bally, Max Mara, and notably, Tom Ford. As EssilorLuxottica's Chairman and Chief Executive Officer boasted: "We are the biggest in the industry, of course. . . . *We are, in many parts of the world, a proxy of the market*."[9]

11.    As a direct and proximate cause of EssilorLuxottica's monopolistic scheme, Plaintiffs and the Class were, and remain, forced to purchase Premium Eyewear and Custom Lenses from EssilorLuxottica's owned or controlled retail outlets at supracompetitive prices and have been deprived of any meaningful choice to purchase from brands or retailers that compete to offer better value. Plaintiffs and the Class have been harmed by EssilorLuxottica's monopolistic scheme, exclusionary conduct, and elimination of retail price competition by paying higher prices

---

[8] EssilorLuxottica 2023 Universal Registration Document, at 9, 16, 18, 28, and 37 (Mar. 8, 2024), https://www.essilorluxottica.com/en/investors/financial-publications/ ("EL 2023 URD").

[9] Transcript, EssilorLuxottica Capital Market Day 2022, at 2–3 (Sept. 13, 2022), https://www.essilorluxottica.com/en/cap/content/101976/ (emphasis added) ("EL 2022 CMD").

for Premium Eyewear and Custom Lenses than they would have in a competitive market. Plaintiffs and the Class are also threatened with impending future harm of additional overcharges if EssilorLuxottica's anticompetitive conduct is not enjoined.

**PARTIES**

## I.  Plaintiffs

12.  Plaintiff **Kelly Brown** is a citizen of the State of Illinois and resides in Mokena, Illinois. Ms. Brown purchased Ray-Ban frames with EssilorLuxottica-made prescription lenses at Pearle Vision located at Hickory Creek Marketplace, 19975 S. Lagrange Rd. Frankfort, Illinois on or around November 21, 2022. Ms. Brown has purchased, and will continue to purchase, goods in the Relevant Markets and is at risk of paying artificially high prices absent an injunction.

13.  Plaintiff **Isha Fathmath** is a citizen of the State of California and resides in San Francisco, California. Mr. Fathmath purchased a pair of Ray-Ban sunglasses at Sunglass Hut located at 250 Stockton St., San Francisco, California on or around January 26, 2022. Mr. Fathmath has purchased, and will continue to purchase, goods in the Relevant Markets and is at risk of paying artificially high prices absent an injunction.

14.  Plaintiff **Tara Foster** is a citizen of the State of Minnesota and resides in Woodbury, Minnesota. Ms. Foster purchased Ray-Ban frames with EssilorLuxottica-made prescription lenses at Target Optical located at 449 Commerce Drive, Woodbury, Minnesota on or around December 30, 2022. Ms. Foster has purchased, and will continue to purchase, goods in the Relevant Markets and is at risk of paying artificially high prices absent an injunction.

15.  Plaintiff **Rebecca Froehlich** is a citizen of the State of Minnesota and resides in St. Paul, Minnesota. Ms. Froehlich purchased a pair of Coach frames with EssilorLuxottica-made prescription lenses at LensCrafters located at the Southdale Shopping Center, 2195 Southdale Shopping Center, Edina, Minnesota on or around March 23, 2021. Ms. Froehlich has purchased,

and will continue to purchase, goods in the Relevant Markets and is at risk of paying artificially high prices absent an injunction.

16.   Plaintiff **Sally A. Jaroszynski** is a citizen of the State of New York and resides in Falconer, New York. Ms. Jaroszynski purchased a pair of Ray-Ban sunglasses at Sunglass Hut located at 2544 East Landstreet Road, Suite 100, Orlando, Florida on or around February 1, 2023. Ms. Jaroszynski has purchased, and will continue to purchase, goods in the Relevant Markets and is at risk of paying artificially high prices absent an injunction.

17.   Plaintiff **Jenny Jeltes** is a citizen of the State of Arizona and resides in Tucson, Arizona. Ms. Jeltes purchased a pair of Ralph Lauren sunglasses with EssilorLuxottica-made prescription lenses at Target Optical located at 3699 E. Broadway Blvd, Tucson, Arizona on or around September 3, 2022. Ms. Jeltes has purchased, and will continue to purchase, goods in the Relevant Markets and is at risk of paying artificially high prices absent an injunction.

18.   Plaintiff **Monet Jonas** is a citizen of the State of Minnesota and resides in Andover, Minnesota. Ms. Jonas regularly purchases Premium Eyewear at Pearle Vision located at 12771 Riverdale Blvd, #103, Coon Rapids, Minnesota, including Fysh frames with EssilorLuxottica-made prescription lenses on September 5, 2019, Tiffany sunglasses frames with EssilorLuxottica-made prescription lenses on September 5, 2019, Livia Tom Ford frames with EssilorLuxottica-made prescription lenses on November 23, 2020, Vivid sunglasses frames with EssilorLuxottica-made prescription lenses on November 23, 2020, Versace frames with EssilorLuxottica-made prescription lenses on March 18, 2022, Tiffany sunglasses frames with EssilorLuxottica-made prescription lenses on March 18, 2022, Tom Ford sunglasses frames with EssilorLuxottica-made prescription lenses on March 18, 2022, Sferoflex frames with EssilorLuxottica-made prescription lenses on May 1, 2023, Prada sunglasses frames with EssilorLuxottica-made prescription lenses

on May 1, 2023, Etnia Barcelona frames with EssilorLuxottica-made prescription lenses on April 27, 2024, Kate Spade sunglasses frames with EssilorLuxottica-made prescription lenses on April 27, 2024, and Tiffany sunglasses frames with EssilorLuxottica-made prescription lenses on April 27, 2024. Ms. Jonas has purchased, and will continue to purchase, goods in the Relevant Markets and is at risk of paying artificially high prices absent an injunction.

19.     Plaintiff **Michelle Morgan** is a citizen of the State of Minnesota and resides in Bloomington, Minnesota. Ms. Morgan made several purchases of premium eyewear at Target Optical located at 1515 County Road B W, Roseville, MN 55133, including Ralph Lauren frames with EssilorLuxottica-made prescription lenses on July 21, 2019. Ms. Morgan has purchased, and will continue to purchase, goods in the Relevant Markets and is at risk of paying artificially high prices absent an injunction.

20.     Plaintiff **Alan Peterson** is a citizen of the Commonwealth of Pennsylvania and resides in Lansdale, Pennsylvania. Mr. Peterson purchased a pair of Ray-Ban frames with EssilorLuxottica-made prescription lenses at LensCrafters located at 101 Montgomery Mall, North Wales, Pennsylvania on or around March 26, 2021. Mr. Peterson has purchased, and will continue to purchase, goods in the Relevant Markets and is at risk of paying artificially high prices absent an injunction.

21.     Plaintiff **Frederick Rozo** is a citizen of the State of California and resides in Rancho Santa Margrita, California. Mr. Rozo purchased a pair of Oakley sunglasses at Oakley Vault located at 48750 Seminole Dr. Ste. 124, Cabazon, California on or around June 21, 2022. Mr. Rozo has purchased, and will continue to purchase, goods in the Relevant Markets and is at risk of paying artificially high prices absent an injunction.

22.    Plaintiff **Maureen Schmidt** is a citizen of the State of Pennsylvania and resides in Abington, Pennsylvania. Ms. Schmidt purchased a pair of Coach frames with EssilorLuxottica-made prescription lenses at Target Optical located at 1495 Old York Rd., Abington, Pennsylvania 19001 on or around November 5, 2021. Ms. Schmidt also purchased a pair of Oakley frames with EssilorLuxottica-made prescription lenses at the same Target Optical store on or around November 5, 2021. Ms. Schmidt has purchased, and will continue to purchase, goods in the Relevant Markets and is at risk of paying artificially high prices absent an injunction.

## II.    Defendants



Figure 2

23.    Defendant **EssilorLuxottica S.A.** is a vertically integrated joint stock company incorporated under the laws of France with a registered office at 147 rue de Paris 94220, Charenton-Le-Pont, France. EssilorLuxottica S.A. is the parent of three main subsidiaries: Defendants Luxottica Group S.p.A., Essilor International SAS, and GrandVision B.V. EssilorLuxottica S.A. was formed from the 2018 merger of Luxottica Group S.p.A. and Essilor International SAS, and in 2021, EssilorLuxottica S.A. acquired GrandVision B.V.[10]

24.    As described below, these subsidiaries, under the ownership or control of EssilorLuxottica S.A., design, manufacture, distribute, or sell Proprietary Brands, Fashion House Brands, and Premium Eyewear Competitor Brands, as well as finished and semi-finished lenses. It is through its three main subsidiaries that EssilorLuxottica S.A. regularly conducts business throughout the United States. EssilorLuxottica S.A. describes itself as "the world's leading ophthalmic optics company" with "large operations in the U.S., including a global research and development center in Dallas, Texas and production facilities in various cities such as Charlottesville, Virginia and Salt Lake City, Utah."[11]

25.    Defendant, EssilorLuxottica S.A.'s leadership structure includes Francesco Milleri ("Milleri") as Chairman and Chief Executive Officer, Paul du Saillant (du Saillant") as Deputy

---

[10] EL 2023 URD, at 54.

[11] *Essilor International SAS and Essilor Manufacturing (Thailand) Co., Ltd. v. J.P. Morgan Chase Bank, N.A.*, No. 1:22-cv-03361-LJL (S.D.N.Y. Apr. 25, 2022) (D.1, ¶11). *See also* EL 2023 URD, at 38 ("[T]he Atlanta (Georgia) campus manages nearly all product categories and includes primary ophthalmic lenses laboratory to serve the North American market and main frames stock in the US . . . . In addition, the Dallas (Texas) and Columbus (Ohio) campuses are the major distribution centers for lenses and contact lenses serving North America as accessories for the ophthalmic sector.").

Chief Executive Officer, and Stefano Grassi ("Grassi") as Chief Financial Officer.[12] As alleged below, Milleri, du Saillant, and Grassi also hold executive positions with Luxottica Group S.p.A. and Essilor International SAS.[13] Additionally, GrandVision B.V.'s key executives were appointed by, and also hold positions with, EssilorLuxottica S.A. and/or other EssilorLuxottica entities and/or subsidiaries. Upon information and belief, Defendant EssilorLuxottica S.A.'s key executives, including but not limited to, Milleri, du Saillant, and Grassi, are the driving force behind all high-level decisions made within EssilorLuxottica.

26.     Defendant **Luxottica Group S.p.A.** is a corporation organized under the laws of Italy with its principal place of business at Piazzale Luigi Cadorna 3, 20121 Milan, Italy, and an office in the United States at 4000 Luxottica Place, Mason, Ohio 45040. "Luxottica is, in part, engaged in the business of producing, manufacturing and distributing throughout the world . . . premium, luxury and sports eyewear products under federally registered trademarks."[14]

27.     Luxottica Group S.p.A. owns Alain Mikli, Arnette, Bliz, Bolon, Costa, DbyD, Luxottica, Molsion, Native, Oakley, Oliver Peoples, Persol, Ray-Ban, Seen, Sferoflex, Unofficial, and Vogue Eyewear ("Proprietary Brands"). Luxottica Group S.p.A. also holds exclusive licenses for the eyewear brands of the Fashion Houses, including Giorgio Armani, Emporio Armani, Armani Exchange, Brooks Brothers, Brunello Cucinelli, Burberry, Chanel, Coach, Dolce & Gabbana, Ferrari, Scuderia Ferrari, Jimmy Choo, Michael Kors, Moncler, Prada, Prada Linea Rossa, Miu Miu, Ralph Lauren, Polo Ralph Lauren, Ralph Eyewear, Chaps, Starck Biotech Paris,

---

[12] EL 2023 URD, at 54.

[13] *Id.*

[14] *Luxottica Group S.P.A., Oakley, Inc., and Eye Safety Systems, Inc. v. The Partnerships and Unincorporated Associations, et al.*, No. 1:17-cv-05691 (N.D. Ill. 2017) (D.1, ¶ 4).

Swarovski, Tiffany, Tory Burch, and Versace ("Fashion House Brands"). To the extent that several of the Fashion Houses have re-entered their licensing agreements or entered into new licensing agreements since the merger of Luxottica Group S.p.A. and Essilor International SAS, EssilorLuxottica S.A. may hold these licensing agreements directly. For example, EssilorLuxottica S.A. is the exclusive license holder for Jimmy Choo.

28.    According to Luxottica Group S.p.A.'s public disclosures, the group of companies controlled by Luxottica Group S.p.A. operate under a single business strategy implemented through the presence of subsidiary companies in the various countries in which it operates, including the United States.[15] Interlocking directorates and management among these companies serve as a cooperative mechanism to facilitate the execution of the group's unified business strategy. For example, Massimo Vian was appointed Director of Luxottica Group on October 29, 2014, taking on all the powers of management ad interim until January 19, 2015, the date on which he was appointed to the office of CEO for Product and Operations. At the time of his appointment, Vian also served as CEO of Luxottica S.r.l.,[16] a member of the Board of Directors of EssilorLuxottica America SAS (f/k/a Luxottica U.S. Holdings Corp.), Luxottica of America Inc. (f/k/a Luxottica Retail North America Inc.), Luxottica North America Distribution LLC, and Oakley, Inc.[17] Currently, EssilorLuxottica S.A.'s executives Milleri holds the position of Chairman

---

[15] Luxottica 2012 Report on Corporate Governance and Ownership Structure, at 3 (Feb. 28, 2013), https://www.borsaitaliana.it/comitato-corporate-governance/documenti/governanceenglish/luxottica.en.pdf ("The group of companies controlled by Luxottica Group S.p.A., . . . is driven by a single business strategy implementing through the presence of subsidiary companies in the various countries in which it operates.").

[16] Upon information and belief, Luxottica S.r.l. is a wholly-owned manufacturing subsidiary of Luxottica Group S.p.A. and the direct parent of Sunglass Hut International, Inc.

[17] Luxottica 2017 Report on Corporate Governance and Ownership Structure, at 14.

and Chief Executive Officer, du Saillant holds the position of Director, and Grassi holds the position of Director at Luxottica Group S.p.A.[18]

29.     Luxottica Group S.p.A. and certain companies controlled by Luxottica Group S.p.A. also provided loan guarantees, capital contributions, or both, to the Group's U.S. subsidiaries. For example, Luxottica Group S.p.A. has historically entered into joint revolving loan agreements with EssilorLuxottica America SAS, which borrowing was guaranteed by Luxottica S.r.l.[19] Luxottica Group S.p.A.'s contacts with the United States and control over its subsidiaries are also evidenced by the numerous U.S. lawsuits it has brought in the federal courts to combat counterfeiters and its active enforcement of intellectual property rights.[20]

30.     Defendant **Luxottica of America Inc.** (f/k/a Luxottica Retail North America) is an Ohio corporation with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040. Luxottica of America Inc. is a wholly-owned subsidiary of Luxottica Group S.p.A. and does

---

[18] EL 2023 URD, at 54.

[19] Luxottica 2012 Report on Corporate Governance and Ownership Structure, at 8 ("On April 17, 2012 Luxottica Group S.p.A. and the subsidiary Luxottica U.S. Holdings Corp. entered into a revolving loan agreement for Euro 500 million expiring on March 10, 2017 with [several banks], guaranteed by its subsidiary Luxottica S.r.l.").

[20] *See, e.g., Luxottica Group, S,p.A. v. Airport Mini Mall, LLC, et al.,* No. 1:15-cv-01422-AT (N.D. Ga. 2015) (D.1, ¶ 1) (suit brought in Northern District of Georgia alleging contributory trademark infringement at "a well-known indoor flea market in College Park"); *Luxottica Group S.P.A., Oakley, Inc., and Eye Safety Systems, Inc. v. The Partnerships and Unincorporated Associations, et al.,* No. 1:17-cv-05691 (N.D. Ill. 2017) (D.1, ¶ 3) (suit brought in Northern District of Illinois "to combat online counterfeiters who trade upon Plaintiffs' reputations and goodwill by offering for sale and selling unauthorized and unlicensed counterfeit products…"); *Luxottica Group, S.p.A. v. Jay's Smoke Shop, LLC, et al.,* No. 2:18-cv-03415-MCA-JAD (D.N.J. 2018) (D.1, ¶ 18) (suit brought in District of New Jersey alleging "wrongful importation, distribution, advertisement, marketing, offering for sale, and/or sale of eyewear bearing counterfeit reproductions of the Ray-Ban Marks"); *Luxottica Group, S.p.A. v. Tyler Thornton, et al.,* No. 2:19-cv-05772-CAS-MRW (C.D. Cal. 2019) (D.1, ¶ 16) (suit brought in Central District of California alleging trademark infringement of Ray-Ban Marks).

business as LensCrafters, Pearle Vision,[21] Target Optical, Sunglass Hut, Oakley retail stores, and Ray-Ban retail stores, and owns e-commerce retail websites such as Glasses.com, Framesdirect.com, Ray-Ban.com, Oakley.com, SunglassHut.com, Pearlevision.com, and LensCrafters.com.[22] Through these retail outlets, EssilorLuxottica, and Luxottica Group S.p.A in particular, have sold Premium Eyewear and Custom Lenses to millions of class members at supracompetitive prices. Luxottica of America Inc. also does business as EyeMed Vision Care, LLC.

31.    Defendant **EyeMed Vision Care, LLC** is a subsidiary of Luxottica of America Inc. and one of the largest vision insurance providers in the United States, serving 72 million members, and boasts America's largest vision network, controlling approximately 83 percent of optometrists.[23] EyeMed Vision Care, LLC is a Delaware limited liability company with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040.

32.    Defendant **Essilor International SAS** is a French simplified joint-stock company with its principal place of business at 147 rue de Paris 94220, Charenton-le-Pont, France. Along

---

[21] In addition to corporate-owned Pearle Vision locations, Luxottica of America Inc. controls the operations of its Pearle Vision franchisees, including as to the products and professional services that are provided to customers. Pearle Vision franchisees also must agree to utilize vendors, suppliers, and lab services that have been approved or required by Pearle Vision. *See* Defendant Luxottica of America Inc.'s Motion to Dismiss in *Brave Optical, Inc., et al. v. Luxottica of America, Inc. f/k/a Luxottica Retail North America*, No. 1:23-cv-00793 (S.D. Ohio Feb. 20, 2024) (D. 19).

[22] EssilorLuxottica's presence in North America includes 1,652 Sunglass Hut stores, 1,014 LensCrafters stores, 574 Target Optical stores, 570 owned or controlled Pearle Vision stores, 187 Oakley Stores, 37 Ray-Ban stores, and 260 other physical locations which includes over 100 For Eyes stores. EL 2023 URD, at 12.

[23] David Balto, *Get Ready to Pay When One Company Dominates the Eyeglass Market*, The Hill (Nov. 28, 2017), https://thehill.com/opinion/healthcare/362146-getready-to-pay-when-one-company-dominates-the-eyeglass-market/ (hereinafter "Balto, *Get Ready*").

with Luxottica Group S.p.A. and GrandVision B.V., it is one of the three main subsidiaries of EssilorLuxottica S.A.[24] The same executives that control EssilorLuxottica S.A. and Luxottica Group S.p.A. also hold executive positions with Essilor International SAS: Milleri is the CEO and Director and DuSaillant and Grassi are both Directors.[25]

33.     Defendant **Vision Source, LLC** is a wholly owned subsidiary of Essilor Doctor Alliance Corporation ("EDA Corporation") which in turn is a subsidiary of Essilor International SAS. Vision Source has a network of approximately 4,500 independent optometrists that treat approximately 16 million patients annually. It is a leading optical retailer in the U.S. with 2,994 optometric locations and generates $2.938 billion in eyewear sales in 2023.

34.     Defendant **Essilor of America Inc.** is a subsidiary of Defendant Essilor International SAS. It is a Delaware corporation with headquarters at 13555 N. Stemmon Freeway, Dallas, Texas 75234. Essilor of America Inc. manufactures and distributes prescription optical lenses in the U.S. under the brands Varilux, Crizal, Xperia UV, Transitions, Optifog, Definity, Airwear, Nikon Eyes, and Kodak.

35.     Defendant **Essilor Laboratories of America, Inc.** is a subsidiary of Defendant Essilor of America, Inc., organized and existing under the laws of North Carolina, with headquarters at 13555 N. Stemmons Freeway, Dallas, Texas 75234. Essilor Laboratories of America, Inc. operates optical laboratories specializing in the production of optical lenses and sells optical lenses under the trade names Southern Optical Company and New City Optical, among others such as Walman Optical.

---

[24] EL 2023 URD, at 54.

[25] *Id.*

36.    Essilor International SAS exercises control over its domestic subsidiaries through the involvement of its employees in the operations and management of these subsidiaries. For instance, Sara Francescutto, who resides in Italy and serves as EssilorLuxottica's Head of Markets Business Controlling, is the CFO of several of its subsidiaries, including Essilor of America, Inc., Essilor Laboratories of America, Inc., EyeMed Vision Care, LLC, FGX International Inc., Luxottica of America, Inc., Vision Source and Frames for America, Inc. Similarly, Fabrizio Uguzzoni is the President of Wholesale at EssilorLuxottica North America; the President and a Director of Essilor of America, Inc. and Essilor Laboratories of America, Inc.; and a Director of Vision Source. Luca Marsura, EssilorLuxottica's Senior Director of Treasury for the Americas, is also the Treasurer of Essilor of America, Inc., FGX International Inc., Frames for America, Inc., Luxottica of America, Inc. and Vision Source. Millicent Knight, a Senior Vice President at EssilorLuxottica North America, also serves as a Director of Vision Source. Philippe Alfroid, a Director of Gentex Optics, Inc., lists his business address as the Essilor International headquarters in France.[26]

37.    Essilor International SAS's contacts with the United States and its control over its subsidiaries is also evident in the lawsuits and proceedings it has brought on behalf of its U.S. subsidiaries.[27] Furthermore, Essilor International SAS's U.S. subsidiaries also use Essilor's branding and logo.

---

[26] Gentex Optics, Inc. is a U.S. subsidiary of EOA Holding Co., Inc. and direct parent of Frames for America, Inc. Frames for America, Inc. has merged into Essilor of America, Inc.

[27] *See, e.g., Essilor International SAS and Essilor Manufacturing (Thailand) Co., Ltd. v. J.P. Morgan Chase Bank, N.A.*, No. 1:22-cv-03361-LJL (S.D.N.Y. 2022) (D.1, ¶ 1) (suit brought in Southern District of New York against J.P. Morgan Chase Bank, N.A. to recover $272 million of fraudulent transfers from an account of its subsidiary); *Essilor International, et al. v. JDP Holdings, LLC, et al.*, No. 20-cv-01159-SDM-AEP (M.D. Fla. May 19, 2020) (D. 1, ¶¶ 1-6) (suit

38.     Defendant **GrandVision B.V.** is a wholly owned subsidiary of EssilorLuxottica S.A. GrandVision is a Dutch private limited liability company with its principal place of business at Tower C, 6th floor, Evert van de Beekstraat 1-80, 1118 CL Schiphol, Netherlands. GrandVision is a global optical retailer with more than 7,200 stores worldwide. Acquired by EssilorLuxottica S.A. in 2021, GrandVision is one of the three main subsidiaries of EssilorLuxottica S.A., along with Luxottica Group S.p.A. and Essilor International SAS. EssilorLuxottica viewed "the integration of GrandVision [as] a major milestone in the completion of EssilorLuxottica's strategy."[28] In 2023, EssilorLuxottica touted that its direct-to-consumer activities continued to grow, driven by the optical business and the positive effects of the Group's strategy in connection with the acquisition of Grand Vision.[29] With the acquisition of GrandVision B.V., the Group's direct-to-consumer network includes approximately 18,000 stores worldwide.[30]

39.     Defendant **For Eyes Optical Company** ("For Eyes") is a Pennsylvania corporation headquartered at 285 W 74th Pl, Hialeah, Florida, 233014. Through its intermediate holding companies, GrandVision Retail Holding B.V. and GrandVision USA Retail Holding Corporation, Defendant GrandVision B.V. owns and controls Defendant For Eyes. For Eyes owns more than 100 retail optical stores throughout the United States. For Eyes's website notes the "high-range

---

in Middle District of Florida for patent infringement and breach of contract brought by Essilor International and its wholly owned subsidiaries); *Essilor International v. Maercks*, Notice of Opposition, USPTO Trademark Trial and Appeal Board Proceeding No. 91290222 (Mar. 8, 2024), at 6 and 17 (Essilor International filing as opposer to the registration of mark which it alleged was "deceptively similar" marks which it had continuously used in interstate commerce in the United States).

[28] EL 2023 URD, at 18.

[29] *Id.* at 46.

[30] *Id.* at 7.

quality eye care offered by Grandvision®, through FOR EYES®." For Eyes's website also touts its close relationship with GrandVision: "In December of 2015 we became a part of GRANDVISION® (part of the EssilorLuxottica Group) . . . . By being part of GrandVision®, For Eyes® is able to offer product assortments including prescription glasses, including frames and lenses, contact lenses and contact lens care products, as well as sunglasses, both plain and with prescription lenses."[31] The website offers for sale Premium Eyewear throughout the United States, including in this District.[32] Among the Premium Eyewear on For Eyes' internet site are "exclusive brands" from GrandVision such as DbyD, Unofficial and Seen, that "entered [EssilorLuxottica's] eyewear portfolio" when EssilorLuxottica acquired GrandVision N.V.[33]

40.    Defendants EssilorLuxottica S.A., Luxottica Group S.p.A., Luxottica of America Inc., EyeMed Vision Care, LLC, Essilor International SAS, Vision Source, LLC, Essilor of America, Inc., Essilor Laboratories of America, Inc., GrandVision B.V., For Eyes Optical Company, and all other subsidiaries that are owned or controlled by EssilorLuxottica S.A. are collectively referred to herein as "**EssilorLuxottica**."

41.    All the above-named defendants and all other subsidiaries that are owned and/or controlled by EssilorLuxottica S.A., operate as a single unit under the trade name "EssilorLuxottica", and are referred to collectively as the "EssilorLuxottica Group" in

---

[31] *See* Our Story, FOREYES, https://www.foreyes.com/about-us (last accessed Aug. 5, 2024)

[32] *See* Brands, FOREYES, https://www.foreyes.com/brands (last accessed Aug. 5, 2024).

[33] EL 2023 URD, at 42.

EssilorLuxottica S.A.'s 2023 Universal Registration Document.[34] For example, www.grandvision.com automatically redirects to the EssilorLuxottica website.

42.    EssilorLuxottica S.A. exercises ultimate control over the named defendants, among others, through its executives such as du Saillant, Milleri and Grassi.[35] For example, "[i]n close collaboration with Francesco Milleri and his teams, [du Saillant] is actively working on the integration and synergy plans of the three companies [*i.e.*, integrating Luxottica Group S.p.A., Essilor International SAS, and GrandVision B.V.]. He defines the Group's strategy with Francesco Milleri and ensures its execution and performance."[36]

43.    In their "message" to shareholders contained in EssilorLuxottica's 2023 Universal Registration Statement, Milleri and du Saillant have boasted about their "fully unified and integrated organization" and their "common culture and shared values, which will be woven into the fabric of EssilorLuxottica and everything we do."[37] Through its executives' direct oversight, EssilorLuxottica "oversees every aspect of both its lens and frame businesses, from production plants to prescription labs through to retail eyecare locations," allowing EssilorLuxottica to synergize operational methods and wield total control over its products and prices.[38]

---

[34] *See* EL 2023 URD, at 199, 257–61, 377, and 410.

[35] Other executives include, but are not limited to, Leonardo Maria Del Vecchio (who died in 2022), Luigi Francavilla, Massimiliano Mutinelli, and Niccolò Bencivenni.

[36] Paul du Saillant, ESSILORLUXOTTICA, https://www.essilorluxottica.com/en/governance/board-directors/paul-du-saillant/ (last accessed Aug. 5, 2024).

[37] EL 2023 URD, at 3.

[38] *Id.* at 32.

44.     EssilorLuxottica S.A. also shares a unified marketing strategy with its U.S. subsidiaries. For example, the websites of U.S. subsidiaries such as FGX International Inc. feature links to the "EssilorLuxottica" and "Essilor Group" websites. Furthermore, the "EssilorLuxottica" U.S. website does not distinguish between the international and domestic U.S. entities.

45.     The named defendants, along with their subsidiaries, also publish consolidated financial statements.

46.     Upon information and belief, at all relevant times Defendants and their divisions, affiliates, integrated enterprises, joint employers, subsidiaries, parents, principals, related entities, co-conspirators, authorized agents, partners, joint venturers, and/or guarantors, actual or ostensible, were alter egos.

47.     Upon information and belief, each and every one of the acts and omissions alleged herein were performed by, and/or attributable to, all Defendants, each acting as agents and/or employees, and/or under the direction and control of each of the other defendants, and that said acts and failures to act were within the course and scope of said agency, employment and/or direction and control.

48.     With respect to the anticompetitive scheme alleged in this Complaint, all Defendants operate together as a single commercial entity and act as agents of one another. Their collective goal is EssilorLuxottica's monopolization of the Relevant Markets and the collection of monopoly rents for the sale of its Premium Eyewear and Custom Lenses, both directly and through third-party channels.

## III.    Co-conspirators

49.     Various persons and/or entities not named as defendants participated as co-conspirators in the violations alleged in this complaint and performed acts in furtherance thereof.

For example, Plaintiffs allege *infra* that Defendants conspired with the Fashion Houses, Premium Eyewear Competitors, Third-Party Sellers, and Captive Optometrist Groups to fix prices through long-term exclusive licensing and anticompetitive sales agreements. These other entities facilitated, adhered to, participated in, aided and abetted, and otherwise acted in concert with Defendants in connection with EssilorLuxottica's monopolization of the Relevant Markets. Plaintiffs reserve the right to name some or all of these entities as Defendants.

50.    **Fashion House Co-conspirators**. Among these participating non-defendant co-conspirators are: Giorgio Armani S.p.A.; BBGI US, Inc. (formerly Brooks Brothers Group, Inc.); Brunello Cucinelli S.p.A.; Bulgari S.p.A.; Burberry Ltd.; Chanel Ltd.; Tapestry, Inc. (formerly Coach, Inc.); Dolce & Gabbana S.r.l.; Ferrari S.p.A.; Jimmy Choo Ltd.; Michael Kors, Inc.; Gianni Versace S.r.l; Moncler S.p.A.; Prada S.p.A.; Ralph Laurent Corp.; Swarovski AG; Tiffany & Co.; and Tory Burch LLC, among others ("Fashion House Co-conspirators").

51.    Fashion House Co-conspirators agreed to exclusive dealing contracts with EssilorLuxottica—anticompetitive agreements maintaining EssilorLuxottica's monopoly control of Premium Eyewear—in exchange for a share of the monopoly profits. Fashion House Co-conspirators have agreed to permit EssilorLuxottica to establish retail price floors, far above competitive levels, or otherwise eliminate retail price competition.

52.    **Premium Eyewear Competitor Co-conspirators**. These participating non-defendant co-conspirators include Kering S.A., Kering Eyewear S.p.A., LVMH Moët Hennessy Louis Vuitton SE, Thélios S.p.A, Marcolin S.p.A., Safilo Group S.p.A, Marchon Eyewear, Inc., and De Rigo S.p.A., among others ("Premium Eyewear Competitor Co-conspirators").

53.    Premium Eyewear Competitor Co-conspirators entered into unlawful, anticompetitive sales agreements with EssilorLuxottica, agreeing to permit EssilorLuxottica to

establish retail price floors or otherwise coordinating the retail price of their Premium Eyewear sold at both EssilorLuxottica's retail outlets and those of Premium Eyewear Competitors, far above competitive levels, thereby eliminating retail price competition. Fashion House Brand Co-conspirators and Premium Branded Eyewear Competitors Co-conspirators are aware of which Premium Eyewear brands are subject to such sales agreements with EssilorLuxottica by virtue of those brands' presence in the EssilorLuxottica retail and online stores, among other reasons.

54.    **Third-Party Seller Co-conspirators**. These participating non-defendant co-conspirators include third-party sellers that, in distribution agreements with EssilorLuxottica, agree to adhere to EssilorLuxottica's retail pricing decisions, discount prohibitions, and advertising restrictions; and agree to eliminate retail price competition for EssilorLuxottica's Proprietary Brands and Fashion House Brands ("Third-Party Seller Co-conspirators"). Third-Party Seller Co-conspirators include eyecare professionals within EyeMed's vision care network who have agreed to adhere to EssilorLuxottica's pricing constraints, discount prohibitions, and advertising restrictions; and to collect and share in EssilorLuxottica's monopoly profits for Premium Eyewear.

55.    **Captive Optometrist Groups**. These participating non-defendant co-conspirators include the Professional Eyecare Resources Cooperative ("PERC"), Infinity Vision Alliance ("IVA"), and Vision Source's group of supposedly independent optometrist who—through Vision Source—funnel their prescription lens orders to EssilorLuxottica labs. Captive Optometrist Groups, like the Third-Party Seller Co-conspirators, also agree to adhere to EssilorLuxottica's retail pricing decisions, discount prohibitions, and advertising restrictions; and agree to eliminate retail price competition for Premium Eyewear.

56.    Essilor of America owns a majority interest in PERC and IVA. PERC/IVA is a group purchasing organization comprised of approximately 4,000 doctors, from over 2,400

independent eyecare practices in the U.S. Through such ownership, EssilorLuxottica is well-positioned to exert further control over independent eyecare providers' ("IECPs") purchase of its frames and lens products. Through its ownership of Walman, EssilorLuxottica also owns and controls ADO, another IECP buying group that purchases EssilorLuxottica frames and lens products. Finally, EssilorLuxottica has an ownership interest in Opti-Port, yet another IECP buying group that purchases frames and lenses from EssilorLuxottica. EssilorLuxottica's continued ownership or control of IECP buying groups that purchase its own products has increased its ability to monitor, influence, or control IECP purchases of frames and lenses in the Relevant Markets.

57.    On information and belief, other corporations, partnerships, or business entities currently unknown to Plaintiffs, including the parents or subsidiaries of Fashion House Co-conspirators and Premium Eyewear Competitor Co-conspirators, are co-conspirators with EssilorLuxottica in committing the alleged unlawful conduct.

## JURISDICTION AND VENUE

58.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than 100 members of the class; and at least one member of the class is a citizen of a state different from that of one Defendant.

59.    This Court has jurisdiction over this action pursuant to Sections 3, 4, and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15(a), and 26, and Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1–2. Plaintiffs request declaratory and injunctive relief and seek to recover treble damages for injuries sustained by Plaintiffs and the Class resulting from Defendants' anticompetitive agreements and unlawful foreclosure of competition in the Relevant Markets that

maintained and enhanced Defendants' dominant position and monopoly power. Therefore, this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a).

60.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. §§ 1391 (b) and (c), because Defendants, themselves or through their owned or controlled subsidiaries and affiliates, transacted business and sold the products at issue throughout the United States including in this District; had substantial contacts within the United States, including this District; and engaged in anticompetitive conduct that was directed at and had a foreseeable, direct, and intended effect of causing injury to the business or property of persons throughout the United States, including this District.

61.     This Court has personal jurisdiction over Defendants because each, either directly or through the ownership and/or control of its subsidiaries (a) transacted business in the United States, including in this District; (b) directly or indirectly sold or marketed substantial quantities of Premium Eyewear and Custom Lenses throughout the United States as a whole, including this District; (c) had substantial aggregate contacts with the United States, including in this District; or (d) engaged in anticompetitive conduct that was directed at import trade and import commerce, or had a direct, substantial, reasonably foreseeable and intended effect of causing injury to Plaintiffs and the Class who reside in the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they have purposefully availed themselves of the laws of the United States.

62.     The United States is EssilorLuxottica's "largest market and deepest market".[39] Specifically, Defendant Luxottica of America Inc. serves as EssilorLuxottica's retail arm in the

---

[39] Transcript, EssilorLuxottica S.A. Capital Market Day (Sept. 25, 2019), https://bulletin.webull.com/20190925/150371684/280d82003afa601eb0910e0b09ffbcdb.

United States, doing business as LensCrafters, Pearle Vision, Target Optical, Sunglass Hut, Oakley retail stores, Ray-Ban retail stores, For Eyes, as well as owns e-commerce retail websites such as Glasses.com, Framesdirect.com, Ray-Ban.com, Oakley.com, SunglassHut.com, LensCrafters.com, and ForEyes.com. In addition, Defendant EyeMed Vision Care, LLC controls the largest vision care provider network in the United States. Through Luxottica of America Inc., EyeMed, and its other U.S. operations, EssilorLuxottica has built a dominant presence in both physical and online retail outlets in the United States. Through these retail outlets, EssilorLuxottica has sold Premium Eyewear and Custom Lenses to millions of class members at prices above competitive levels. Thus, Defendants' anticompetitive scheme to maintain a monopoly in the Relevant Markets has resulted in an adverse effect on the purchasers of Premium Eyewear and Custom Lenses in the United States.

### ESSILORLUXOTTICA'S MONOPOLISTIC SCHEME, ANTICOMPETITIVE AGREEMENTS, AND UNLAWFUL EXCLUSIONARY CONDUCT

63.     Luxottica Group S.p.A., the global eyewear conglomerate, was founded by Leonardo Del Vecchio in 1961. Del Vecchio aspired to dominate and monopolize every aspect of Premium Eyewear.

64.     Essilor International SAS, a French optical lens manufacturer, whose roots stretch to Parisian eyeglass assembly shops in the 1840s, was formed in 1972. Since then, Essilor has become the world's largest manufacturer of corrective lenses.

65.     In the last twenty-five years, both Luxottica and Essilor devoured the most fundamental elements of the eyewear industry—frame and lens manufacturing, distribution, lens lab processing, and, importantly, the retail chains and the brands.[40]

66.     In 2018, Essilor and Luxottica merged, forming EssilorLuxottica—a vertically integrated, multinational conglomerate that designs, manufactures, distributes, sets the prices for, and sells Premium Eyewear and Custom Lenses, and provides vision benefits to U.S. consumers. Luxottica's 2018 merger with Essilor fulfilled Del Vecchio's decades-long aspiration.[41] The merger created the world's largest eyewear company, with a broad geographic footprint and a firm grip on Premium Eyewear and Custom Lenses and whose market share continues to grow.

67.     EssilorLuxottica gained its monopoly in the Relevant Markets through a series of acquisitions, exclusionary agreements, minimum retail price maintenance agreements, and steering practices. The continuing rise in consumer prices for Premium Eyewear and Custom Lenses and the increase in EssilorLuxottica's profit margins reflect the diminished competition and the company's consolidated market power in those markets.[42] From 2021 to 2023 EssilorLuxottica's adjusted operating margin increased from 16.1% to 16.8%. Since

---

[40] Sam Knight, *The Spectacular Power of Big Lens*, THE GUARDIAN (May 10, 2018), https://www.theguardian.com/news/2018/may/10/the-invisible-power-of-big-glasses-eyewear-industry-essilor-luxottica (hereinafter "Knight, *Power of Big Lens*").

[41] *Id.*

[42] Balto, *Get Ready* ("Since Luxottica bought Ray-Ban almost 20 years ago, the average selling price has gone up, and so have Luxottica's profit margins.").

EssilorLuxottica was formed, its global gross profit has increased from a reported €10.2 billion ($11.06 billion) in 2018 to € 15.5 billion ($16.8 billion) in 2022.[43]

I.    **EssilorLuxottica has carried on its predecessors' practice of aggressively eliminating vertical and horizonal competition.**

68.    EssilorLuxottica's predecessors, driven by a desire for unchecked expansion, aggressively eliminated competition through strategic horizontal and vertical acquisitions. While Essilor expanded in the shadows, quietly consolidating lens manufacturing facilities and lens laboratories, Luxottica ruthlessly acquired the more visible segments of the eyewear industry—*i.e.*, Premium Eyewear manufacturing, distribution, and retail. Since the merger, EssilorLuxottica has continued this legacy of aggressive expansion by acquiring global competitors across the Premium Eyewear and Custom Lens supply chains to fortify its monopoly.

A.    **Luxottica Consumed the Premium Eyewear Market.**

69.    For over three decades, Luxottica pursued a comprehensive strategy to acquire direct competitors that designed, manufactured, distributed, and sold Premium Eyewear, consolidating and expanding its position in the industry.

i.    **Luxottica acquired some of the most recognizable Premium Eyewear Brands.**

70.    Luxottica began building its empire with its 1981 acquisition of Sferoflex. Luxottica then gobbled up Premium Eyewear brands in a successive fashion:

    a.  1990: Vogue Eyewear;

    b.  1995: Persol;

---

[43] Global Gross Profit of EssilorLuxottica from 2018 to 2022, STATISTA, https://www.statista.com/statistics/241586/global-gross-profits-of-luxottica/ (last visited Sept. 29, 2023).

    c.  1999: Ray-Ban;

    d.  1999: Arnette;

    e.  2007: Oakley;

    f.  2007: Oliver Peoples;

    g.  2013: Alain Mikli; and

    h.  2013: Starck Eyes.

71. Today, EssilorLuxottica owns over a dozen spectacle frame and sunglasses brands—many of which were former competitors. These brands include Alain Mikli, Arnette, Bliz, Bolon, Costa, DbyD, Luxottica, Molsion, Native, Oakley, Oliver Peoples, Persol, Ray-Ban, Seen, Sferoflex, Starck Biotech Paris, Unofficial, and Vogue Eyewear. EssilorLuxottica considers all these brands to be Premium Eyewear (collectively, EssilorLuxottica's "Proprietary Brands").

### ii. Luxottica seized some of the most well-known eyewear retail chains.

72. Luxottica entered eyewear retail in 1995 with its $1.4 billion hostile takeover of U.S. Shoe Corporation, owner of LensCrafters, which was at that time the single largest eyewear retail chain in the U.S.[44] with about 5.4 percent market share for all optical products.[45] Following the purchase, Luxottica broke up U.S. Shoe, spinning off its non-eyewear divisions until only LensCrafters remained. It then stocked LensCrafters with almost exclusively Luxottica frames.[46]

---

[44] Luxottica Equity Report, LUMOS RESEARCH, at 14 (Apr. 6, 2017), https://lumosresearch.files.wordpress.com/2018/02/luxottica-equity-report1.pdf (hereinafter "Lumos Luxottica"); Luxottica Group S.p.A. 2016 Form 20-F, at 20 (Apr. 28, 2017), https://www.sec.gov/Archives/edgar/data/857471/000104746917003023/a2231810z20-f.htm (hereinafter "Luxottica 2016 Form 20-F").

[45] John Tagliabue, *Luxottica to Acquire U.S. Shoe for $1.4 Billion*, NEW YORK TIMES (Apr. 18, 1995), https://www.nytimes.com/1995/04/18/business/luxottica-to-acquire-us-shoe-for-1.4-billion.html.

[46] Knight, *Power of Big Lens*.

73.    Six years later in 2001, Luxottica purchased Sunglass Hut for $653 million (including a $191 million debt assumption).[47]  Then, in 2004, Luxottica purchased Cole National Corp., the parent company of Pearle Vision and the third largest optical retailer in the U.S.,[48]  for $401 million.[49]  This acquisition also netted retail licensing for Target Optical and Sears Optical.[50] Luxottica promptly excluded competing frames from Pearle Vision, as it had done previously with LensCrafters.[51]

74.    Before its merger with Essilor, Luxottica systematically acquired a succession of successful eyewear retailers, both physical and online (collectively EssilorLuxottica's "Retail Outlets"):

  a.  1995: LensCrafters;

  b.  1999: Ray-Ban retail;

  c.  2001: Sunglass Hut;

  d.  2004: Cole National;

  e.  2004: Pearle Vision;

---

[47] *Luxottica Buys Sunglass Hut*, CNN MONEY (Feb. 22, 2001), https://money.cnn.com/2001/02/22/deals/sunglasshut/; *see also* Lumos Luxottica, at 14 (listing the total value of Luxottica's acquisition of Sunglass Hut, as of 2016, to be $669 million).

[48] *Cole National Corporation,* 2002 Annual Report and Form 10-K, at 1, 4 (June 10, 2003), https://www.sec.gov/Archives/edgar/vprr/0302/03021665.pdf.

[49] *Luxottica to Buy Parent of Pearle Vision for $401 Million*, NEW YORK TIMES (Jan. 27, 2004), https://www.nytimes.com/2004/01/27/business/company-news-luxottica-to-buy-parent-of-pearle-vision-for-401-million.html#:~:text=COMPANY%20NEWS%3B%20LUXOTTICA%20TO%20BUY,MILLION%20%2D%20The%20New%20York%20Times.

[50] Luxottica 2016 Form 20-F, at 20.

[51] Knight, *Power of Big Lens*.

f.   2004: Target Optical;

g.   2007: Oakley retail;

h.   2009 FramesDirect.com; and

i.   2014: Glasses.com.

75.    In line with its monopolistic goals, Luxottica leveraged its market dominance to restrict availability of Premium Eyewear and hike eyewear prices. For example, after acquiring Ray-Ban in 1999, EssilorLuxottica withdrew Ray-Ban eyewear from over 13,000 rival stores and significantly increased its price.[52]

76.    Luxottica's acquisitions were not without discord. As one former Luxottica manager put it, "it's all about domination." This domination, which drives EssilorLuxottica's current strategy, was also Luxottica's primary objective before the merger. Del Vecchio, the President of Luxottica and later EssilorLuxottica until his death in 2022, reportedly ruled by fear, and opticians have been reluctant to even say his name to reporters for fear of "getting a horse's head in the bed."[53]

77.    Luxottica infamously and ruthlessly made an example of Oakley in the mid-2000s. Oakley, then the world's hottest sunglasses brand and an important retailer, got into a pricing dispute with Luxottica, which had just purchased Sunglass Hut.[54] In the summer of 2001, Oakley sought to strike a deal with Luxottica, but Luxottica would not budge. A few months later, Luxottica stopped selling Oakley sunglasses at Sunglass Hut, which made up 25 percent of

---

[52] *Id.*

[53] *Id.*

[54] Sticker Shock.

Oakley's business.[55] Luxottica's retribution caused Oakley's stock price to plummet by 37 percent.[56]

78.    Luxottica then began producing and selling Ray-Bans with blue and green lenses that were virtually a carbon-copy of Oakley's trademark "Ice" and "Emerald" sunglasses.[57] Oakley sued, Luxottica denied wrongdoing, and the companies agreed to a settlement.[58]

79.    Following Oakley's run-in with Luxottica, it understood its precarious position compared to Luxottica. In one public filing, it admitted:

> Our sunglass specialty stores compete primarily with mall-based sunglass specialty retailers, the largest being *Sunglass Hut, which is owned by Luxottica, a competitor that is also our largest single customer*. . . . Luxottica is larger and has greater financial resources than we do.[59]

80.    Left with no choice, Oakley ultimately merged with Luxottica in 2007. As one reporter put it: Oakley "tried to compete and they lost and then [Luxottica] bought them."[60] Or as then Luxottica Chief Executive Officer Andrea Guerra ominously stated: Oakley "understood that life was better together."[61]

---

[55] Knight, *Power of Big Lens*.

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] Oakley, Inc. 2006 Form 10-K,  at 11 (Mar. 9, 2007), https://www.sec.gov/Archives/edgar/data/946356/000095013707003579/a28078e10vk.htm ("Oakley 2006 10-K") (emphasis added).

[60] Sticker Shock.

[61] *Id.*

### iii.   Luxottica spreads into vision benefits.

81.     Today, EssilorLuxottica also owns EyeMed, one of the largest vision health insurance providers. Luxottica first acquired EyeMed in 1998. In 2001, Luxottica further expanded its influence by acquiring EyeMed's competitor First American Health Concepts and integrating it into EyeMed, thereby reducing competition and significantly bolstering EssilorLuxottica's dominance in the vision benefits space.

### B.     Essilor sought to consolidate and dominate the market for Custom Lenses.

82.     Essilor started as an optical lens brand in France. It began buying up and assimilating its competitors in the 1990s. Today, EssilorLuxottica maintains a "global manufacturing network" that controls each step of lens production.[62] Indeed, EssilorLuxottica proudly refers to vertical integration of lens manufacturing as a "key pillar of Luxottica's business approach from the very beginning" and has carried forward that approach after the merger.[63]

### i.     Essilor becomes the global power in Custom Lens manufacturing.

83.     Essilor has long sought to control all aspects of lens manufacturing. In 1995, Essilor bought Gentex Optics, Inc., the world's then-largest designer and manufacturer of precision polycarbonate lenses. Following that, Essilor purchased, among others, the following:

  a.   2010: Shamire Optical Industry Ltd. (50 percent);

  b.   2010: Danyang ILT Optical Co., Ltd.;

  c.   2011 Wanxin Optics Co., Ltd.;

  d.   2012: Jiangsu Youli Optics. Co. Ltd. and Jiangsu Seeworld Optical Co. Ltd.;

---

[62] EL 2023 URD, at 6.

[63] *Id.* at 18.

e.  2013: Onbitt Co., Ltd.;

f.  2015: GKB Vision Pvt Ltd.;

g.  2016: Ningbo Exciton Technology Co. Ltd.; and

h.  2016: Jiangsu Creasky Optical Glasses Co., Ltd.

### ii.    Essilor spreads its control over lens processing laboratory services in the U.S and lens laboratory equipment.

84.    To achieve greater vertical integration, Essilor sought to control lens laboratories. Before the 2018 merger, Essilor controlled 40 to 50 percent of lens laboratories outside Europe. Essilor Lens Laboratories of America's U.S. lens labs generated approximately $1.488 billion in 2017 alone—more than four times the revenue generated by Essilor's closest competitor.[64] Further, Essilor's processing capacity dwarfed every competitor. In 2017, Essilor labs could process 87,500 lenses *daily* while its closest competitor could only manage 19,500.[65]

85.    Through successive acquisitions, by 2017, Essilor gobbled up previously independent lens laboratories throughout the United States: 21st Century Optical; ABBA Contact Lens; AccuRX Inc.; Advanced Optical; Apex; Aspen Optical; Balester; Barnett & Ramel; Bartley Optical; Beiter-McKee Optical; Bell Optical Labs; Bristow Optical; Brothers Optical; Central One Optical; Classic Optical; Collard Rose Optical; Crown Optical; CSC; Custom Eyes; Dash Lab; DBL Labs; Deschutes Optical; Duffens Optical; Dunlaw Optical; e.magine; East Coast Ophthalmic; Elite Optical; ELOA Boston; ELOA New Jersey; Empire Optical; Epic Labs; Eyecare Express; Focus Optical; Future Optical FL; Gold Optical; Gulf States Optical; Heard Optical; Hi-

---

[64] *Top Labs Earn High Marks in VM's Annual 'Checkup'*, VISION MONDAY, at 34 (Sept. 11, 2017), https://www.visionmonday.com/CMSDocuments/2017/09/VM_Top_Labs_2017.pdf ("VM 2017 Top Labs").

[65] *Id.* at 34, 38.

Tech; Homer Optical; iCoat; IcareLabs; Jorgenson Optical; Intestate Optical; Kosh Ophthalmic; LensTech; Meridian Optical; McLead Optical; MGM Optical; Midland Optical; Milroy; NEA Optical; New City Optical; Omega Optical; Omni Optical Lab; Optic Blue; Optical Suppliers Inc.; Optical Supply; Opti-Craft; Optogenics of Syracuse; Pech Optical; Perferx Optical; Plunkett Optical; Precision Optical Company; Precision Optics; Premier Optics; Professional Ophthalmic Labs; Reliable Optics; S&G Optical; Select Optical; Southern Optical; Spectrum Optical; Sunstar Optical; Sutherlin Optical; Tri-Supreme; Truckee Meadows; Twin City Optical; Vision Craft; Winchester; WOS Optical; Katz & Klein; Lenco; Optiport, LLC; Manhattan Lens Express; Prescription Optical; Sunland Optical; and the Lens Connection.[66]

86.     Post-merger, EssilorLuxottica has persistently expanded its lens laboratory network, notably with its 2021 acquisition of Walman Optical, which, before the acquisition, was the largest remaining independent lens laboratory.[67] Essilor expanded its reach beyond consolidating lens laboratory processing by acquiring Satisloh Holding AG, a leading supplier of prescription laboratory equipment, in 2008.[68]

### iii.     Essilor Acquires Optometric Groups.

87.     EssilorLuxottica also owns a significant number of group purchasing organizations, including Vision Source and PERC/IVA (collectively, "Captive Optometrist Groups").

---

[66] *Id.* at 34. Some of the Essilor labs operating under the listed trade names have since been closed.

[67] *See id.* at 36 (showing Walman Optical as the leading independent wholesale lab by 2017 sales at $180,000,000 and having a capacity to process 8,800 lenses daily).

[68] *Essilor to Acquire Satisloh*, VISION MONDAY (June 16, 2008), https://www.visionmonday.com/article/essilor-to-acquire-satisloh/.

88.     Vision Source is the largest optometry group in the U.S., describing itself as "a family of 3,000 locally-owned optometric practices and more than 4,500 doctors."[69] Those practices and doctors treat an estimated 16 million patients annually. EssilorLuxottica acquired these Captive Optometrist Groups in a coordinated flurry of acquisitions in 2015. Today, Vision Source is the largest optical retailer in the United States.

89.     In 2015, Essilor acquired PERC/IVA, a group purchasing organization comprised of approximately 4,000 doctors, from over 2,400 IECP practices in the U.S.[70] A year later, in 2016, Essilor acquired interest in yet another IECP buying group that purchases frames and lenses from EssilorLuxottica.[71] Through these acquisitions, Essilor, now EssilorLuxottica, has positioned itself to exert further control and influence over IECP's purchase of Premium Eyewear and Customer Lenses.

### iv.     Essilor lenses dominate the Custom Lens Market.

90.     EssilorLuxottica describes its massive portfolio of proprietary lenses, both created and acquired, as "unparalleled" and consisting of "the most loved" and "globally recognized

---

[69] What is Vision Source?, VISION SOURCE, https://visionsource.com/about/ (last accessed Aug. 5, 2024) (hereinafter "Vision Source About").

[70] *Essilor Acquires Professional Eyecare Resources Co-Operative(PERC)/Infinity Vision Alliance*, VISION MONDAY (Nov. 10, 2015), https://www.visionmonday.com/latest-news/article/essilor-acquires-professional-eyecare-resource-cooperativeperc-infinity-vision-alliance-1/#:~:text=Essilor%20Acquires%20Professional%20Eyecare%20Resource%20Co%2DOperativ e(PERC)/Infinity%20Vision%20Alliance&text=and%20Jessica%20Hall%2C%20VP%20Operat ions%2C%20PERC/IVA.

[71] *Essilor Acquires Opti-Port Alliance*, VISION MONDAY (Apr. 25, 2016), https://www.visionmonday.com/business/dba/article/essilor-acquires-optiport-alliance.

brands."[72] In addition to its own designs (Varilux, Crizal, Eyezen, Stellest, Xperio, and Optifog[73]), EssilorLuxottica has acquired brand after brand of lenses, including  Shamir Optical (obtaining a 50% stake in 2010 and the remaining 50% in 2022) and Transitions Optical, worn by over 60 million people worldwide (in 2014).

91.    EssilorLuxottica has strategically ensured control of important and well-known lens technologies—from sport offerings (*e.g.* Oakley) to light-adapting lenses (Transitions) to fog-free coatings (Optifog).[74] The Group also maintains licenses with the lens brands of Nikon, Kodak, and Satisloh.[75]

### C.    Post-merger, EssilorLuxottica continued its expansion in, and monopolization of, the Relevant Markets.

92.    In 2018, the merger of Essilor Luxottica gave rise to EssilorLuxottica, a colossal entity. This union perpetuated an unrelenting quest for acquisition, consolidation, and monopolization. To satisfy its appetite for dominance, EssilorLuxottica has extended its tentacles across the entire spectrum of the Premium Eyewear Market and Custom Lens Market.

///

---

[72] EL 2023 URD, at 38.

[73] *Id.* at 39.

[74] *Id.*

[75] *Id.* at 40.

i.     **EssilorLuxottica's acquisition of GrandVision broadens its brand and retail footprint.**

93.     In 2021, EssilorLuxottica purchased the giant Dutch eyewear retailer GrandVision for a reported $8.7 billion.[76] With its purchase of GrandVision, EssilorLuxottica expanded its collection of Premium Eyewear with the brands DbyD, Seen, and Unofficial.

94.     Acquiring GrandVision gave EssilorLuxottica control of more than 7,200 additional direct-to-consumer retail outlets globally and added over 100 For Eyes retail stores in the United States as well as foreyes.com, further cementing EssilorLuxottica's control and monopoly over of the Premium Eyewear Market.

ii.     **EssilorLuxottica further solidifies its monopoly in the Relevant Markets by expanding into other segments.**

95.     Despite EssilorLuxottica's already powerful control over Premium Eyewear and Custom Lenses, the conglomerate has extended its influence on other critical facets of the eyewear industry.

96.     EssilorLuxottica's 2019 acquisition of Barberini S.p.A. further solidified its stronghold on Custom Lenses by assimilating a key supplier of high-quality lenses to the world's most prestigious eyewear brands.[77] In 2022, EssilorLuxottica acquired Giorgio Fedon & Figli S.p.A., which produces and distributes spectacle cases and customizable eyewear accessories,[78] becoming one of the leading manufacturers of cases and accessories for Premium Eyewear. These

---

[76] Albertina Torsoli and Bloomberg, *Ray-Ban Owner will go Ahead with Pre-Pandemic $8.7 Billion GrandVision buy Despite Fight with Seller*, FORTUNE (Jun. 30, 2021), https://fortune.com/2021/06/30/ray-ban-essilorluxottica-merger-grandvision/.

[77] EL 2023 URD, at 40.

[78] *Id.* at 9, 16, 18, 28, 37.

acquisitions give EssilorLuxottica greater control over other elements of eyewear industry, namely, accessories, components, and lenses.

### iii.    EssilorLuxottica's acquisition and expansion of frame and lens manufacturing.

97.    EssilorLuxottica owns 48 mass production facilities—35 lens sites and 13 frame sites.[79] In 2023, these facilities produced a staggering 550 million prescription lenses and 112 million frames.[80] EssilorLuxottica bolstered this manufacturing dominance by strategically acquiring production facilities in nearly every corner of the world, including Fukui Megane in 2018[81] and Barberini in 2019.[82]

98.    EssilorLuxottica's history of buying manufacturing entities likely understates the company's command over lens and frame production sites, given the quantity and magnitude of Essilor's own facilities. Growth has not slowed since the Essilor-Luxottica merger. In 2023, EssilorLuxottica opened facilities in Rayong (Thailand) and Tijuana (Mexico); expanded its capabilities at plants in Agordo (Italy), Chihuahua (Mexico), and Paris (France); and further invested in Fukui Megane (Japan).[83] According to EssilorLuxottica, this manufacturing hegemony contributes to its "unrivalled ability to provide centralization for eyewear manufacturing."[84]

---

[79] *Id.* at 6.

[80] *Id.*

[81] Our History, ESSILORLUXOTTICA, https://www.essilorluxottica.com/en/group/history/ (last accessed Aug. 5, 2024).

[82] EL UDR 2023, at 33.

[83] *Id.* at 32.

[84] *Id.*

### iv. EssilorLuxottica's continued dominance of U.S. lens laboratories and lens processing.

99.    Upon merging, Essilor combined its network of lens laboratories with the Luxottica-owned Foothill Ranch, a giant laboratory in California. And EssilorLuxottica further expanded its U.S. laboratory footprint by acquiring competitor Walman Optical, previously the largest independent laboratory group remaining in the country, which operates 35 facilities nationwide.[85]   Today, EssilorLuxottica's ambition for "[d]irect oversight of the entire production platform" is reinforced by its ownership of 583 global prescription laboratories and edging-mounting facilities (79 Industrial, 504 Proximity Labs).[86] The company's ownership of corrective lens laboratories in the United States underscores its significant market presence in nearly every state, including Puerto Rico:

| Lab Name | City | State |
|---|---|---|
| Plunkett Optical | Fort Smith | AR |
| Bristow Optical | Tucson | AZ |
| Meridian Optical | Phoenix | AZ |
| Bartley Optical | Azusa | CA |
| Collard Rose Optical Lab | Whittier | CA |
| CSC Labs | Watsonville | CA |
| Elite Optical | Visalia | CA |
| Elite Optical | Rancho Dominguez | CA |
| Elite Optical | Sacramento | CA |
| Empire Optical | N. Hollywood | CA |
| iCoat | Sante Fe Springs | CA |
| Meridian Optical | San Diego | CA |
| Duffens Optical | Denver | CO |
| Walman | Denver | CO |
| Apex Optical | Winter Garden | FL |

---

[85] EssilorLuxottica to Acquire Walman, the Largest Independent Lab Group in the U.S., VISION MONDAY (Mar. 25, 2021), https://www.visionmonday.com/business/suppliers/article/essilorluxottica-to-acquire-walman-the-largest-independent-lab-group-in-the-us.

[86] EL UDR 2023, at 6, 32.

| | | |
|---|---|---|
| East Coast Ophthalmic | Jacksonville | FL |
| East Coast Ophthalmic | Jacksonville | FL |
| Future Optics Inc. | Clearwater | FL |
| IcareLabs | St. Petersburg | FL |
| Kosh Optical | Pompano Beach | FL |
| Milroy Optical | Tampa Bay | FL |
| Southern Optical | Norcross | GA |
| Optical Suppliers | Aiea | HI |
| Optical Suppliers | Hilo | HI |
| Pech Optical | Sioux City | IA |
| Walman | West Des Moines | IA |
| Custom Eyes | Rock Island | IL |
| Midland Optical | Chicago | IL |
| Walman | Champaign | IL |
| Walman | Milan | IL |
| Walman | Rockford | IL |
| Interstate Optical | Indianapolis | IN |
| LensTech | Greenwood | IN |
| Walman | Evansville | IN |
| Walman | Fort Wayne | IN |
| Walman | Indianapolis | IN |
| Duffens Optical | Lenexa | KS |
| Duffens Optical | Topeka | KS |
| Twin City Optical | Louisville | KY |
| Duffens Optical | New Orleans | LA |
| Gulf States Optical Lab | Jefferson | LA |
| ELOA Boston | Danvers | MA |
| Perferx Optical | Pittsfield | MA |
| Homer Optical | Silver Springs | MD |
| New City Optical | Baltimore | MD |
| Walman | Baltimore | MD |
| McLeod | Augusta | ME |
| Optical Supply | Grand Rapids | MI |
| Twin City Optical | Traverse City | MI |
| Walman | Jackson | MI |
| Walman | Traverse City | MI |
| Custom Eyes | Sauk Rapids | MN |
| DBL Labs | Saint Cloud | MN |
| Epic Labs | Waite Park | MN |
| Precision Optics | Saint Cloud | MN |
| Spectrum Optical | Sauk Rapids | MN |

| | | |
|---|---|---|
| Twin City Optical | Minneapolis | MN |
| Twin City Optical | Staples | MN |
| Walman | Bemidji | MN |
| Walman | Proctor | MN |
| Midland Optical | St. Louis | MO |
| Sutherlin Optical | Kansas City | MO |
| Twin City Optical | Billings | MT |
| Walman | Billings | MT |
| Southern Optical | Greensboro | NC |
| Southern Optical | Morrisville | NC |
| Twin City Optical | Bismark | ND |
| Walman | Fargo | ND |
| Walman | Minot | ND |
| Walman | Omaha | NE |
| ELOA New Jersey | Warren | NJ |
| Twin City Optical | Albuquerque | NM |
| Truckee - Sunstar Optical | Las Vegas | NV |
| Walman | Las Vegas | NV |
| 21st Century Optics, Inc. | Long Island City | NY |
| Advanced Optical | Rochester | NY |
| Optical Ventures dba Reliable Optics | Brooklyn | NY |
| Optogenics | Syracuse | NY |
| Tri-Supreme | Farmingdale | NY |
| US Optical | East Syracuse | NY |
| Winchester Optical | Elmira | NY |
| Bell Optical | Columbus | OH |
| Bell Optical | Twinsburg | OH |
| Central One Optical | Youngstown | OH |
| Classic Optical Laboratories | Youngstown | OH |
| Interstate Optical | Mansfield | OH |
| Select Optical | Columbus | OH |
| Top Network | Columbus | OH |
| Walman | Dayton | OH |
| Walman | Toledo | OH |
| Duffens Optical | Oklahoma City | OK |
| Dunlaw Optical | Lawton | OK |
| Opti-Craft | Portland | OR |
| Balester Optical | Wilkes Barre | PA |
| Beitler McKee | Pittsburgh | PA |
| Homer Optical | York | PA |
| New City Optical | Dunmore | PA |

| | | |
|---|---|---|
| Walman | York | PA |
| MGM Optical Lab | San Juan | PR |
| McLeod | Warrick | RI |
| Southern Optical | North Charleston | SC |
| Twin City Optical | Rapid City | SD |
| Walman | Sioux Falls | SD |
| Southern Optical | Bristol | TN |
| Southern Optical | Nashville | TN |
| Dash Lab | Lubbock | TX |
| Duffens Optical | Houston | TX |
| ELOA Executive | Garland | TX |
| Eyecare Express | Houston | TX |
| Omega Optical | Dallas | TX |
| Omni Optical | Beaumont | TX |
| Optic Blue | Lubbock | TX |
| Homer Optical | Virginia Beach | VA |
| New City Optical | Virginia Beach | VA |
| Southern Optical | Richmond | VA |
| Jorgenson-Peninsula Optical | Tacoma | WA |
| Vision Craft | Yakima | WA |
| Walman | Kent | WA |
| Walman | Green Bay | WI |
| Walman | La Crosse | WI |
| Walman | Madison | WI |
| Walman | Oak Creek | WI |
| WOS Optical | Green Bay | WI |
| Bell Optical | Kenova | WV |
| Twin City Optical | Casper | WY |

## II.    EssilorLuxottica imposes vertical and horizontal restraints on retail sale of Premium Eyewear.

100.    EssilorLuxottica's decades of mergers and acquisitions have positioned it atop a Premium Eyewear Market devoid of meaningful competition. In 2022, Francesco Milleri summed up EssilorLuxottica's position: "[b]ecause of our size, it's difficult to find the target to compete

with . . . ."[87] EssilorLuxottica has leveraged its size and dominance to impose vertical and horizontal restraints on the retail sale of Premium Eyewear to prevent price competition and extract monopoly prices.

### A.    EssilorLuxottica's Exclusive Licensing Agreements with Fashion Houses eliminate retail price competition in the Premium Eyewear Market.

101.    EssilorLuxottica produces and distributes Premium Eyewear for many top Fashion Houses in the world. It has exclusive rights to do so, and those rights are locked into long-term contracts that prevent any actual or potential rivals from acquiring rights to produce or distribute these well-known brands.

102.    In 1988, Luxottica began entering into exclusive licensing agreements with Fashion Houses for the design, production, wholesale distribution, and direct-to-consumer retail of Fashion House Brands. Since then, EssilorLuxottica has engaged in a never-ending effort to foreclose the Premium Eyewear Market through ultra-long term exclusive agreements. Luxottica's, and now EssilorLuxottica's, series of initial exclusive agreements include:

      a.    1988: Armani Group[88]

      b.    1992: Brooks Brothers[89]

      c.    1997: Bulgari[90]

---

[87] Transcript, EssilorLuxottica 2Q 2022 Management Call, at 10 (July 28. 2022), https://www.essilorluxottica.com/en/cap/content/106146/ (hereinafter "EL 2Q 2022 Call").

[88] *EssilorLuxottica and the Armani Group Announce 15-year License Renewal*, ESSILORLUXOTTICA (Sept. 14, 2022), https://www.essilorluxottica.com/cap/content/104580/ (hereinafter "EL – Armani Renewal").

[89] Luxottica 2016 Form 20-F, at 24.

[90] EssilorLuxottica 2022 Universal Registration Document, at 16 (Mar. 10, 2023), https://www.essilorluxottica.com/en/cap/content/101986/ (hereinafter "EL 2022 URD").

    d.   1999: Chanel[91]

    e.   2003: Prada Group[92]

    f.   2003: Versace[93]

    g.   2006: Dolce & Gabbana[94]

    h.   2006: Burberry

    i.   2007: Ralph Lauren[95]

    j.   2008: Tiffany[96]

    k.   2009: Tory Burch[97]

    l.   2012: Coach[98]

    m.   2015: Michael Kors[99]

    n.   2016: Ferrari[100]

---

[91] Luxottica 2016 Form 20-F, at 25.

[92] EL 2023 URD, at 43.

[93] *Id.* at 44.

[94] *Id.* at 43.

[95] *Id.*

[96] *Id.* at 44.

[97] Luxottica 2016 Form 20-F, at 27.

[98] EL2023 URD, at 43.

[99] Luxottica 2016 Form 20-F, at 25.

[100] *EssilorLuxottica Extends its Partnership with Ferrari, New License Agreement for Prancing Horse Brand*, ESSILORLUXOTTICA (Dec. 15, 2022), https://www.essilorluxottica.com/en/cap/content/104508/ (hereinafter "EL – Ferrari Agreement").

    o.  2022: Swarovski[101]

    p.  2022: Brunello Cucinelli[102]

    q.  2023: Jimmy Choo[103]

    r.  2023: Moncler (5-year agreement with option to renew additional 5-years)[104]

103. But for these agreements, the Fashion Houses could have competed with each other and EssilorLuxottica's Proprietary Brands or entered licensing partnerships with other eyewear companies that compete with EssilorLuxottica. Instead, the Fashion Houses have agreed to forgo their rights to independently manufacture and sell eyewear. Through these licensing agreements, Essilor Luxottica and the Fashion Houses have agreed to refrain from competing with one another in the Premium Eyewear Market.

104. EssilorLuxottica's exclusive licensing agreements with the Fashion Houses are all described as "exclusive, global contracts"[105] and are multi-year licenses for designing, manufacturing, wholesaling, pricing, and distributing the Fashion House Brands.[106] Although the Fashion Houses send early sketches of their new collections to EssilorLuxottica, EssilorLuxottica

---

[101] *Swarovski and EssilorLuxottica Announce a Ten-Year Licensing Agreement*, ESSILORLUXOTTICA (Dec. 6, 2022), https://www.essilorluxottica.com/en/cap/content/104516/.

[102] *Brunello Cucinelli and EssilorLuxottica, Together for the Next Ten Years*, ESSILORLUXOTTICA (Nov. 21, 2022), https://www.essilorluxottica.com/en/cap/content/114036/.

[103] *EssilorLuxottica and Jimmy Choo Announce a Ten-Year Licensing Agreement*, ESSILORLUXOTTICA (June 29, 2023), https://www.essilorluxottica.com/en/cap/content/124094/.

[104] *EssilorLuxottica And Moncler Announce an Exclusive Licensing Agreement*, ESSILORLUXOTTICA (Nov. 22, 2023), https://www.essilorluxottica.com/en/cap/content/153798/.

[105] EL 2022 URD, at 36.

[106] EL 2022 URD, at 56.

makes the final design decisions.[107] The agreements are so exclusive they even require the Fashion Houses themselves to buy their own eyewear products from EssilorLuxottica at wholesale.

105.    The exclusive licenses with the Fashion Houses bestow upon EssilorLuxottica the power to eliminate competition. These agreements, often extending from five to ten years and sometimes as long as fifteen years, preclude competitors or new entrants from negotiating with the Fashion Houses to distribute their eyewear brands.

106.    EssilorLuxottica maintains and perpetuates its exclusive licensing agreements with the Fashion Houses through successive renewals or entering into new agreements before the existing ones expire. EssilorLuxottica renews its agreements with Fashion Houses through renegotiation and not automatic renewal. By way of example, Bulgari allowed its exclusive licensing agreement with EssilorLuxottica to expire on December 31, 2023. The agreements EssilorLuxottica renegotiated anew include:

    a.    2013: Armani Group (10-year renewal)[108]

    b.    2014: Tory Burch (10-year renewal)[109]

    c.    2015: Burberry (10-year renewal)[110]

---

[107] *See* Andrew Goodman, *There's More to Ray-Ban and Oakley Than Meets the Eye*, FORBES (Jul. 16, 2014), https://www.forbes.com/sites/agoodman/2014/07/16/theres-more-to-ray-ban-and-oakley-than-meets-the-eye/?sh=548550b722cd.

[108] EL – Armani Renewal.

[109] *Luxottica and Tory Burch Renew Eyewear License Agreement*, BUSINESS WIRE (Dec. 19, 2014), https://www.businesswire.com/news/home/20141219005404/en/Luxottica-and-Tory-Burch-renew-eyewear-license-agreement.

[110] Monica Karski, *Luxottica and Burberry Renew Eyewear License Agreement*, FASHION NETWORK (Jul. 30, 2015), https://ww.fashionnetwork.com/news/luxottica-and-burberry-renew-eyewear-license-

    d.   2015: Dolce & Gabbana (10-year renewal)[111]

    e.   2015: Prada Group (10-year renewal)[112]

    f.   2016: Ralph Lauren (10-year renewal)[113]

    g.   2017: Tiffany (10-year renewal)[114]

    h.   2020: Chanel (new 5-year agreement with 3-year extension option)[115]

    i.   2020: Versace Group (new 10-year agreement)[116]

    j.   2021: Bulgari (3-year renewal)[117]

---

agreement,555423.html#:~:text=Italy's%20Luxottica%20and%20Britain's%20Burberry,extend%20to%20December%2031%2C%202025.

[111] *Luxottica Group and Dolce & Gabbana Renew Eyewear License Agreement*, VISION MONDAY (Dec. 18, 2015), https://www.visionmonday.com/latest-news/article/luxottica-group-and-dolceandgabbana-renew-eyewear-license-agreement-1/.

[112] Monica Karski, *Luxottica and Prada Renew Eyewear License Agreement*, FASHION NETWORK (May 15, 2015), https://www.fashionnetwork.com/news/luxottica-and-prada-renew-eyewear-license-agreement,485947.html.

[113] *Luxottica Group and Ralph Lauren Renew Eyewear License Agreement*, VISION MONDAY (Dec. 28, 2016), https://www.visionmonday.com/style/brands-and-designers/article/luxottica-group-and-ralph-lauren-renew-eyewear-license-agreement-1/.

[114] *Luxottica and Tiffany & Co. Strengthen Offering with Renewed Multi-Year Global License*, VISION MONDAY (Dec. 15, 2017), https://www.visionmonday.com/latest-news/article/luxottica-and-tiffany-and-co-strengthen-offering-with-renewed-multiyear-global-license-1/.

[115] Nicola Mira, *Luxottica Renews Eyewear license Contract with Chanel*, FASHION NETWORK (Oct. 24, 2019), https://ww.fashionnetwork.com/news/Luxottica-renews-eyewear-licence-contract-with-chanel,1150868.html.

[116] *Versace and Luxottica Group Renew License Agreement*, CAPRI HOLDINGS LTD (Apr. 10, 2020), https://s22.q4cdn.com/557169922/files/doc_news/2020/04/Versace-and-Luxottica-Group-Renew-License-Agreement.pdf.

[117] Nicola Mira, *Bulgari Extends Eyewear License with Luxottica to end 2023, eyes US, Asia Expansion*, FASHION NETWORK (Jul. 31, 2019), https://us.fashionnetwork.com/news/Bulgari-extends-eyewear-licence-with-luxottica-to-end-2023-eyes-us-asia-expansion,1125533.html.

k.  2021: Coach (5-year renewal with potential for 5-year extension)[118]

l.  2021: Tory Burch (new 10-year agreement)[119]

m.  2022: Ferrari (new multi-year agreement)[120]

n.  2023: Armani Group (15-year renewal)[121]

o.  2024: Dolce & Gabbana (new 16-year agreement)[122]

p.  2024: Michael Kors (5-year new agreement with option for 5-year extension, effective January 1, 2025)[123]

107.    By providing EssilorLuxottica with exclusive manufacturing and distribution rights, these exclusive licenses empower EssilorLuxottica to restrict the output and raise the price of Fashion House Brands. The Fashion Houses have consented to allow EssilorLuxottica to set and maintain retail price floors or raise retail pricing far above competitive levels or otherwise eliminate retail price competition.[124]

---

[118] *EssilorLuxottica and Coach Renew Global License Agreement*, ESSILORLUXOTTICA (Jun. 25, 2021), https://www.essilorluxottica.com/cap/content/110356/.

[119] *EssilorLuxottica and Tory Burch Renew License Agreement*, ESSILORLUXOTTICA (Jun. 21, 2021), https://www.essilorluxottica.com/en/cap/content/110566/.

[120] EL – Ferrari Agreement.

[121] EL – Armani Renewal.

[122] *EssilorLuxottica and Dolce & Gabbana Announce 16-Year License Renewal*, ESSILORLUXOTTICA (Mar. 7, 2024), https://www.essilorluxottica.com/en/cap/content/170942/.

[123] *EssilorLuxottica and Michael Kors Announce Extended Licensing Partnership*, ESSILORLUXOTTICA (Feb. 21, 2024), https://www.essilorluxottica.com/en/cap/content/170044/.

[124] Goodman, *More to Ray-Ban and Oakley*.

108.    In return, EssilorLuxottica agrees to share its supracompetitive monopoly profits with the Fashion Houses. It pays, among other monetary payments, royalties ranging from 6 to 13 percent to the Fashion Houses for the sale of Premium Eyewear under Fashion House Brands.[125]

**B.    EssilorLuxottica's sales agreements with Premium Eyewear Competitors restrict retail price competition for Premium Eyewear Competitor Brands.**

109.    EssilorLuxottica has also entered into sales agreements with Premium Eyewear Competitors. Under these agreements, EssilorLuxottica controls the sale and pricing of Premium Eyewear Competitor Brands in EssilorLuxottica owned and controlled retail outlets.

110.    For example, Kering Eyewear S.p.A.'s Balenciaga, Chloé, Gucci, Maui Jim, and Saint Laurent brands are sold at EssilorLuxottica's retail stores like Sunglass Hut and LensCrafters. So are Marcolin S.p.A.'s Tom Ford brand and LVHM/Thélio's Dior, Fendi, Celine, Loewe, and Bulgari brands.

111.    These sales agreements also grant EssilorLuxottica the authority to set prices for its competitors' products; establish retail price floors far above competitive levels; and otherwise provide the means for EssilorLuxottica to control, maintain, and inflate prices of Premium Eyewear sold at its retail outlets. They eliminate price competition, allowing EssilorLuxottica to raise its prices for its retail sales of not only these competitors' brands, but also its own Proprietary Brands and licensed Fashion House Brands.

**C.    EssilorLuxottica's distribution agreements with third-party sellers restrict retail price competition for Proprietary Brands and Fashion House Brands.**

112.    EssilorLuxottica authorizes only selected third-party retailers ("Third-Party Sellers") to sell its Proprietary Brands and licensed Fashion House Brands. Although these retailers

---

[125] EL 2022 URD, at 56.

should compete directly with EssilorLuxottica's owned and controlled retail outlets, EssilorLuxottica controls the retail price of those products through its distribution agreements with Third-Party Sellers.

113.    EssilorLuxottica's distribution agreements contain limiting terms and conditions including most-favored-nation, or MFN clauses, which prevent Third-Party Sellers from discounting EssilorLuxottica's Proprietary Brands and Fashion House Brands. These MFN agreements restrict price competition and allow EssilorLuxottica to maintain supracompetitive prices. Monopolists like EssilorLuxottica often use MFN provisions to lock down their market dominance. Having acquired market power, monopolists prevent competition by prohibiting any actual or potential competitors from undercutting them on price. EssilorLuxottica has employed this strategy through its MFN agreements with Third-Party Sellers.

114.    EssilorLuxottica has imposed retail price floors as part of so-called "brand protection guidelines" and has zealously enforced those price floors against sellers who dare to price below the levels EssilorLuxottica sets. Luxottica CEO Stefano Grassi stated in 2018:

> The third aspect that is important to remember and it is not new to you is the continued and relentless effort to clean up the market from the actions of clients that are not adhering with our brand protection guidelines. And you know how strict and diligent we have been in implementing policies like this in [various parts] of the world.[126]

115.    Through these agreements, which are sometimes communicated verbally, EssilorLuxottica maintains and enforces retail pricing requirements[127] that must be followed for

---

[126] Transcript, Luxottica 1H 2018 Results Call, at 8 (July 23, 2018), https://www.essilorluxottica.com/en/cap/content/123652/ (hereinafter "Luxottica 1H 2018").

[127] French Competition Authority Decision 21-D-20 (July 22, 2021) (hereinafter "FCA 21-D-20").

all of its Premium Eyewear. These pricing agreements prohibit pricing discounts and promotional pricing and restrict price advertising on Proprietary Brands and Fashion House Brands.

116.    EssilorLuxottica strictly monitors and enforces its pricing requirements by policing and punishing Third-Party Sellers who fail to obey them by, for example, delaying deliveries or withdrawing authorization to sell EssilorLuxottica's products.[128] Because EssilorLuxottica's portfolio encompasses most of the biggest and most recognizable eyewear brands, sellers have no real choice: comply with the price floors or lose essential product lines.

117.    Because third-party retailers need EssilorLuxottica's Proprietary Brands and Fashion House Brands, EssilorLuxottica can dictate the retail price of those products when sold by Third-Party Sellers. This permits EssilorLuxottica to establish retail price floors far above competitive levels and otherwise eliminate retail price competition. EssilorLuxottica dictates supracompetitive retail prices and eliminates retail price competition for its Proprietary Brands and Fashion House Brands sold by Third-Party Sellers.

118.    EssilorLuxottica vigorously enforces these price floors as Minimum Advertised Prices to "clean up the market"—*i.e.*, prevent competition.[129] As with brand protection guidelines, EssilorLuxottica's use of Minimum Advertised Prices prevents price competition among sellers and allows EssilorLuxottica to continue to charge supracompetitive prices.

119.    These MFN agreements and minimum advertised price restrictions impose horizontal and vertical restraints on trade because EssilorLuxottica is vertically integrated. Third-

---

[128] Luxottica 1H 2018, at 14 ("So, the number of doors that we have is probably slightly declining because we are going through the selection process of making sure that our clients adhere with our commercial policies. So whenever there isn't that compliance, we go through a decline of our doors over there. So the numbers there are slightly declining").

[129] *Id.*

Party Sellers are restrained from horizontally competing with EssilorLuxottica's retail outlets, such as Target Optical, LensCrafters, Pearle Vision, For Eyes, and Sunglass Hut. They are also vertically restrained by their supplier EssilorLuxottica, particularly in their ability to discount or promote discounts. The MFN agreements therefore also operate as minimum resale price maintenance agreements.

### D.    EssilorLuxottica imposes retail price controls on Premium Eyewear through EyeMed.

120.    As described above, EssilorLuxottica uses agreements with its horizontal competitors to fix Premium Eyewear prices. But it does not stop there: the company also imposes vertical restraints through its vision benefits company, EyeMed.

121.    Optometrists participating in EyeMed's vision network—a whopping 83 percent of optometrists in the U.S.—must remain in "good standing" by, in part, "complying with all contractual commitments and policies" imposed by EssilorLuxottica through EyeMed.[130]

122.    One such policy EssilorLuxottica imposes on optometrists within EyeMed's network is a prohibition on discounts for "high-end brand" frames:

> **Designer frames that prohibit discounts.** Many high-end brands have restrictions on which frames can be discounted.[131]

The referenced "high-end brand" frames are Proprietary Brands, Fashion House Brands, and Premium Eyewear Competitors' brands.

---

[130] EyeMed July 2023 Provider Manual, at 4, https://web.archive.org/web/20230726024532/https://www.eyemedinfocus.com/wp-content/uploads/2023/05/April-2023-PM-Final-Clean-4.10.23.pdf (hereinafter "EM 2023 Manual").

[131] *Id.* at 39 (emphasis in original).

123.    Vision Source similarly requires the optometric practices within its network to abide by the retail price controls set by EssilorLuxottica on the sale of any Proprietary Brands, Fashion House Brands, and Premium Eyewear Competitors Brands.

124.    EssilorLuxottica implements and enforces this retail pricing control policy over Premium Eyewear through the retail price clauses contained in its anticompetitive agreements. Notably, EssilorLuxottica does not impose the same discount prohibition on value-priced mass consumer frames.

**E.    EssilorLuxottica exerts monopolistic control over Premium Eyewear.**

125.    Through its domination of the Premium Eyewear Market and its extensive web of exclusive licensing and sales agreements, EssilorLuxottica controls the prices of its Proprietary Brands, Fashion House Brands, and Premium Eyewear Competitors Brands, eliminating both intra-brand and inter-brand retail price competition. And because competing brands fear being dropped from EssilorLuxottica's retail stores, EssilorLuxottica can sustain its supracompetitive pricing. In return, Fashion Houses and Premium Eyewear Competitors share in EssilorLuxottica's anticompetitive profits from the sale of Premium Eyewear at artificially inflated prices.

126.    Once EssilorLuxottica gets its hooks into a competitor through an exclusive licensing agreement, the company makes it almost impossible to reestablish competition. For example, Prada, one of Luxottica's biggest licensors, left its exclusive license deal with Luxottica in 1999 and partnered with De Rigo to start a joint venture, Eyewear International Distribution S.A. ("EID"). EID tried to compete directly with Luxottica, but Luxottica's dominance drove EID to steep losses. In 2003, Prada returned to Luxottica, signing a 10-year exclusive licensing agreement. This new agreement even allowed Luxottica to exercise control over De Rigo: it prohibited De Rigo from distributing Prada eyewear and allowed Luxottica to require De Rigo to

continue to produce a "very, very small" amount of eyewear for the brand—under Luxottica's supervision.[132]

127.    During the Class Period, Defendants and their Co-conspirators had numerous opportunities to meet, discuss strategies, exchange competitively sensitive information and/or reach anticompetitive agreements under the guise of legitimate business interactions. For example, during the Class Period, executives from EssilorLuxottica, Fashion Houses, and Premium Eyewear Competitors attended Vision Expo, a major trade show and conference for the optical and eyewear industry held biannually in two major locations: New York City and Las Vegas. Attendees of Vision Expo include frame and lens manufacturers, eyecare professionals, eyewear distributors and retailers. EssilorLuxottica made its first appearance as a merged company at Vision Expo in 2021. President of Essilor North America Rick Gadd, President of Luxottica Wholesale Americas Fabrizio Uguzzoni, Chief Marketing Officer and Senior Vice President of Essilor Sherianne James, Vice President of Luxottica North America Wholesale Marketing Alessandro Mariani, Senior President of Essilor's ECP Sales Jessica Kozak, and Senior Vice President of Luxottica North America Optical Channel Sales Ludo Ladreyt all participated as speakers.[133] These trade shows provide opportunities for EssilorLuxottica, Fashion Houses, and Premium Eyewear Competitors to perform acts necessary for the operation and furtherance of their conspiracy to reduce output and/or maintain retail price floors for Premium Eyewear.

---

[132] *Prada Ends De Rigo Eyewear Venture, Signs 10-Year License with Luxottica*, WWD (Jul. 24, 2003), https://wwd.com/feature/prada-ends-de-rigo-eyewear-venture-signs-10-year-license-with-luxottica-724476-1909788/.

[133] Vision Expo Show Daily (2021), https://bt.e-ditionsbyfry.com/publication/?i=709204.

III.    **EssilorLuxottica engages in steering and exclusive conduct as part of an overarching scheme to monopolize the Custom Lens Market.**

128.    EssilorLuxottica's grip on all aspects of the lens industry—from manufacturers to finishing laboratories, from popular brands to the retail channels through which they are sold—leaves vanishingly little competition in the Custom Lens Market. Even if another company offers competing brands of custom lenses, they are likely finished at an EssilorLuxottica lab. EssilorLuxottica has nevertheless sought to eliminate any remaining competition through product steering and exclusive arrangements for the purpose of reducing choice and raising prices.

A.    **EssilorLuxottica uses EyeMed to steer 72 million patients to EssilorLuxottica-controlled eyecare professionals, laboratories, and products.**

129.    Through EyeMed, which Luxottica brought to the 2018 merger, EssilorLuxottica exercises control over a reported 83 percent of optometrists in the U.S.[134] Leveraging this control, the company has implemented policies to steer EyeMed's patients to lenses owned by EssilorLuxottica, manufactured in EssilorLuxottica's facilities, finished at EssilorLuxottica's lens laboratories, or some combination thereof.

130.    EyeMed steers patients to EssilorLuxottica's wholly-owned eyecare providers such as LensCrafters, Pearle Vision, Target Optical, glasses.com, lenscrafters.com, ray-ban.com, and targetoptical.com. Additionally, EyeMed drives patients to eyecare professionals with contractual obligations to offer, sometimes exclusively, EssilorLuxottica products and services. When EyeMed markets these eyecare providers' services to its insureds, it does not disclose their EssilorLuxottica affiliation.

---

[134] Balto, *Get Ready*.

131.    In exchange, these IECPs accept certain reimbursement rates from EyeMed and agree to certain contractual terms that benefit EssilorLuxottica. One of the policies EyeMed-participating IECPs must comply with to remain in "Good Standing" is the requirement that, "unless stated otherwise in their contracts," all EyeMed providers "must use our network labs or single vision In-Office Finishing program (if applicable) for all EyeMed member eyewear."[135] That network includes EssilorLuxottica owned labs such as Essilor Labs, Luxottica Lab Services, and Walman Optical Company (acquired by EssilorLuxottica in 2022).[136] Another policy provides that "[w]hen using the lab network for eyewear orders, you're required to order lenses listed in the Essilor or Luxottica Lab Services product catalogs for EyeMed when members use their funded benefits."[137]

132.    EyeMed actively promotes EssilorLuxottica's Premium Eyewear and Custom Lenses to consumers and incentivizes or requires its in-network providers to do the same, employs a tiered marketing strategy to further influence patient choices, and pushes a category of "PLUS Providers" with the promise of enhanced benefits and additional savings. PLUS providers are eyecare professionals that are owned by EssilorLuxottica, affiliated with Vision Source, or contractually bound to stock or promote EssilorLuxottica's Proprietary Brands and licensed Fashion House Brands.

---

[135] EM 2023 Manual, at 4, 68.

[136] *Id.* at 68.

[137] *Id.* at 69.

**B.    EssilorLuxottica has significant influence over patient lens choices through Vision Source.**

133.    For EssilorLuxottica, it is not enough to own and control a vast array of Premium Eyewear and optical lens brands, manufacturing facilities, laboratories, retail outlets, and other eyewear-related businesses. The company goes to considerable lengths to ensure consumers buy its brands at its retail stores and use its manufacturing and laboratory services.

134.    Vision Source, a wholly-owned EssilorLuxottica subsidiary, has a network of approximately 3,000 optometric practices and over 4,500 doctors that are financially incentivized to make their wholesale purchases through Vision Source.[138] These incentives include rebates and discounts for buying EssilorLuxottica frames and lenses, with higher purchases leading to greater "Loyalty Rebates" through Vision Source and its buying group.[139] Such rebates and discounts do not translate into lower retail prices for consumers, because, as discussed above, EssilorLuxottica imposes price floors to prevent price competition among retailers. Thus, in addition to sharing its monopoly profits with Fashion Houses and Premium Eyewear Competitors, EssilorLuxottica endeavors to do so with IECPs through Vision Source. Many Vision Source optometrists do not disclose their relationships with Vision Source and EssilorLuxottica. Instead, they hold themselves out as independent eyecare professionals.

---

[138] Vision Source About.

[139] 2024 Vision Source Elite Vendor Program, LUXOTTICA VISION SOURCE, at 2 (June 2024), https://visionsourceshowcase.luxottica.com/wp-content/uploads/Luxottica-Elite-Vendor-Program-Details-1.pdf (hereinafter "VS Elite Vendor Program").

C.    **EssilorLuxottica engages in exclusive arrangements with horizontal and vertical optical competitors.**

135.    Since 2011, Defendant Essilor of America, Inc. has been the "sole and exclusive" supplier of all "single vision and multi-vision lenses" for National Vision Holdings, Inc.[140] Vision Source and Luxottica of America, Inc. are the two largest U.S. optical retailers. National Vision Holdings is the third.[141] Collectively, EssilorLuxottica owns or controls the top three optical retailers, giving the company command over approximately $7.2 billion in annual optical lens sales. The 2011 exclusive lens supply agreement with National Vision Holdings, renewed successively in 2014, 2018, and 2022, is set to continue until May 2026.[142]

136.    In 2023, EssilorLuxottica and Eastman Kodak inked a "perpetual worldwide brand license agreement", effective on January 1, 2024. EssilorLuxottica had long held a licensing arrangement with Kodak that allows it to design, develop, manufacture, and distribute Kodak-branded optical products. The new licensing agreement grants EssilorLuxottica an exclusive and indefinite right to use the Kodak brand in optical products and services.[143]

---

[140] National Vision Holdings, Inc. 2017 Form 10-K, Ex. 10.29 (Mar. 8, 2018), https://www.sec.gov/Archives/edgar/data/1710155/000156761917002082/s001582x7_ex10-29.htm (hereinafter "NVH 201710-K").

[141] *VM's 2023 Top 50 U.S. Optical Retailers*, VISION MONDAY, at 20 (Jun. 2023), https://www.visionmonday.com/CMSDocuments/2023/06/vmtop50retailers_2023.pdf.

[142] *See* NVH 201710-K, Ex. 10.31; National Vision Holdings, Inc. 2018 Form 10-K, at 11 (Feb. 27, 2019), https://www.sec.gov/Archives/edgar/data/1710155/000171015519000016/nvhi201810-k.htm (hereinafter "NVH 2018 10-K"); National Vision Holdings, Inc. 2023 Form 10-K, at 12 and Ex. 10.26 (Mar. 1, 2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001710155/000171015523000011/eye-20221231.htm (hereinafter "NVH 2023 10-K").

[143] *EssilorLuxottica and Kodak Announce Perpetual Worldwide Brand License Agreement*, ESSILORLUXOTTICA (Jul. 27, 2023), https://www.essilorluxottica.com/cap/content/126228/.

IV.    **Foreign competition authorities have scrutinized and imposed penalties on EssilorLuxottica for similar anticompetitive and exclusionary practices.**

137.    Government regulators in France and Turkey have investigated and imposed fines on EssilorLuxottica for its abuse of market dominance, price-fixing, and other anticompetitive conduct.

A.    **The French Competition Authority fined Luxottica €125,174,000 for price fixing and prohibiting online sale of Premium Eyewear.**

138.    On July 22, 2021, France's Autorité de la concurrence, the French Competition Authority ("Autorité"), announced findings from an extensive investigation into first Luxottica's and then EssilorLuxottica's anticompetitive conduct affecting spectacle frames and sunglasses.[144] The Autorité cites "a body of serious, precise, and consistent evidence" of Luxottica's misconduct, including:

- "Luxottica had distributed so-called 'recommended' prices to its distributors and had encouraged them to maintain a certain level of retail sales prices for its products";

- "Luxottica entered into selective distribution contracts with its distributors which were interpreted as prohibiting certain pricing practices during retail sales";

- "Luxottica has imposed certain restrictions on its distributors regarding price advertising";

- "Luxottica . . . organized price monitoring, enlisting the help of its distributors" who acted as "price police" that spied on their distribution competitors and reported back to Luxottica if any competitors disobeyed Luxottica's pricing commands; and

- "Luxottica . . . intervened with distributors who did not apply its pricing instructions and sanctioned those who persisted in ignoring its incentives by

---

[144] FCA 21-D-20 ¶ 28 (defining investigation as related to eyeglass frame and non-prescription sunglass submarkets of broader eyewear market).

delaying deliveries to their stores, or by withdrawing the approval necessary for the distribution of certain of its brands."[145]

139.    The Autorité set forth in excruciating detail how the price maintenance scheme worked, drawing information from internal EssilorLuxottica documents, interview testimony by EssilorLuxottica witnesses, materials provided to the Autorité by EssilorLuxottica's Fashion House co-conspirators, and statements from opticians forced to comply with EssilorLuxottica's scheme.

140.    Luxottica's selective distribution agreements required retailers to adhere to fixed price levels, forbidding discounts and promotions that would reduce prices below Luxottica's set levels.[146] For example, a Luxottica supply agreement for Oakley stated: "Any form of advertising or other form of commercial communication, in particular, without limitation, by prospectus, poster or on the website, may only be carried out with the prior written consent of [Luxottica]."[147] A supply agreement for Persol echoed this requirement that Luxottica approve all advertising, and explained "[t]he sole purpose of the control thus carried out by Luxottica on the advertiser. . . is to verify the conformity of the project with the image of the Brand and the Products."[148] While the agreements claim not to restrict opticians' pricing decisions, Luxottica and the opticians mutually understood that discounting was prohibited.[149] This was evident when one retailer excluded Luxottica's brands from a "half price on frames" sale due to "a selective distribution contract not

---

[145] *Id.* at 5.  All quotations from Decision No. 21-D-20 hereinafter are translated from French.

[146] *Id.* ¶¶ 195–96.

[147] *Id.* ¶ 197.

[148] *Id.* ¶ 200.

[149] *Id.* at Table 43.

authorizing this type of operation [for Luxottica brands]."[150]  Luxottica's internal documents and interviews confirmed that they understood these provisions forbid sales.[151]

141.    The Autorité detailed how Luxottica initially disseminated its price-fixing commands to opticians in books of "recommended" prices but later shifted to shadowy pricing directives, such as imposing a fixed multiplier on wholesale prices to determine retail prices, and even resorted to verbal communications of pricing instructions.[152]  As one optician explained to the Autorité: "The prices of the frames that we display correspond to the prices recommended by the suppliers . . . In reality these are *recommended coefficients*, which are *indicated verbally*."[153]

142.    This shift shows that Luxottica knew its price-fixing activities were illegal and tried to conceal its price-fixing. The commercial director of Luxottica France admonished a sales representative to "contact [an] optician" about price demands "ONLY BY TELEPHONE," and instructed the representative to "DELETE ALL YOUR E-MAILS ON THIS SUBJECT ASAP."[154] Nevertheless, the Autorité uncovered Luxottica emails that expressly referred both to "fixed price[s]"[155] and to Luxottica's knowledge that "[a]ny . . . attempt to impose . . . sales prices is comparable to an anti-competitive agreement."[156]

---

[150] *Id.* ¶ 228.

[151] *Id.* ¶¶ 234–41.

[152] *Id.* ¶¶ 173–77 & Tables 24 & 25.

[153] *Id.* at Table 24.

[154] *Id.* ¶ 317.

[155] *Id.* ¶ 193.

[156] *Id.* at Table 27.

143.     The Autorité's investigation revealed that these "recommended" prices were actually mandatory. An optician reported that "[w]e know that if we do not respect the recommended prices our stores will have problems in their relations with manufacturers (in terms of orders, opening accounts)."[157]  Luxottica stringently enforced these pricing policies, employing secret shoppers to verify that retailers did not offer discounts and enlisting the help of its retailers to "fight against abuses,"[158] which meant informing on competitors who bypassed Luxottica's pricing commands.[159]  As one independent optician stated:

> [O]ur suppliers of . . . frames constantly monitor our selling prices
> [...] In this case, it concerns brands under contract, with selective
> distribution (Dior, Oakley, Prada, Bulgary (sic), Dolce & Gabanna
> (sic), brands owned by Luxottica and Safilo) [i.e., EssilorLuxottica
> brands]. These suppliers are generally helped in this by our optician
> competitors who carry out real price policing in our stores.[160]

144.     The Autorité determined that Luxottica used its supply agreements, which required opticians to adhere to Luxottica's fixed prices, to destroy competition, reduce output, and raise prices.

145.     First, the Autorité concluded that Luxottica used its supply agreements to destroy any price competition among opticians, citing a study that found that Luxottica's pricing commands were "aimed at maintaining a homogenous price within its distribution network."[161] That homogenous price reflected a steep overcharge: Luxottica prohibited opticians from offering

---

[157] *Id.*

[158] *See, e.g., id.* ¶ 312.

[159] *See, e.g.*, *id.* ¶ 295 and accompanying table.

[160] *Id.* ¶ 295.

[161] *Id.* ¶ 185 & Table 26.

sunglasses at less than 240 percent of the standard wholesale price at which Luxottica supplied the sunglasses to opticians.  It also prohibited opticians from selling spectacle frames for less than 280 percent of the wholesale price.[162] For some brands, the mark-up was even higher: the Sferoflex markup was 450 percent, for example.[163]

146.    Second, Luxottica used its pricing power to reduce output. A Luxottica France employee responsible for commercial relations with optician networks explained that its price-fixing efforts helped reduce output and thereby raise its margins: "Why sell [Ray-Bans] for €80 when you can very well sell it for €120? We could argue that we will sell more, but . . . on the other hand it is mathematical that with each glasses we lose 40 € margin!!"[164]

147.    Third, Luxottica used its pricing power to artificially inflate prices: as one optician explained, Luxottica "constantly monitor[s] our sales prices and *ask[s] us orally to raise them*, which we do under penalty of no longer being supplied."[165]

148.    These practices, the Autorité found, were "anti-competitive by their very purpose," had "serious[] . . . repercussions on end consumers, some of whom are captive and vulnerable," and "caused  certain damage to the economy, in particular to the extent that they affected well-known brands of frames and glasses, affected intra-brand competition for a long period, and concerned a significant proportion of distributors . . . ."[166]  The Autorité fined Luxottica

---

[162] *Id.* ¶ 183.

[163] *Id.* ¶ 184.

[164] *Id.* at Table 27.

[165] *Id.* at Table 25.

[166] *Id.* at 5 and ¶¶ 295, 312.

€125,174,000 (over $148.2 million at the time) for price-fixing and preventing pricing competition on all of its brands.[167] This fine redressed harm resulting from EssilorLuxottica's anticompetitive conduct in France, but EssilorLuxottica's internal emails uncovered in the Autorité's investigation confirm that Luxottica's price-fixing was not limited to France.[168]

### B. The French Competition Authority fined Essilor International SAS and EssilorLuxottica for discriminatory practices by hindering online lens sales.

149. On October 6, 2022, the Autorité issued a second decision finding that Essilor had, for over a decade, "abused [its] dominant position [in the market for corrective lenses] by implementing a discriminatory commercial policy aimed at hindering the development in France of online sales sites" that offered lenses and frames together in a "mixed or all-inclusive offer."[169] Essilor did not, the Autorité noted, offer any valid justification for its misconduct.[170]

150. The Autorité began its decision by noting the "successive connections marking the history of Essilor"[171] and acknowledging that, by virtue of its acquisitions, EssilorLuxottica "was in a dominant position on the French Market for the wholesale distribution of corrective lenses"[172]

---

[167] *Id.* at 7.

[168] *See id.* ¶ 193.

[169] Autorité de la concurrence, Decision No. 22-D-16 at 2 (Oct. 6, 2022).

[170] *Id.*

[171] *Id.* ¶¶ 42–48.

[172] *Id.* at 2.

across production, wholesale, and retail.[173]  The Autorité noted that many of EssilorLuxottica's online retail outlets offered only Essilor lenses to consumers.[174]

151.    The Autorité found that Essilor not only refused to deliver branded lenses to other online sellers but also prohibited them from using Essilor's trademarks and logos and from communicating about the origins of the lenses.[175]  This significantly harmed other burgeoning online lens retailers in France, where the Essilor name was well known to consumers. As one online retailer's president noted:

> French consumers only know the Essilor brand. There is not a customer who does not ask for the brand of glasses . . . if tomorrow I can put the Essilor brand on [my website], I will multiply the turnover by 6 or 7.[176]

In other words, EssilorLuxottica's exclusion of competing retail outlets from selling Essilor lenses caused those competitors to lose the business of 83 to 86 percent of potential French consumers.

152.    EssilorLuxottica's resistance to allowing third-party online retailers to sell Essilor lenses stemmed from concerns that discounting by competitors could force EssilorLuxottica to reduce its prices for its lens products.[177] One study commissioned by EssilorLuxottica warned of "a high probability that 'low cost' offers will develop and affect the market."[178]  Even competitors

---

[173] *Id.* ¶¶ 50, 52.

[174] *Id.* ¶¶ 74–75.

[175] *See generally id.* ¶¶ 109–250, 251–687.

[176] *Id.* ¶ 95.

[177] *Id.* ¶ 114 (describing internal EssilorLuxottica document that "identified online sales sites as a 'potential danger,' for the following reasons: 'different bias of Essilor: *the price, the discount,* the look'").

[178] *Id.* ¶ 115.

knew that EssilorLuxottica's supply restrictions were aimed at safeguarding profit margins against downward pricing pressures. As one would-be online competitor noted, one of the "main reasons" for EssilorLuxottica's refusal to supply Essilor lenses to online retailers is "the fear of seeing prices fall to the detriment of the margin of physical opticians initially, then that of manufacturers."[179]

153.    The Autorité concluded that EssilorLuxottica's misconduct was "of a certain seriousness, particularly since they took place in the public health sector," "caused certain damage to the economy," and enabled Essilor to ensure "the maintenance of high prices and limit the choice and information of consumers."[180]  It imposed a fine of €96,467,400 (or $95.6 million) on Essilor International SAS and EssilorLuxottica S.A., for hindering the development of online sales of corrective lenses in France.[181]

### C.    The Turkish Competition Board fined EssilorLuxottica for breaching merger commitments through bundling practices.

154.    On August 17, 2023, the Turkish Competition Board (the "Board") fined EssilorLuxottica €28.3 million (approximately $30.6 million) for monopolistic practices and for breaching the terms of its 2018 merger commitments.[182]

155.    When Essilor and Luxottica asked the Board to clear their proposed merger in 2018,[183] they promised that, as a merged entity, they would not enter into any *de jure* or *de facto* exclusive agreements with ophthalmologists that would limit ophthalmologists' ability to purchase

---

[179] *Id.* ¶ 118.

[180] *Id.* at 3.

[181] *Id.*

[182] Turkish Competition Authority ("TCA") Decision 23-39/749-259 (Aug. 17, 2023).

[183] TCA Decision 18-36/585-286 (Oct. 1, 2018).

competing products and would not bundle its products (*i.e.*, sunglasses, optical frames, and ophthalmic lenses).[184]

156.    In November 2021, the Board initiated an investigation into EssilorLuxottica on allegations that it was abusing its market dominance through bundling practices.[185] On August 17, 2023, the Board concluded that EssilorLuxottica bundled its supply of ophthalmic lenses with ophthalmic devices which resulted in *de facto* exclusivity and disincentivized ophthalmologists from purchasing ophthalmic lenses from the company's competitors. The Board further concluded that this exclusionary conduct constituted an abuse of EssilorLuxottica's dominant position and a breach of its merger commitments.[186]

## RELEVANT MARKETS

### I.    Relevant Product Markets.

157.    For antitrust purposes, there are two principal relevant product markets in which to evaluate Defendants' anticompetitive conduct: the market for the retail sale of Premium Eyewear ("Premium Eyewear Market") and the market for the retail sale of custom optical lenses inserted into both premium and non-premium branded eyewear ("Custom Lens Market"). Within the Premium Eyewear Market, there are two submarkets: (i) the submarket for premium spectacle frames and (ii) the submarket for premium sunglasses.

### A.    Premium Eyewear Market

158.     Within the eyewear industry, antitrust markets are delineated by consumer perceptions of the eyewear quality, its manufacturer, and the prestige of the brand. The boundaries

---

[184] *Id.* ¶ 158; *see also* TCA Decision 23-39/749-259.

[185] TCA Decision 21-51/709-M (Oct. 21, 2021).

[186] TCA Decision 23-39/749-259.

of the Premium Eyewear Market are established by fashion, designer, and famous eyewear brands; by the major frame-makers and -owners; and by the licensees of those brands. The uniqueness of Premium Eyewear Market is recognized by EssilorLuxottica, its competitors, the fashion media, and consumers. The products within the Premium Eyewear Market and the premium spectacle and premium sunglass submarkets are not sufficiently interchangeable with products in other segments of the eyewear industry to render a broader definition of the relevant market.

> ### i. EssilorLuxottica, its competitors, Fashion Houses, and consumers treat Premium Eyewear as a distinct product market.

159.    EssilorLuxottica and its competitors Safilo, LVHM/Thélios, Kering Eyewear, Marcolin, Marchon, and De Rigo recognize Premium Eyewear as distinct from other eyewear products.[187] For example, EssilorLuxottica identifies its Proprietary Brands and Fashion House Brands as fitting into several "brand" categories: lifestyle brand (Ray-Ban), sport and performance (Oakley, Costa, Bliz, and Native), high-end (Persol, Oliver Peoples, and Alain Mikli), streetstyle (Arnette), and fashion and luxury (Vogue, Molsion, Bolon, and other licensed Fashion House Brands).[188] But EssilorLuxottica also explains that all of the those brands compete in the "premium, high-end eyewear segment."[189] Indeed, EssilorLuxottica credits then-Luxottica with

---

[187] *See, e.g.*, Kering 2023 Universal Registration Document, at 40 (Mar. 29, 2024), https://www.kering.com/api/download-file/?path=KERING_2023_URD_EN_01eada3a94.pdf ("Kering 2023 URD").

[188] EssilorLuxottica 2023 Universal Registration Document, at 34 (Mar. 24, 2022), https://www.essilorluxottica.com/en/cap/content/101970/; (hereinafter "EL 2021 URD"); EL 2022 URD, at 34; EL 2023 URD, at 40.

[189] EL URD 2021, at 30;  EL 2022 URD, at 30; EL 2023 URD, at 35; *see also* Luxottica 2018 Annual Report, at 21 (Dec. 30, 2018), https://www.essiluxottica.com/en/cap/content/117976/ ("Luxottica is the ideal partner for fashion houses and stylists seeking to translate their style and values into successful premium eyewear collections."); EL 2022 URD, at 18;  EL 2023 URD, at 20 (describing the appetite for "luxury" and "high-quality premium branded eyewear.").

creating this distinctive market by "chang[ing] the way consumers used their glasses, evolving them from a necessary medical device into a fashion accessory and a symbol of personal style. Essentially, an entirely new 'eyewear' category was born."[190]

160.    EssilorLuxottica is not alone in recognizing the Premium Eyewear Market. Participants in this market sometimes use synonyms of "premium" to describe the market, such as "high-end," "fashion," "designer," or "luxury." Kering Eyewear explains that its eyewear brands—which include Linberg, Maui Jim, Gucci, Cartier, Saint Laurent, Bottega Veneta, Balenciaga, Chloé, Alexander McQueen, Montblanc, Dunhill, Alaïa, and Puma—are positioned in the "strategically important high-end eyewear segment."[191] For example, the eyewear brands Marcolin considers "luxury" or "fashion" eyewear to include Tom Ford, Tod's, Zegna, Emilio PUCCI, Bally, Max Mara and Sport Max, among others.[192] Similarly, LVMH/Thélios views its eyewear brands as "luxury," which include Dior, Fendi, Celine, Loewe, Givenchy, Stella McCartney, Kenzo, Bulgari, Tag Heuer, Fred, Barton Perreira, and Vuarnet.[193] And Safilo considers Boss, Carolina Herrera, Isabel Marant, Missoni, PORTS, Moschino, and Etro to be "fashion" and "luxury" eyewear.[194]

---

[190] EL – Armani Renewal.

[191] Kering 2023 URD, at 40.

[192] Marcolin S.p.A 2023 Annual Report, at 9 (Apr. 4, 2024), https://www.marcolin.com/wp-content/uploads/2022/11/Marcolin-Group_Financial-Statement-FY23_en.pdf.

[193] About Us, THÉLIOS, https://www.thelios.com/en-us/about-us (last accessed Aug. 5, 2024).

[194] Safilo Group S.p.A. 2023 Annual Report, at 34 (Mar. 22, 2024), https://downloads.ctfassets.net/cmstik7jzbvm/72MOLD3munD0rWO6s3A70Q/c4f345cc5c750a77e4b062c2a4143dcb/Annual_Report_2023_Safilo_Group_web.pdf.

161.    Consistently, the fashion press address EssilorLuxottica, Safilo, Marchon, De Rigo, Marcolin, and Kering Eyewear as the primary "specialist eyewear players" within the "premium eyewear market" and identify some, but not all, of the notable brands within this segment—*e.g.*, Persol, Ray-Ban, Chanel, Armani, Prada, Micheal Kors, Dior, Fendi, Celine, Marc Jacobs, Calvin Klein, Valentino, Salvatore Ferragamo, Chloe, Lanvin, Loewe, Carolina Herrera, Tom Ford, Balenciaga, Tod's, and Ermenegildo Zegna.[195]

162.    The market for Premium Eyewear also has distinct, targeted, customers who do not consider value-priced eyewear to be reasonably interchangeable with Premium Eyewear. EssilorLuxottica's targeted consumer demographic for its "premium eyewear" are consumers having higher levels or increasing levels of disposable income.[196] The customers in the value-priced eyewear space, by contrast, are much more price sensitive. For example, National Vision Holdings, which targets "value seeking" consumers, has noted that consumers in its eyewear market have "*lower income [and] rely on tax refunds to pay for eyewear*[.]"[197] Price sensitivity in the value-priced eyewear segment of the industry is so significant that, as National Vision reports, "delay[s] in the issuance of tax refunds can accordingly have a timing impact on [its] quarterly financial results in the first half of the year."[198] By contrast, EssilorLuxottica and its competitors in the Premium Eyewear sector serve customers that need not depend on tax refunds to be able to

---

[195] *See, e.g.*, Robin Mellery-Pratt, *A Closer Look at the $13 Billion Premium Eyewear Market*, BUSINESS OF FASHION (May 15, 2015), https://www.businessoffashion.com/articles/news-analysis/a-closer-look-at-the-13-billion-premium-eyewear-market/.

[196] EL 2022 URD, at 18; EL 2023 URD, at 20.

[197] NVH 2023 10-K, at 16 (emphasis added).

[198] NVH 2023 10-K, at 16, 51.

afford eyewear, as evidenced by the fact that neither EssilorLuxottica nor Kering, Safilo, Marcolin, LVHM/Thélios, Marchon, and De Rigo have expressed any concern that delayed tax refunds affect their quarterly financial results.

163.    Import prices of Italian-made eyewear, as a proxy for the Premium Eyewear Market, further indicate that Premium Eyewear is a distinct market separate and apart from all eyewear. In 2000, the average price for a dozen Italian frames was almost double that of frames from all countries combined; by 2024, this disparity grew, with the ratio climbing to 4.4 for plastic frames and more than 5 for frames made of other materials. When the prices of Italian-imported frames are excluded from these averages, the price disparity between Italian and non-Italian import frames would become even more pronounced.



**Figure 3**

164.    Most significantly, consumers of Premium Eyewear do not view value-priced eyewear as reasonable substitutes. Eyecare professionals frequently explain that they must carry Premium Eyewear brands, such as Ray-Ban, Oliver Peoples, Gucci, and Prada because, if they do not, their customers will switch providers rather than purchase the non-premium alternatives.

### ii.    Premium Eyewear are not reasonably interchangeable with value-priced, mass consumer spectacle frames and sunglasses.

165.    Affordable or value-priced eyewear is not an economic substitute for Premium Eyewear, since the latter is not reasonably, *i.e.*, sufficiently, interchangeable with affordable, value-priced, or otherwise non-premium-branded mass consumer eyewear, *i.e.*, prescription and non-prescription frames and sunglass frames. Premium Eyewear and value-priced eyewear are not equivalent to one another, nor are they reasonably interchangeable. Thus, brands that are specifically marketed as "affordable" eyewear, such as EssilorLuxottica's Foster Grant brand,[199] are not in the Premium Eyewear Market. Nor are the vast majority of eyewear brands offered by National Vision Holdings, Inc., owner of America's Best and Eyeglass World, which itself acknowledges that it "operate[s] within the value segment of the U.S. optical retail industry, which emphasizes price and value."[200]

166.    Notably, some well-known retailers do not fall within the Premium Eyewear Market. For example, neither EssilorLuxottica nor its primary competitors consider Warby Parker, a popular eyewear retailer, as a participant in the Premium Eyewear Market. As Kering Eyewear CEO and Chairman Roberto Vedovotto explained:

> Warby Parker, specifically, is a very successful company. They have done very well. They have disrupted a little bit the industry, but *they have, with*

---

[199] EL 2021 URD, at 30; EL 2022 URD, at 30; EL 2023 URD, at 35.

[200] NVH 202310-K, at 15; *see also id.* at 6, 9, 16, 47.

*all due respect, very little to do with luxury. . . . It's for a different consumer target that is not where we play. Plus, being connected with our brands in terms of style, in terms of what we propose to the market, we will never be into a situation to get towards those sort of potential competitors.*[201]

167.    Due to the actual and perceived distinctive characteristics of Premium Eyewear, there is no significant substitution between that market and other forms of eyewear. The prices of in-market products are not influenced or constrained by eyewear outside of this market. First, the retail price of value-priced eyewear is significantly lower than that of Premium Eyewear. As explained above, consumers of Premium Eyewear are willing to pay a higher price for these products because they reflect their style, individuality, and fashion sense and do not view more affordable value-price eyewear as interchangeable. Such significant price premium could not be sustained if there were meaningful cross-price elasticity. Second, Warby Parker's 2010 entry into the U.S. eyewear market has not affected EssilorLuxottica's pricing power over Premium Eyewear, which has remained consistently high since then, far above competitive levels.[202] This sustained pricing power is additional evidence revealing insignificant cross-price elasticity.

### iii.    Premium spectacle frames and premium sunglasses are distinct submarkets.

168.    Within the Premium Eyewear Market, there are two submarkets, each of which EssilorLuxottica has monopolized through its overarching anticompetitive scheme. Those are: (i) the submarket for premium spectacle frames and (ii) the submarket for premium sunglasses.

---

[201] Transcript, Kering Investor Day, at 14 (Jun. 7, 2018), https://www.kering.com/api/download-file/?path=Kering_Eyewear_Investor_day_June_2018_1ed407b859.pdf (emphasis added).

[202] Sticker Shock; Chavie Lieber, *Glasses can Have a Markup of 1,000%. Two Former LensCrafters Executives Revealed Why*, VOX (Mar. 6, 2019), https://www.vox.com/the-goods/2019/3/6/18253555/eyeglasses-cost-lenscrafters-essilor-luxottica (hereinafter "Lieber, *Markup of 1,000%*").

169.    The first relevant submarket is the market for **premium spectacle frames**. Spectacle frames refer to the frame device in which corrective lenses are mounted and worn to correct imperfections in consumers' vision.[203]

170.    The second relevant submarket is the submarket for **premium sunglasses**. Sunglasses are spectacle frames with non-prescription ("plano") lenses pre-inserted for the purpose of protecting one's eyes from the sun.[204] However, a person needing vision correction may order prescription lenses to be inserted into sunglass frames. Both non-prescription and prescription sunglasses fall into the same relevant submarket: any set of sunglass frames can be fitted with either plano lenses or ophthalmic lenses, so all premium sunglasses are reasonably interchangeable.

171.    Sunglasses and spectacle eyewear serve two distinct purposes—sunglasses serve the purpose of protecting eyes from the harmful effects of ultraviolet light while spectacle eyewear is the frame device that holds corrective lenses.

172.    As with Premium Eyewear described above, (a) EssilorLuxottica and its competitors recognize premium spectacle frames and premium sunglasses as distinct from each other, and as distinct from non-premium spectacle frame and sunglass products, respectively; (b) the markets for premium spectacle frames and premium sunglasses have distinct, targeted, customers who do not consider value-priced spectacle frames and sunglasses to be reasonably interchangeable with premium spectacle frames and premium sunglasses; and (c) due to the actual and perceived distinctive characteristics of premium spectacle frames and premium sunglasses,

---

[203] EL 2020 URD, at 16.

[204] *Id.* at 17.

there is no significant substitution between those submarkets and other spectacle frame and sunglass submarkets.

### B.    Custom Lens Market.

173.    Another relevant market is the market for the **custom lenses** that are manufactured, finished to match a specific consumer's vision-correction needs, and inserted to create a finished consumer eyewear product.

174.    The Custom Lens Market includes finished lenses for simple eyesight correction and semi-finished lenses for more complex prescriptions (like progressive lenses). It does not, however, include plano lenses that come in off-the-shelf sunglasses, or vision-neutral plano lenses that are inserted into frames for advertising or retail purposes, but later removed to accommodate optical lenses made to fit a specific consumer's specifications.

175.    The Custom Lens Market does not include contact lenses. Contact lenses are a distinct market. Unlike eyewear, contact lenses are not worn on the face, cannot be fitted into frames, and are not a fashion accessory or symbol of personal style. Furthermore, contact lenses and optical lenses, though sometimes used for the same purpose, are not reasonably interchangeable for antitrust purposes. Contact lenses can only be worn for limited periods, necessitating consumers to also have eyewear when contacts are not worn. Contacts also differ from sunglasses lenses as they don't offer brightness reduction or UV protection. Some consumers cannot wear contacts due to comfortability factors or health issues, such as severe allergies or dry eye syndrome. And some consumers, especially those who favor Premium Eyewear, prefer the aesthetic of glasses. Therefore, a small but significant non-transitory price increase in lenses would not cause consumers to switch from corrective lenses to contacts.

## II.      Relevant Geographical Market.

176.    The relevant geographic market is the United States. The Premium Eyewear Market and the Custom Lens Market operate on a nationwide basis. The majority of sales activities in these markets take place through nationwide channels, including EssilorLuxottica itself, nationwide retailers, and national distribution of the relevant products to other third-party retailers all of which maintain a strong online presence.

## ESSILORLUXOTTICA'S MONOPOLY POWER

177.    EssilorLuxottica has monopoly power in the Relevant Markets. It has the power to control prices and exclude competition and has done both throughout the United States.

178.    EssilorLuxottica's chokehold on the Relevant Markets results from the anticompetitive feedback loop it deliberately created by acquiring the most famous fashion and designer eyewear brands; hoarding lens brands, manufacturing facilities, and finishing laboratories; acquiring vision benefit companies and group purchasing organizations to enforce its monopolistic control across the market; and grabbing the most conspicuous aspects of the eyewear market, namely, well-established eyewear retail chains. As EssilorLuxottica Chairman and CEO Milleri explained during EssilorLuxottica's Capital Markets Day 2022:

> [EssilorLuxottica] [is] not just selling frames or lenses or machines or services, we are supplying most of the players in the market. And we don't supply just finished goods, we supply acetate, we supply lenses, when you buy Maui Jim's spectacular frames and lenses you buy Barberini, fully owned by [EssilorLuxottica]. And also the brands the luxury brands in the market, are using, as a key supplier, one of our companies, Fedon, and I can make hundreds of examples.
>
> So, you see that the value added of the market is created through the full interconnection from [EssilorLuxottica] to all players . . . . *We are*, in many parts of the world, *a proxy of the market*.[205]

---

[205] EL 2022 CMD, at 2–3 (emphasis added).

179.    There is both direct and indirect evidence of EssilorLuxottica's monopoly power in the Relevant Markets.

## I.    EssilorLuxottica has monopoly power in the Premium Eyewear Market.

180.    Direct evidence of a firm's monopoly power includes its ability to raise and maintain prices above competitive levels in the relevant market, restrict output, or exclude competition. Here, evidence for all three factors is present regarding EssilorLuxottica's monopoly power in the Premium Eyewear Market.

181.    First, EssilorLuxottica has the ability to significantly mark up the price of its Premium Eyewear, often by 1,000% and far higher above marginal costs, maintaining high profit margins without losing sales to competitors due to limited alternatives. A small, but significant, non-transitory price increase for EssilorLuxottica's Premium Eyewear would not cause EssilorLuxottica to lose sales to its competitors.

182.    EssilorLuxottica wields this pricing power over Premium Eyewear principally in its retail outlets. As of 2023, EssilorLuxottica owns 3,800 corporate-owned retail stores across North America and controls many other retail locations (such as the more than 450 Pearle Vision franchise locations). Additionally, it dictates pricing in thousands of other stores through Vision Source and ensures pricing adherence in EyeMed-controlled IECP offices and retailers—representing more than 83 percent of all optometry practices nationwide.[206]

183.    Through a series of acquisitions, mergers, and exclusive licensing deals, EssilorLuxottica has consolidated an astonishing array of premium brand eyewear within its control, removing any impetus for price competition among the brands. In all, EssilorLuxottica

---

[206] Balto, *Get Ready*.

owns or controls about three dozen brands of Premium Eyewear, including Alain Mikli, Arnette, Bliz, Bolon, Costa, DbyD, Luxottica, Molsion, Native, Oakley, Oliver Peoples, Persol, Ray-Ban, Seen, Sferoflex, Unofficial, Vogue Eyewear, Giorgio Armani, Emporio Armani, Armani Exchange, Brooks Brothers, Brunello Cucinelli, Burberry, Chanel, Coach, Dolce & Gabbana, Ferrari, Scuderia Ferrari, Jimmy Choo, Michael Kors, Moncler, Prada, Prada Linea Rossa, Miu Miu, Ralph Lauren, Polo Ralph Lauren, Ralph Eyewear, Chaps, Starck Biotech Paris, Swarovski, Tiffany, Tory Burch, and Versace.[207]

184.    Leveraging its wide retail network and its stable of Premium Eyewear, EssilorLuxottica not only sells its Proprietary Brands and licensed Fashion House Brands at elevated prices but also dictates the pricing for Premium Eyewear Competitor brands, thanks to its strategic licensing deals and sales agreements.[208]

185.    EssilorLuxottica's power to set prices is well-known and broadly acknowledged within the industry. One reporter has described Luxottica as "a price maker which means that *essentially [Luxottica] can set prices[.]*"[209] And as one Premium Eyewear competitor bemoaned: "[I]f you make glasses, you want to be in [EssilorLuxottica's] stores; and if you have stores, you want to sell Ray-Bans! *So [EssilorLuxottica] can set the prices as high as it wants*."[210]

186.    EssilorLuxottica also has the power to exclude competition in the Premium Eyewear Market. EssilorLuxottica unlawfully exercises that power by entering into ultra-long term

---

[207] *Eyewear*, ESSILORLUXOTTICA, https://www.essilorluxottica.com/en/brands/eyewear/ (last accessed Aug. 5, 2024).

[208] *See* Knight, *Power of Big Lens*.

[209] Sticker Shock (emphasis added).

[210] *Id.*

exclusive licensing agreements with the Fashion Houses, excluding would-be competitors from launching their own versions of eyewear under these famous brand names.

187.    Should Plaintiffs require or choose to prove EssilorLuxottica's market power through indirect evidence—that is, by alleging a relevant market and demonstrating the defendants' power within that market—there is ample indirect evidence to substantiate EssilorLuxottica's monopoly power in the Premium Eyewear Market.

188.    In 2022, Premium Eyewear generated approximately $7.9 billion in retail revenue in the United States, of which EssilorLuxottica captured 80 percent, or approximately $6.3 billion.[211] Its next closest competitor has only an estimated 10 percent market share of retail revenue in Premium Eyewear sales:

///

---

[211] Statista Luxury. If EssilorLuxottica acquires Marcolin, as expected, its stranglehold will rise to 85%, or $6.7 billion.



**Figure 4**

189.    The Herfindahl-Hirschman Index ("HHI") is a measure of market concentration ranging from near 0 (in a market with many players, each holding a small market share) to 10,000 (in a market with only one firm holding 100% of the market share). The higher an HHI, the more concentrated the market. Each time a firm is removed from the market—for example, each time EssilorLuxottica buys up a competitor—the HHI increases. The U.S. Department of Justice and the Federal Trade Commission consider a market where the HHI is between 1,000 and 1,800 to be moderately concentrated; and a market with an HHI above 1,800 to be highly concentrated, with presumptively anticompetitive effects. Owing to EssilorLuxottica's dominance of the market, the HHI in the Premium Eyewear Market is at least 6,550. If it succeeds in acquiring Marcolin, the

HHI will rise even higher to at least 7,350. The U.S. Department of Justice and the Federal Trade Commission presume that any market combination that increases the HHI by more than 100 points in an already highly concentrated market will substantially lessen competition.[212]

190.    EssilorLuxottica's retail market share for Premium Eyewear is even greater when demarcated by premium sunglasses, at approximately 90 percent, and is still huge for premium spectacle frames, at approximately 72 percent. As with the broader Premium Eyewear market, the HHI for premium sunglasses, having an HHI of 8,100, and premium spectacle frames, having an HHI of 5,184, is highly concentrated based on EssilorLuxottica's market share alone.

## II.    EssilorLuxottica's has monopoly power in the Custom Lens Market.

191.    There is direct evidence of EssilorLuxottica's monopoly power in the Custom Lens Market: EssilorLuxottica can profitably raise prices above competitive levels without suffering a corresponding loss in sales volume.

192.    A top-quality lens should cost "$1.25 apiece."[213] However, EssilorLuxottica's control over the lens manufacturing facilities allows it to charge supracompetitive prices for manufactured lenses. There are many waypoints in the Custom Lens Market—including manufacturing, wholesale distribution, laboratory finishing, and retail—at each step, a market participant can impose a price mark-up, supposedly to compensate for that participant's role in supplying lenses to consumers. Because EssilorLuxottica dominates manufacturing, wholesaling,

---

[212] 2023 Merger Guidelines, U.S. DEP'T OF J. AND FED. TRADE COMM'N, at 5–6 (Dec. 18, 2023), https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf.

[213] David Lazarus, *Glasses are Still too Damn Expensive*, LA TIMES (Jan. 11, 2022), https://www.latimes.com/business/story/2022-01-11/column-glasses-still-too-expensive; (hereinafter "Lazarus, *Still too Damn Expensive*"); *see also* Lieber, *Markup of 1,000%.*

domestic laboratory services, and retail of Custom Lenses, it can impose supracompetitive price increases multiple times to a single pair of lenses.

193.    EssilorLuxottica's dominance in global lens manufacturing allows it to raise the prices on lenses at the very start. Its ability to steer eyecare professionals to stock, market, and sell EssilorLuxottica lenses allows for additional excessive markups when it supplies its lenses to those eyecare professionals. Its control over most U.S. lens finishing laboratories means it can tack on another markup (even for competitors' lenses if they are processed at EssilorLuxottica's laboratories). Its ownership and control of a vast network of retail outlets where lenses are sold enables it to impose yet an additional markup at the point of sale. Consequently, a pair of lenses that should cost $2.50 are sold for much more: the average price without insurance for a pair of single vision lenses is $107, while progressive lenses typically cost up to $600.[214] That represents a markup ranging from 4,200 percent to an astonishing 24,000 precent.

194.    There are simply no substantial, material rivals to EssilorLuxottica's control of the market for Custom Lenses. Given its dominance in all facets of the Custom Lens market, a small, but significant, non-transitory price increase for EssilorLuxottica's Custom Lenses would not cause EssilorLuxottica to lose sales to its competitors.

195.    There is also indirect evidence of EssilorLuxottica's monopoly power in the Custom Lens Market. EssilorLuxottica owns, or owns the exclusive rights to, sixteen of the most popular lens brands: Barberini, Crizal, Essilor, Eyezen, Kodak Lens, Nikon, Oakley, Optifog, Ray-

---

[214] Accrue Savings, *Decoding Price Tags: How Much Will You Pay for Glasses?* (June 10, 2023), https://www.accruesavings.com/post/how-much-do-glasses-cost.

Ban, Shamir, Stellest, Transitions, Varilux, Xperio, eyexpert, iWear, and Humanware.[215] This stable of lens subsidiaries and affiliates gives EssilorLuxottica an estimated 42 to 45 percent of global market share for *all* corrective lenses used in eyewear.[216] But that is only part of the company's monopoly power. EssilorLuxottica also owns most optical lens manufacturers worldwide and 60 percent, if not more, of all lens laboratory processing capacity in the United States. This gives EssilorLuxottica a majority of revenue from sales of Custom Lens: in 2023, EssilorLuxottica branded lenses generated at least 52 percent of all custom lens retail revenue in the United States or $6.9 billion of the total $13.3 billion in retail revenue generated by custom lenses.[217]

## III.    EssilorLuxottica enjoys high barriers to entry in the Relevant Markets.

196.    Barriers to entry are high for any potential entrant into the Premium Eyewear Market and the Custom Lens Market, as they require economies of scale; significant capital; credit access; and extensive resources for manufacturing, production, distribution, retail facilities, and raw materials. Manufacturing alone is costly. For example, when Warby Parker, a value-priced eyewear company, constructed an optical lab in New York, it estimated the construction costs to be approximately $16 million.[218]

---

[215] *Eyecare*, ESSILORLUXOTTICA, https://www.essilorluxottica.com/en/brands/eyecare/ (last accessed Aug. 5, 2024).

[216] Distribution of the Corrective Lens Global Market as of 2019, By Company, STATISTA, https://www.statista.com/statistics/1087381/share-of-global-cardiovascular-market-bycompany/ (last accessed Sept. 9, 2023); Knight, *Power of Big Lens*.

[217] Statista Spectacle Lenses.

[218] Elizabeth Seyran, *Warby Parker Is Opening an Enormous New Optical Lab in*

197.    With the high costs of market entry and capital investment, new, smaller eyewear companies are plagued by their inability to access the necessary credit lines to meaningfully expand and are unable to grow in emerging and existing markets where large existing companies like EssilorLuxottica thrive. Indeed, the eyewear industry is "dominated by large groups" that have "left little space for independent players, which often lack the financial muscle and manufacturing prowess to compete."[219]

198.    Potential entrants face an additional hurdle because eyewear remains a mix of fashion and health care. As Marchon Senior Vice President Thomas Burkhardt explained, newcomers in the Premium Eyewear Market and Custom Lens Market find it difficult to break through on a meaningful scale because there "is still a vision care component that is an essential part of the experience" and consumers continue to "look for advice from trusted partners."[220]

199.    Premium Eyewear also faces another significant barrier to entry in building consumer brand awareness. It is not enough that a new entrant's eyewear serves the intended functionality of holding optical lenses. Rather, newcomers must devote significant time and resources to build their brand into a "desirable fashion accessory" with the perceived quality of the other players in the Premium Eyewear Market, including EssilorLuxottica. Indeed, consumers naturally gravitate towards brands they know and recognize, such as Chanel, Ralph Lauren, or

---

*Rockland County*, FAST COMPANY (June 27, 2016), https://www.fastcompany.com/4011943/warby-parker-is-opening-an-enormous-new-optical-lab-in-rockland-county.

[219] Martino Carrera, *Niche Italian Eyewear Brands Play by a Different Rulebook in Pandemic Aftermath*, WWD (Apr. 1, 2022), https://wwd.com/accessories-news/eyewear/niche-italian-eyewear-brands-know-covid19-aftermath-1235140868/.

[220] Misty White Sidell, *Why Eyewear is a Difficult Industry to Disrupt*, WWD (Mar. 22, 2019), https://wwd.com/accessories-news/eyewear/eyewear-difficult-industry-disrupt-1203086950/.

Gucci in the spectacle frame space; or to Ray-Ban or Oakley in the sunglass space; or to lens brands like Transitions, Crizal, or Varilux.[221] New entrants simply do not have immediate recognition as Premium Eyewear or Custom Lenses.

200.    The Premium Eyewear Market and Custom Lens Market, dominated by EssilorLuxottica, present formidable challenges for new entrants. Milleri, acknowledging the difficulty competitors face in matching EssilorLuxottica's scale, commented: "[b]ecause of our size, it's difficult to find the target to compete with."[222] The company's long-term exclusive licensing agreements with Fashion Houses further impede new competitors by preventing them from introducing price competition with established, well-known brands.

<strong>ANTICOMPETITIVE EFFECTS</strong>

201.    EssilorLuxottica's above-described conduct has had serious anticompetitive effects on competition in the Relevant Markets. As a result, Plaintiffs and the Class have paid supracompetitive prices for EssilorLuxottica's Proprietary Brands, licensed Fashion House Brands, Premium Eyewear Competitor Brands, and Custom Lenses.

202.    EssilorLuxottica, along with subsidiaries, affiliates, and entities controlled by EssilorLuxottica, willfully and unlawfully maintained its market power by orchestrating a comprehensive exclusionary strategy and overarching scheme to circumvent merit-based competition, with the  aim of eliminating, deterring, and mitigating price competition in the Relevant Markets. EssilorLuxottica carried out this scheme to perpetuate inflated prices in the Relevant Markets. These acts, in combination and individually, have the purpose and effect of maintaining or raising Premium Eyewear and Custom Lens prices at supracompetitive levels,

---

[221] *Id.*

[222] EL 2Q 2022 Call, at 10.

limiting consumer choice, disincentivizing product innovation, and otherwise imposing unreasonable restraints on competition in the Relevant Markets.

I.    **EssilorLuxottica's anticompetitive scheme allows it to raise prices above competitive levels in the Relevant Markets.**

203.    EssilorLuxottica has harmed competition by restricting Premium Eyewear competitors' ability to compete with EssilorLuxottica on the retail price of its Premium Eyewear through a multi-dimensional scheme comprised of a web of exclusive agreements, sales agreements, and distribution agreements; its vertical and horizontal retail price restraints; and its practice of steering supposedly independent eyecare providers and purchasers to its products. With functionally no retail competition, EssilorLuxottica has been able to charge supracompetitive prices for its Proprietary Brands and licensed Fashion House Brands, and for Premium Eyewear Competitor Brands it sells to consumers.

204.    First, publicly available information confirms that, from at least 2019, prices in the submarkets for Premium Eyewear are inflated by at least 1,000 percent, while the costs to produce and manufacture Premium Eyewear remain remarkably low over time. As one industry insider remarked, consumers could purchase "designer-quality frames, like what you'd get from Prada for $15."[223] Nevertheless, EssilorLuxottica's Premium Eyewear retail from approximately $250 up to a $1,000 a pair and even higher. For example, non-prescription Ray-Bans retail for hundreds of dollars, with some exceeding $1,000. Oliver Peoples non-prescription sunglasses sell at Sunglass Hut for anywhere between $400 and $1,750. Armani spectacle frames retail for $954 excluding lens costs. These prices, as well as those for all other Premium Eyewear brands owned or controlled by EssilorLuxottica, would fall precipitously in a competitive marketplace.

---

[223] Lazarus, *Still too Damn Expensive*; *see also* Lieber, *Markup of 1,000%*.

205.    EssilorLuxottica imposes supracompetitive retail prices in the Premium Eyewear Market without fear of losing market share because competitors *need* EssilorLuxottica's retail outlets to sell their Premium Eyewear. Additionally, independent retailers must offer EssilorLuxottica's Premium Eyewear to remain viable in the market. Fashion House Co-conspirators, Premium Eyewear Competitor Co-conspirators, and Third-Party Seller Co-conspirators recognize EssilorLuxottica's importance to the economic viability of their Premium Eyewear business, including the lack of alternative distribution and sales channels in the Premium Eyewear Market. This market dynamic empowers EssilorLuxottica to dictate exorbitant prices for its Premium Eyewear with little to no resistance from competitors. EssilorLuxottica's market influence is so strong that competitors seeking to challenge its position have only two outcomes: they are either absorbed by EssilorLuxottica, as demonstrated by the acquisition of Oakley, or they back down, like Prada.

206.    In the Custom Lens Market, EssilorLuxottica's stranglehold on nearly every step in the supply chain—from manufacturing to distribution to lens finishing—means that EssilorLuxottica can impose a supracompetitive markup at each step of the chain. As one industry analyst has observed:

> If Luxottica has spent the last quarter of a century buying up the most conspicuous elements of the optical business (the frames, the brands and the high-street chains), then Essilor has busied itself in the invisible parts, acquiring lens manufacturers, instrument makers, prescription labs (where glasses are put together) and the science of sight itself.[224]

Through dominance of manufacturing and supply channels, steering of consumers to its stores and brands, and other means, EssilorLuxottica ensures consumers are forced to pay supracompetitive

---

[224] Lieber, *Markup of 1,000%.*

prices for its Custom Lenses. EssilorLuxottica can raise Custom Lens prices without losing sales because consumers simply have no alternatives: whether because EssilorLuxottica owns or controls most manufacturing and laboratory facilities, or because it leverages its EyeMed and Vision Source assets to restrict consumer choice, consumers end up with EssilorLuxottica branded, manufactured, and/or finished lenses.

207.    One tactic EssilorLuxottica uses, in both Relevant Markets, to ensure consumers buy its supracompetitively priced products is so-called loyalty programs offered to IECPs. EssilorLuxottica incentivizes eyecare professionals to sell its Premium Eyewear by offering 3 to 5 percent "rebates" through its "EssilorLuxottica 360" program. These so-called rebates give IECPs strong incentives to push consumers toward EssilorLuxottica's Premium Eyewear: EssilorLuxottica pays participating providers $12.51 to $22.60 every time they sell Oakleys or Ray-Bans, for example; and up to $47.70 for selling high-end brands like Armani. Likewise, the company's "Essilor Experts" program pays IECPs each time they sell a consumer EssilorLuxottica Custom Lenses. The IECP earns 25 "points" per sale and can cash in 25 points for a $1 rebate. Put differently, EssilorLuxottica pays IECPs $1, on top of their margins, for selling EssilorLuxottica lenses. Vision Source's "Elite Vendor Program" similarly provides IECPs with "loyalty" and other rebates and discounts to prioritize selling Proprietary Brands and Fashion House Brands EssilorLuxottica controls. Like other resale obligations described above, IECPs also "must be in 'good standing' at all times determined by [Essilor]Luxottica" to receive these benefits, and "all benefits and discounts are subject to change at [Essilor]Luxottica's sole discretion."[225]

208.    These rebates are essentially kickbacks—EssilorLuxottica is "sharing" its exorbitant monopoly profits with IECPs in order to maintain its unlawful monopoly.

---

[225] VS Elite Vendor Program.

EssilorLuxottica contends these programs offer a way to save IECPs and consumers money on Premium Eyewear. But these savings are necessary only because EssilorLuxottica's anticompetitive scheme raised prices to supracompetitive levels in the first place. Such practices, far from being purely for market efficiency, are designed to maintain supracompetitive prices and reward volume sales of EssilorLuxottica products, effectively excluding competition and fixing retail prices to include a margin for these kickbacks.

II.    **EssilorLuxottica's anticompetitive scheme allows it to restrict output and limit consumer choice in the Relevant Markets.**

209.    EssilorLuxottica's anticompetitive scheme also limits the number and variety of Premium Eyewear products available to consumers. Through exclusive licensing agreements, EssilorLuxottica prevents Fashion Houses from distributing or otherwise wholesaling their own Premium Eyewear to independent, third-party retailers, who might, in turn, compete with EssilorLuxottica's retail pricing of those products. By foreclosing access to Premium Eyewear products, suppliers, distributors, and brands, EssilorLuxottica has limited the output, distribution, and availability of those products.

210.    Through its ownership and control of optical lens brands, manufacturing facilities, lens finishing laboratories, retail outlets, and other eyewear-related businesses, EssilorLuxottica has steered millions of patients to its own Custom Lenses and laboratory services and ensured that a substantial number of Custom Lens sales are funneled to EssilorLuxottica. Consumer choice has been further limited because competitors disadvantaged by EssilorLuxottica's anticompetitive acts have suffered a diminished capacity to invest in research and resources needed to develop new lens products and to improve the quality of manufacturing, finishing and laboratory processing of their existing lens products.

211.    Through its anticompetitive scheme, EssilorLuxottica has unlawfully eliminated vertical and horizontal competition, coordinated with its coconspirators to raise and maintain retail prices to supracompetitive levels, reduced output, and steered consumers to its products within the Relevant Markets. Such practices will continue to harm consumers like Plaintiffs and members of the Class, by maintaining and raising Premium Eyewear and Custom Lens prices above competitive levels. Plaintiffs and the Class are, and continue to be, deprived of the choice of purchasing high-quality and less-expensive Premium Eyewear and Custom Lens products.

**ANTITRUST IMPACT AND IMPACT ON INTERSTATE COMMERCE**

212.    During the relevant period, Plaintiffs and the Class paid substantial overcharges on Premium Eyewear and Custom Lenses as a result of EssilorLuxottica's anticompetitive scheme.

213.    Plaintiffs and the Class paid the overcharge directly to EssilorLuxottica by purchasing Premium Eyewear and Custom Lenses at direct-to-consumer retail stores, physical and online, that are wholly owned or otherwise controlled by EssilorLuxottica, which include, *inter alia*, Oakley stores, Ray-Ban stores, LensCrafters, Pearle Vision, Sunglass Hut, Target Optical, For Eyes stores, Oliver Peoples stores, Persol stores, Alain Mikli stores, Vision Source optometric offices, eyebuydirect.com, framesdirect.com, glasses.com, oakley.com, ray-ban.com, sunglasshut.com, lenscrafters.com, pearlevision.com, targetoptical.com, oliverpeoples.com, persol.com, costadelmar.com, vogue-eyewear.com, or arnette.com.

214.    Consequently, Plaintiffs and the Class have sustained substantial losses and damage to their property in the form of overcharges. The full amount, form, and components of such damages will be calculated after discovery and proof at trial.

215.    Defendants' efforts to monopolize and restrain competition in the Premium Eyewear Market and the Custom Lens Market have substantially affected interstate commerce.

216.    At all material times, EssilorLuxottica sold Premium Eyewear and Custom Lenses in a continuous and uninterrupted flow of commerce across state lines and throughout the United States.

217.    At all material times, EssilorLuxottica shipped, transported, or otherwise distributed Premium Eyewear and Custom Lenses in a continuous and uninterrupted flow of commerce across state and national lines in connection with its direct-to-consumer sales.

## CLASS ALLEGATIONS

218.    Plaintiffs bring this action on behalf of themselves and on behalf of members of the following class (the "Class") under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3):

> All persons and entities in the United States and its territories who purchased Premium Eyewear, Custom Lenses, or both, for their own use directly from any Defendant, or directly from any division, subsidiary, or affiliate that is owned or controlled by any Defendant from July 21, 2019 through and until the date of trial (the "Class Period"). Excluded from the Class are Defendants, their employees, parent companies, subsidiaries, affiliates, and co-conspirators, whether or not named in this Complaint, as well as federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies, and instrumentalities.

219.    While Plaintiffs do not know the exact number of members of the Class, Plaintiffs believe there are at least hundreds of thousands of members in the Class.

220.    Plaintiffs' claims are typical of those of the Class. Plaintiffs and all members of the Class were all injured by the same unlawful conduct, which resulted in all of them paying more for Premium Eyewear, Custom Lenses, or both, manufactured, produced, and/or distributed by EssilorLuxottica than they otherwise would have in a competitive market.

221.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiffs are not antagonistic to those of the Class.

222.    Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be individual to individual class members since the Defendants have acted and refused to act on grounds generally applicable to the Class.

223.    Questions of law and fact common to the Class include:

a.  Whether the Premium Eyewear Market constitutes a relevant product market for antitrust purposes;

b.  Whether the Custom Lens Market constitutes a relevant product market for antitrust purposes;

c.  Whether premium spectacle frames and premium sunglasses constitute relevant submarkets for antitrust purposes;

d.  Whether the United States and its territories constitutes the relevant geographic market for antitrust purposes;

e.  Whether EssilorLuxottica possesses monopoly power in the relevant product and geographic markets;

f.  Whether EssilorLuxottica entered into exclusive licensing agreements with the Fashion Houses;

g.  Whether EssilorLuxottica entered into anticompetitive agreements containing most-favored-nation clauses or other price-setting mechanisms with its direct competitors for Premium Eyewear;

h.  Whether EssilorLuxottica set the price at which Premium Eyewear could be sold at retail outlets owned or controlled by EssilorLuxottica;

i.  Whether EssilorLuxottica's acquisitions of spectacle frame, sunglass, and optical lens companies were part of an anticompetitive scheme and contributed to its monopoly power;

j.  Whether EssilorLuxottica engaged in an unlawful monopolistic scheme in the Premium Eyewear Market, the Custom Lens Market, or both in the United States in violation of Section 2 of the Sherman Act;

k.  Whether EssilorLuxottica monopolized, conspired to monopolize, or attempted to monopolize the Premium Eyewear Market, Custom Lens Market, or both in the United States in violation of Section 2 of the Sherman Act;

l.   Whether EssilorLuxottica's exclusive dealing agreements constitute anticompetitive acts intended to maintain EssilorLuxottica's monopoly in the Premium Eyewear Market in the United States in violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act;

m.   Whether EssilorLuxottica's exclusive dealing agreements, sales agreements, and distribution agreements constitute a conspiracy to monopolize the Premium Eyewear Market in the United States in violation of Section 2 of the Sherman Act;

n.   Whether EssilorLuxottica engaged in anticompetitive retail price maintenance in violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act;

o.   Whether EssilorLuxottica, Fashion House Co-conspirators, Premium Eyewear Competitor Co-conspirators, and Third-Party Seller Co-conspirators entered into horizontal agreements to fix, raise, maintain, or stabilize prices for Premium Eyewear or otherwise restrain trade in the United States in violation of Section 1 of the Sherman Act;

p.   Whether the conduct of EssilorLuxottica, as alleged in this Complaint, caused Plaintiffs and the Class to pay supracompetitive prices for Proprietary Brands, Fashion House Brands, and Premium Eyewear Competitor Brands and thereby suffer antitrust injuries;

q.   Whether the conduct of EssilorLuxottica, as alleged in this Complaint, caused Plaintiffs and the Class to pay supracompetitive prices for Custom Lenses in and thereby suffer antitrust injuries;

r.   The appropriate declaratory and injunctive relief for the Class; and

s.   The measure of damages sustained by Plaintiffs and the Class.

224.   Plaintiffs are represented by counsel who are experienced in the prosecution of complex antitrust and unfair competition class actions.

225.   Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class

mechanism, including providing injured persons with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise managing this class action.

## CAUSES OF ACTION

### COUNT ONE

**Overarching Anticompetitive Scheme**
(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

226.    Plaintiffs incorporate by reference the preceding allegations.

227.    EssilorLuxottica has monopoly power in the Relevant Markets at all relevant times. EssilorLuxottica knowingly and willfully engaged in anticompetitive conduct to unlawfully maintain its monopoly in these markets, in violation of the Sherman Act, 15 U.S.C. § 2.

228.    Through its overarching anticompetitive scheme, as alleged above, EssilorLuxottica willfully maintained its monopoly power in the Premium Eyewear and Custom Lens Markets using restrictive and exclusionary conduct, rather than by means of greater business acumen, and thereby injured consumers. Such conduct includes the elimination of vertical and horizontal competitors; entering into anticompetitive agreements with Fashion House Co-conspirators, Premium Eyewear Competitor Co-conspirators, and Third-Party Seller Co-conspirators that exclude retail competition for Premium Eyewear; entering into exclusive licenses with competitors in the Custom Lens Market; unlawfully steering consumers to its Premium Eyewear and Custom Lenses; and other conduct meant to facilitate this scheme.

229.    It was EssilorLuxottica's conscious object to further, and expand, its dominance in the Relevant Markets by and through the overarching anticompetitive scheme.

230.    EssilorLuxottica's scheme harmed competition.

231.    To the extent EssilorLuxottica's anticompetitive scheme included horizontal restraints on trade, those restraints are *per se* unlawful. To the extent some elements of the scheme can be characterized as vertical restraints on trade, there is no cognizable, non-pretextual procompetitive justification for EssilorLuxottica's actions that outweighs the harmful effects of its scheme. Even if there were some conceivable justifications that EssilorLuxottica could assert, there are alternative means to accomplish those procompetitive ends that inflict less anticompetitive harm.

232.    Plaintiffs and the Class have been damaged by, among other things: (i) EssilorLuxottica's ability to charge artificially high, supracompetitive retail prices for its Proprietary Brands, Fashion House Brands, Premium Eyewear Competitor Brands, and Custom Lenses; (ii) EssilorLuxottica's ability to control and set minimum retail prices for these products in the Relevant Markets; and (iii) EssilorLuxottica's ability to control and reduce output in the Relevant Markets.

233.    As a direct and proximate cause of EssilorLuxottica's illegal and monopolistic scheme, as alleged herein, Plaintiffs and the Class have been injured by paying more for EssilorLuxottica's Premium Eyewear and Custom Lens products than they would have paid or would pay in the future in the absence of EssilorLuxottica's unlawful conduct.

## COUNT TWO

### Monopolization of the Premium Eyewear Market
(Violation of Section 2 of the Sherman Act, 15 U.S.C.§ 2)

234.    Plaintiffs incorporate by reference the preceding allegations.

235.    EssilorLuxottica has monopoly power in the Premium Eyewear market in the United States during the Class Period, including the power to control prices and exclude competition. No other competitor has been able to restrain EssilorLuxottica's ability to charge

supracompetitive retail prices for the Premium Eyewear sold at retail stores it owns or controls during the Class Period. Being a price maker, EssilorLuxottica has control over the pricing of a huge variety of different brands and has the ability to exclude competitors. EssilorLuxottica knowingly and willfully engaged in a course of exclusionary and conspiratorial conduct designed to prevent actual and potential rivals from competing in or entering the Premium Eyewear Market, and unlawfully extended its monopoly power in the relevant market.

236.    EssilorLuxottica has unreasonably restrained, and further threatens to unreasonably restrain trade in the Premium Eyewear Market by:

    a.  entering into long-term, exclusive, anticompetitive agreements with the Fashion Houses.

    b.  entering into sales agreements containing MFN clauses with Premium Eyewear Competitors.

    c.  entering into distribution agreements with Third-Party-Sellers for the sale of EssilorLuxottica's Proprietary Brands and Fashion House Brands.

    d.  establishing discount prohibitions, minimum advertising prohibitions, retail price maintenance, and coercing compliance with all of the above for the sale of EssilorLuxottica's Proprietary Brands and Fashion House Brands, and Premium Eyewear Competitor Brands.

    e.  using wholly owned subsidiaries, such as EyeMed and Vision Source, to coerce IECPs and independent optometrist offices to comply with discount prohibitions, minimum advertising prohibitions, and retail price maintenance for the sale of EssilorLuxottica's Proprietary Brands and Fashion House Brands.

    f.  aggressively eliminating Premium Eyewear competitors, both frame makers and retailers, through vertical and horizontal anticompetitive acquisitions.

237.    While these anticompetitive acts also constitute individual antitrust violations on a stand-alone basis, together they support a broader monopolization claim. These actions, collectively and individually, exclude retail competition, restrain retail price competition, and limit output.

238.    EssilorLuxottica's monopoly power has not been maintained as a result of superior product, business acumen, or historical accident.

239.    EssilorLuxottica's acquisitions of horizontal competitors and anticompetitive agreements with the Fashion Houses and Premium Eyewear Competitors constitute horizontal restraints on trade and are *per se* unlawful. So are its agreements with Third-Party Sellers, discount prohibitions, minimum advertising prohibitions, and retail price maintenance requirements, because they restrain the direct horizontal competitors of EssilorLuxottica's owned or controlled retail outlets. As for EssilorLuxottica's vertical restraints on trade, there are no procompetitive justifications for EssilorLuxottica's anticompetitive and monopolistic conduct, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

240.    As a direct and proximate cause of EssilorLuxottica's illegal and monopolistic scheme, as alleged herein, Plaintiffs and the Class have been injured by paying more for EssilorLuxottica's Proprietary Brands, Fashion House Brands, and Premium Eyewear Competitor Brands than they would have paid or would pay in the future in the absence of EssilorLuxottica's unlawful conduct.

## COUNT THREE

### Conspiracy to Monopolize the Premium Eyewear Market
(Violations of Section 2 of the Sherman Act, 15 U.S.C. § 2)

241.    Plaintiffs incorporate by reference the preceding allegations.

242.    As described *supra,* EssilorLuxottica, Fashion House Co-conspirators, Premium Eyewear Competitors Co-conspirators, and Third-Party Seller Co-conspirators combined or conspired to create or maintain or attempt to create or maintain EssilorLuxottica's monopoly power in the Premium Eyewear Market.

243.   Through exclusive licensing agreements, sales agreements, and distribution agreements, EssilorLuxottica, Fashion House Co-conspirators, Premium Eyewear Competitors Co-conspirators, and Third-Party Seller Co-conspirators combined or conspired to create or maintain or attempt to create or maintain EssilorLuxottica's monopoly power in the Premium Eyewear Market. The exclusive licensing agreements, sales agreements, and distribution agreements incorporate restraints on, or otherwise eliminate, retail price competition that prevent the Fashion Houses, Premium Eyewear Competitors, and Third-Party Sellers from competing with EssilorLuxottica on Premium Eyewear retail price. The exclusive licensing agreements, sales agreements, and distribution agreements further entrench EssilorLuxottica's monopoly power both by raising the consumer retail price of Premium Eyewear sold by EssilorLuxottica's competitors and by suppressing competition for such products from retail outlets unaffiliated with EssilorLuxottica.

244.   EssilorLuxottica has taken steps in furtherance of the conspiracy by entering into its exclusive licensing agreements, sales agreements, and distribution agreements and enforcing retail pricing constraints by penalizing competitors who refuse to follow or otherwise discount Premium Eyewear.

245.   The purpose and effect of the exclusive licensing agreements, sales agreements, and distribution agreements is to prevent price competition with EssilorLuxottica for Premium Eyewear and thereby artificially increase the retail price of such products. Because EssilorLuxottica, the Fashion Houses, Premium Eyewear Competitors, and Third-Party Sellers agree to restrain competition with EssilorLuxottica, all share a specific intent to establish or maintain EssilorLuxottica's monopoly power.

246.    EssilorLuxottica has monopoly power in the Premium Eyewear Market, including the power to control prices and exclude competition. No other competitor has been able to restrain EssilorLuxottica's ability to charge supracompetitive retail prices for premium spectacle frames and premium sunglasses.

247.    EssilorLuxottica, with its co-conspirators, has willfully acquired or attempted to acquire monopoly power in the Premium Eyewear Market by unlawful and improper means, including through its enforcement of retail pricing restraints, exclusive licensing agreements, sales agreements, and distribution agreements. EssilorLuxottica and its co-conspirators immunize their premium spectacle frames and premium sunglasses from competitive pricing in these submarkets and cause products within those submarkets to be sold at supracompetitive prices.

248.    The existence of EssilorLuxottica's exclusive agreements, sales agreements, and distribution agreements is and has always been known to Defendants and their coconspirators; EssilorLuxottica's exclusive licensing agreements with the Fashion Houses are widely publicized.

249.    EssilorLuxottica's acquisitions of horizontal competitors and anticompetitive agreements with the Fashion Houses and Premium Eyewear Competitors constitute horizontal restraints on trade and are *per se* unlawful. So are its agreements with Third-Party Sellers, discount prohibitions, minimum advertising prohibitions, and retail price maintenance requirements, because they restrain the direct horizontal competitors of EssilorLuxottica's owned and controlled retail outlets. As for EssilorLuxottica's vertical restraints on trade, there are no procompetitive justifications, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means. By engaging in the foregoing conduct, EssilorLuxottica and its co-conspirators have intentionally and wrongfully conspired to monopolize in violation of the Sherman Act.

250.     As a direct and proximate result of EssilorLuxottica's illegal and monopolistic scheme, as alleged herein, Plaintiffs and the Class have been injured by paying more for EssilorLuxottica's Proprietary Brands, Fashion House Brands, and Premium Eyewear Competitor Brands than they would have paid or would pay in the future in the absence of EssilorLuxottica's unlawful conduct.

## COUNT FOUR

### Attempted Monopolization of the Premium Eyewear Market
(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

251.     Plaintiffs incorporate by reference the preceding allegations.

252.     EssilorLuxottica has monopoly power. In the alternative, and at a minimum, it possesses a dangerous probability of success in acquiring monopoly power in the Premium Eyewear Market, including the power to control prices and exclude competition.

253.     EssilorLuxottica has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Premium Eyewear Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

254.     EssilorLuxottica's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and preventing competition in the Premium Eyewear Market. EssilorLuxottica's ongoing anticompetitive conduct presents a dangerous probability that EssilorLuxottica will succeed, to the extent that it has not already, in its attempt to monopolize the Premium Eyewear Market.

255.     EssilorLuxottica's acquisitions of horizontal competitors and anticompetitive agreements with Fashion Houses and Premium Eyewear Competitors constitute horizontal restraints on trade and are *per se* unlawful. So are its agreements with Third-Party Sellers, discount prohibitions, minimum advertising prohibitions, and retail price maintenance requirements,

because they restrain the direct horizontal competitors of EssilorLuxottica's owned and controlled retail outlets. As for EssilorLuxottica's vertical restraints on trade, there are no procompetitive justifications, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

256.    As a direct and proximate cause of EssilorLuxottica's illegal and monopolistic scheme, as alleged herein, Plaintiffs and the Class have been injured by paying more for EssilorLuxottica's Proprietary Brands, Fashion House Brands, and Premium Eyewear Competitor Brands than they would have paid or would pay in the future in the absence of EssilorLuxottica's unlawful conduct.

## COUNT FIVE

### Exclusive Dealing in the Premium Eyewear Market
(Violations of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and
Section 3 of the Clayton Act, 15 U.S.C. § 14)

257.    Plaintiffs incorporate by reference the preceding allegations.

258.    As detailed above, EssilorLuxottica has monopoly power in the Premium Eyewear Market, including the power to control prices and exclude competition.

259.    EssilorLuxottica has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with the Fashion Houses, creating high barriers to entry and unreasonably excluding competitors in the premium spectacle frame and premium sunglass submarkets.

260.    These exclusive dealing agreements are unreasonably restrictive in terms of breadth, duration, and market coverage.

261.    EssilorLuxottica's web of exclusive dealing agreements cannot be justified by any purportedly pro-competitive purpose, such as to ensure a reliable supply of Premium Eyewear, because these agreements also give EssilorLuxottica the exclusive right to distribute Fashion

House brands and to establish unreasonable restrains on retail pricing of Fashion House Brands. Thus, these exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of controlling or excluding retail competitors from the Premium Eyewear Market.

262.    EssilorLuxottica's conduct has substantially foreclosed retail competition in the Premium Eyewear Market.

263.    Because this conduct involves exclusionary agreements between two or more unaffiliated entities, EssilorLuxottica's conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1. EssilorLuxottica's exclusionary agreements also violate Section 2 of the Sherman Act, 15 U.S.C. § 2, because these agreements constitute anticompetitive acts intended to maintain EssilorLuxottica's monopoly in the Premium Eyewear Market. EssilorLuxottica's exclusionary agreements are for the sale of goods and thus violate Section 3 of the Clayton Act, 15 U.S.C. § 14 on the grounds alleged herein.

264.    There are no procompetitive justifications for EssilorLuxottica's anticompetitive and monopolistic conduct, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

265.    As a direct and proximate cause of EssilorLuxottica's illegal and monopolistic scheme, as alleged herein, Plaintiffs and the Class have been injured by paying more for EssilorLuxottica's licensed Fashion House Brands than they would have paid or would pay in the future in the absence of EssilorLuxottica's unlawful conduct.

## COUNT SIX

**Unlawful Minimum Retail Price Maintenance in the Premium Eyewear Market**
(Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§1-2, and
Section 3 of the Clayton Act, 15 U.S.C. § 14)

266.    Plaintiffs incorporate by reference the preceding allegations.

267.    As detailed above, EssilorLuxottica has monopoly power in the Premium Eyewear Market, including the power to control prices and exclude competition.

268.    EssilorLuxottica has willfully and intentionally entered into anticompetitive agreements with Premium Eyewear Competitor Co-conspirators and Third-Party Seller Co-conspirators to establish the retail price at which EssilorLuxottica's Proprietary Brands, Fashion House Brands, and Premium Eyewear Competitor Brands are sold to consumers. In particular, EssilorLuxottica verbally provides the retail price of Proprietary Brands and Fashion House Brands to Third-Party Sellers and prevents Third-Party Sellers from discounting, advertising discounts, or otherwise deviating from the retail prices provided by EssilorLuxottica. EssilorLuxottica coerces compliance with its stated retail prices for its Proprietary Brands and Fashion House Brands through threat of retaliation which includes, but is not limited to, suspension of deliveries and withdrawal of authority to sell EssilorLuxottica's Proprietary Brands and Fashion House Brands. Further, Premium Eyewear Competitors coordinate, or agreed to permit EssilorLuxottica to establish retail price floors, or otherwise coordinate the retail price of their Premium Eyewear, far above competitive levels, and otherwise eliminate retail price competition.

269.    There are no procompetitive justifications for EssilorLuxottica's anticompetitive and monopolistic conduct, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

270.    The prices at which EssilorLuxottica's Proprietary Brands, Fashion House Brands, and Premium Eyewear Competitor Brands have been and continue to be inflated above competitive level causing injury to Plaintiff and the Class.

271.    As a direct and proximate cause of EssilorLuxottica's illegal and monopolistic scheme, as alleged herein, Plaintiffs and the Class have been injured by paying more for

EssilorLuxottica's Proprietary Brands, Fashion House Brands, and Premium Eyewear Competitor Brands than they would have paid or would pay in the future in the absence of EssilorLuxottica's unlawful conduct.

## COUNT SEVEN

### Agreements in Restraint of Trade for Premium Eyewear
(Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

272.    Plaintiffs incorporate by reference the preceding allegations.

273.    EssilorLuxottica has formed a cartel with Fashion House Co-conspirators and Premium Eyewear Competitor Co-conspirators to artificially inflate the price of its Proprietary Brands, licensed Fashion House Brands, and Premium Eyewear Competitor Brands above competitive levels.

274.    EssilorLuxottica, Fashion House Co-conspirators and Premium Branded Eyewear Competitor Co-conspirators are horizontal competitors at the manufacturing, distribution, and retail levels. Through an expansive system of exclusive licensing and sales agreements orchestrated by EssilorLuxottica and made known to Fashion House Co-conspirators and Premium Branded Eyewear Competitor Co-conspirators, these horizontal competitors understand and agree that their ability to control output and/or to compete on price at retail are limited.

275.    Under the exclusive licensing agreements, the Fashion Houses send early sketches of their new collections to EssilorLuxottica, and EssilorLuxottica has the exclusive right to design, produce, and determine the selling price for the Fashion House Brands. EssilorLuxottica's exclusive licensing agreements with the Fashion Houses permit EssilorLuxottica to establish retail price floors far above competitive levels or otherwise eliminate retail price competition, which result in alignment of prices for Fashion House Brands to supracompetitive levels as dictated by

EssilorLuxottica and for the benefit of both EssilorLuxottica and the Fashion Houses at the expense of consumers.

276.    The sales agreements with Premium Eyewear Competitors contain similar terms that permit EssilorLuxottica to establish retail price floors far above competitive levels or otherwise eliminate retail price competition, which result in the setting of prices for Premium Eyewear Competitor Brands to supracompetitive levels as dictated by EssilorLuxottica and for the benefit of EssilorLuxottica and Premium Eyewear Competitors.

277.    The existence of EssilorLuxottica's exclusive agreements and sales agreements is and has always been known to Defendants, Fashion House Co-conspirators, and Premium Eyewear Competitor Co-conspirators. EssilorLuxottica's exclusive licensing agreements with Fashion Houses are widely publicized. At all times, Fashion House Co-conspirators and Premium Eyewear Competitor Co-conspirators understood that these agreements are a key component for them to access the Premium Eyewear Market, even though the very same agreements required them to relinquish direct control over production and distribution.

278.    As a direct and proximate result of EssilorLuxottica's illegal restraint of trade, as alleged herein, Plaintiffs and the Class have been injured by paying more for EssilorLuxottica's Proprietary Brands, licensed Fashion House Brands, and Premium Eyewear Competitor Brands than they would have paid or would pay in the future in the absence of EssilorLuxottica's unlawful conduct.

279.    This conspiracy is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Alternatively, this conspiracy is a "quick look" or rule of reason violation of Section 1 of the Sherman Act. There is no legitimate business justification for, or pro-competitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof. Any proffered

business justification or asserted pro-competitive benefits would be pre-textual, outweighed by the anticompetitive effects of Defendants' conduct, and in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

## COUNT EIGHT

### Monopolization of the Custom Lens Market
(Violation of Section 2 of the Sherman Act, 15 U.S.C.§ 2)

280.    Plaintiffs incorporate by reference the preceding allegations.

281.    EssilorLuxottica has monopoly power in the Custom Lens market in the United States during the Class Period, including the power to control prices and exclude competition. No other competitor has been able to restrain EssilorLuxottica's ability to charge supracompetitive retail prices for Custom Lenses manufactured at its facilities, finished in its laboratories, sold in its owned or controlled retail outlets, or branded with its trademarks. EssilorLuxottica knowingly and willfully engaged in a course of exclusionary and conspiratorial conduct designed to prevent actual and potential rivals from competing in or entering the Custom Lens Market, and unlawfully extended its monopoly power in the relevant market.

282.    EssilorLuxottica has unreasonably restrained, and further threatens to unreasonably restrain trade in the Custom Lens Market by:

    a.  entering into an exclusive anticompetitive agreement of indefinite duration with Eastman Kodak.

    b.  entering into and successively renewing exclusive licensing agreements with National Vision Holdings for the sale of EssilorLuxottica's Custom Lenses in National Vision Holdings retail outlets.

    c.  using wholly owned subsidiaries, such as EyeMed and Vision Source, to coerce IECPs and independent optometrist offices to steer consumers to EssilorLuxottica-branded custom lenses or lenses manufactured at EssilorLuxottica owned or controlled factories at its owned or controlled retail outlets.

283.    While these anticompetitive acts also constitute individual antitrust violations on a stand-alone basis, together they support a broader monopolization claim. These actions, collectively and individually, exclude retail competition, restrain retail price competition, and limit output.

284.    EssilorLuxottica's monopoly power has not been maintained as a result of superior product, business acumen, or historical accident.

285.    EssilorLuxottica's exclusive agreements with Eastman Kodak and National Vision Holdings constitute horizontal restraints on trade and are *per se* unlawful. There are no procompetitive justifications for EssilorLuxottica's steering conduct, and any proffered justifications, to the extent genuine, could be achieved through less restrictive means.

286.    As a direct and proximate result of EssilorLuxottica's illegal and monopolistic scheme, as alleged herein, Plaintiffs and the Class have been injured by paying more for EssilorLuxottica's Custom Lenses than they would in the absence of EssilorLuxottica's unlawful conduct.

## COUNT NINE

### Attempted Monopolization of the Custom Lens Market
(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)

287.    Plaintiffs incorporate by reference the preceding allegations.

288.    EssilorLuxottica has monopoly power. In the alternative, and at a minimum, it possesses a dangerous probability of success in acquiring monopoly power in the Custom Lens Market, including the power to control prices and exclude competition.

289.    EssilorLuxottica has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Custom Lens Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

290.    EssilorLuxottica's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and preventing competition in the Custom Lens Market. EssilorLuxottica's ongoing anticompetitive conduct presents a dangerous probability that EssilorLuxottica will succeed, to the extent that it has not already, in its attempt to monopolize the Custom Lens Market.

291.    As described above, much of EssilorLuxottica's unlawful conduct in furtherance of its attempts to monopolize the Custom Lens market are *per se* illegal. To the extent any are not, there are no procompetitive justifications for that conduct, and any proffered justifications, to the extent legitimate, could be achieved through less restrictive means.

292.    As a direct and proximate result of EssilorLuxottica's illegal and monopolistic scheme, as alleged herein, Plaintiffs and the Class have been injured by paying more for EssilorLuxottica's Custom Lenses than they would have in the absence of EssilorLuxottica's unlawful conduct.

## PETITION FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class, respectfully ask the Court for a judgment that:

A.  Certifies the Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) and directs that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to the Class;

B.  Appoints Plaintiffs and their attorneys as class representatives and class counsel, respectively;

C.  Declares that EssilorLuxottica has engaged in an unlawful overarching scheme to monopolize the Relevant Markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

D.  Declares that EssilorLuxottica has monopolized, conspired to monopolize, or in the alternative, attempted to monopolize, the Relevant Markets in violation of Section 2 of

the Sherman Act, 15 U.S.C. § 2;

E.  Declares that EssilorLuxottica's exclusive licensing agreements with the Fashion Houses and its Custom lens competitors are unreasonable restraints of trade in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and Section 3 of the Clayton Act, 15 U.S.C. § 14;

F.  Declares that EssilorLuxottica's retail price maintenance for Premium Eyewear are unreasonable restraints of trade in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and Section 3 of the Clayton Act, 15 U.S.C. § 14;

G.  Declares that EssilorLuxottica's engaged in unlawful horizontal restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

H.  Awards Plaintiffs and the Class compensatory and treble damages as permitted and as sustained by reason of the antitrust violations alleged herein, plus interest in accordance with the law;

I.  Grants permanent injunctive relief:

      a.  Enjoining EssilorLuxottica from engaging in future anticompetitive conduct with the purpose or effect of foreclosing the Relevant Markets to competition from actual or potential rivals for ten years following judgment; and

      b.  Requiring EssilorLuxottica to take affirmative steps to dissipate the continuing effects of their prior unlawful conduct.

J.  Awards Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees provided by law; and

K.  Directs such further relief in equity or at law as this Court may deem just and proper.

## REQUEST FOR A JURY TRIAL

Plaintiffs demand a trial by jury, pursuant to Federal Rule of Civil Procedure 38(b), of all issues so triable.

[signature page follows]

Dated:  August 6, 2024

Respectfully submitted,

By: */s/ David M. Cialkowski*

David M. Cialkowski (*pro hac vice*)
Ian F. McFarland (*pro hac vice*)
Zachary J. Freese (*pro hac vice*)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
Tel: (612) 341-0400
Fax: (612) 341-0844
david.cialkowski@zimmreed.com
ian.mcfarland@zimmreed.com
zachary.freese@zimmreed.com

Daniel E. Gustafson (*pro hac vice*)
Daniel C. Hedlund (*pro hac vice*)
Michelle J. Looby (*pro hac vice* forthcoming)
Joshua J. Rissman (*pro hac vice*)
Anthony J. Stauber (*pro hac vice*)
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
jrissman@gustafsongluek.com
tstauber@gustafsongluek.com

Heidi M. Silton (*pro hac vice*)
Jessica N. Servais (*pro hac vice*)
Joseph C. Bourne (*pro hac vice*)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Alec Schultz (*pro hac vice* forthcoming)
Ellen Belfer (*pro hac vice* forthcoming)

**HILGERS GRABEN PLLC**
1221 Brickell Avenue, Suite 900
Miami, FL 33131
Tel: (305) 630-8304
aschultz@hilgersgraben.com
ebelfer@hilgersgraben.com

*Interim Co-Lead Counsel for Direct Purchaser Plaintiffs.*