# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **IN RE EYEWEAR ANTITRUST LITIGATION**<br><br>This Document Relates To:<br>*Ringgold*, Indirect Purchaser Class | Case No. 1:24-cv-04826-MKV<br><br>**INDRECT PURCHASER PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT** |

## Table of Contents

Table of Contents ......................................................................................................ii

Nature of the Action ................................................................................................ 1

Jurisdiction and Venue ........................................................................................... 3

Parties ...................................................................................................................... 5
    I.     Plaintiffs..........................................................................................5
    II.    Defendants ...................................................................................... 6

Agents and Co-Conspirators ................................................................................11

Factual Allegations ...............................................................................................14
    I.     Eyewear Overview...................................................................... 14
        A. History of Eyewear ............................................................... 14
        B. Manufacture of Eyewear....................................................... 15
        C. Eyewear are Medical Devices that are Regulated by the FDA.................. 19
        D. Prescription Eyewear Must Be Prescribed by a Licensed Professional..... 19
    II.    EssilorLuxottica's Acquisition of Monopoly Power ......................................... 22
        A. Essilor and Luxottica Merged to Form the World's Largest Eyewear Conglomerate, EssilorLuxottica ...................................................... 23
        B. EssilorLuxottica Has Eliminated Competition by Systematically Acquiring Competitors in all Facets of the Premium Eyewear Market.... 26
           1. Premium Sunglass and Premium Spectacle Frame Brands................. 27
           2. Premium Prescription Lens Brands.......................................... 32
           3. Physical and Online Retail Outlets................................................ 35
           4. Premium Eyewear Manufacturing .................................................. 38
           5. Premium Prescription Lens Processing ................................... 39
           6. Optical Buying Alliances ................................................................ 41
           7. Vision Insurance ............................................................................ 42
    III.   EssilorLuxottica's Monopoly Power ................................................. 43
    IV.   EssilorLuxottica's Horizontal and Vertical Restraints on Trade and Anticompetitive Conduct ........................................................ 45
        A. Agreements Restraining Trade ...................................................... 45
           1. Long-Term Exclusive Licensing Agreements with Fashion Houses... 46
           2. Sales Agreements with Premium Eyewear Competitors..................... 52
           3. Most Favored Nation Agreements with Third-Party Sellers............... 53
        B. Control and Restraints on "Independent" Eyecare Professionals ............ 56
           1. Buying Alliances ............................................................................ 56
           2. Vision Insurance ............................................................................ 60
           3. Lens Processing .............................................................................. 60
           4. Essilor Instruments ........................................................................ 61
           5. EssilorLuxottica uses EssilorPRO and its Accompanying

Programs to Reward and Incentivize Eyecare Professionals to Dispense its Products ................................................................................. 64

V. History of Anticompetitive Conduct .................................................. 67

A. The French Competition Authority Fined Luxottica in 2021 ..................... 68

B. The French Competition Authority Fined Luxottica in 2022 ................... 69

C. EssilorLuxottica Has Faced Regulatory Scrutiny in Other Jurisdictions .. 71

D. EssilorLuxottica Has Faced Scrutiny in the United States ......................... 71

Relevant Market ................................................................................................. 73

EssilorLuxottica Has Monopoly Power in the Premium Eyewear Market ..................... 80

I. There is Evidence of EssilorLuxottica's Market and Monopoly Power .......... 80

II. EssilorLuxottica Has Prima Facie Market Power in the Premium Eyewear Market ................................................................................. 81

III. There is Direct Evidence of EssilorLuxottica's Monopoly Power.................. 82

IV. There is Indirect Evidence of EssilorLuxottica's Monopoly Power................ 84

V. EssilorLuxottica's Market Power is Durable.......................................... 86

VI. There are Significant Barriers to Entry in the Premium Eyewear Market ...... 87

Anticompetitive Effects on Consumers ........................................................... 89

Class Allegations ............................................................................................... 95

Causes of Action ............................................................................................... 98

Count I: Injunctive Relief ................................................................................. 98

Count II: Violations of State Antitrust Laws ................................................. 100

Count III: Violations of State Consumer Protection Laws .............................. 103

Relief Sought .................................................................................................... 105

Demand for Jury Trial ..................................................................................... 106

Plaintiffs Pamela Ringgold, Anthony Persuitti, and Antoine Acosta, individually and on behalf of all others similarly situated, bring their claims against defendants EssilorLuxottica S.A., Luxottica Group S.p.A., Essilor International S.A.S., EssilorLuxottica America SAS, EssilorLuxottica USA Inc., EOA Holding Co., Inc., Essilor of America Inc., Essilor Laboratories of America, Inc., Essilor Doctor Alliances Corporation, and Luxottica of America Inc. (collectively "**EssilorLuxottica**") and allege:

## NATURE OF THE ACTION

1. In 2018, the world's largest manufacturer of eyewear lenses, Essilor International S.A.S., merged with the world's largest manufacturer of eyewear frames, Luxottica Group S.p.A. The resulting entity, EssilorLuxottica S.A., is the world's largest eyewear conglomerate—by a large margin. EssilorLuxottica S.A. is vertically and horizontally integrated, by which it has acquired market power in every aspect of the eyewear market. The merger put the bulk of the world's design, manufacture, marketing, distribution, and sale of premium prescription lenses, premium spectacle frames, and premium sunglasses (collectively, "**Premium Eyewear**") under one roof with a combined market capitalization of over $100 billion. Although EssilorLuxottica presents its products through multiple brands sold at various physical and online retail outlets to create an illusion of customer choice, in reality, the majority of Premium Eyewear brands and stores are owned, controlled, and sold to consumers by this single entity, EssilorLuxottica.

2. EssilorLuxottica obtained and maintained monopoly power in the Premium Eyewear Market, defined herein, through serial acquisitions and a complex scheme of anticompetitive conduct that allowed it to foreclose competition and charge supra-competitive prices. In addition, EssilorLuxottica has entered into written agreements with various third parties to unduly restrain trade and raise, fix, and stabilize the prices charged for Premium Eyewear at supra-competitive rates. As a direct and proximate result of EssilorLuxottica's exercise of its monopoly power and its price-fixing agreements, consumers in the United States have paid supra-competitive rates for Premium Eyewear.

3. Consumers purchase EssilorLuxottica's Premium Eyewear from two sources: (1) directly from EssilorLuxottica through its vast network of retail outlets ("**Direct Purchasers**"); or (2) indirectly from third parties, such as optometrists, who purchase the Premium Eyewear from EssilorLuxottica and pass along the supra-competitive prices ("**Indirect Purchasers**"). EssilorLuxottica's anticompetitive conduct targets the prices paid by both Direct and Indirect Purchasers in all forms of retail outlets.

4. This action is brought by Indirect Purchasers under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and Section 16 of the Clayton Act, 15 U.S.C. § 26 for injunctive relief and damages under certain state antitrust and consumer protection statutes based on EssilorLuxottica's anticompetitive conduct to remedy the harm this conduct has inflicted on hundreds of thousands, if not millions, of consumers in the United States.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, and 1367, because this action arises under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, and under the Clayton Antitrust Act, 15 U.S.C. § 26, Section 16. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; there are more than 100 members of the class; and at least one member of the class is a citizen of a state different from that of one of the Defendants.

6. This Court has personal jurisdiction over each of the Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22, because each Defendant: (a) transacted business in the United States, including in this District; (b) manufactured, sold, shipped, or delivered substantial amounts of product in the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) engaged in anticompetitive conduct that had the direct, foreseeable, and intended effect of injuring the business or property of persons residing in, located in, or doing business in the United States, including in this District. Moreover, each of the Defendants, both individually and collectively, purposefully directed their business activities toward, and had substantial contacts with, this jurisdiction.

7. Venue is appropriate in this District under 28 U.S.C. § 1391 because, during relevant Class Periods, each Defendant transacted business in this District, and the trade and commerce described herein was and is carried out, in substantial part, in this District.

8. Each Defendant engaged in interstate commerce in the United States, including, but not limited to, New York through the design, marketing, distribution and sale of Premium Eyewear sold by EssilorLuxottica that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects on interstate commerce.

9. Each Defendant engaged in activities within the flow of and that were intended to and did have a substantial effect on, interstate commerce in the United States in support of Defendants' products and services sold in the flow of interstate commerce.

10. By reason of the unlawful activities alleged herein, each Defendant's unlawful activities substantially affected commerce throughout the United States, causing injury to Plaintiffs and the geographically dispersed Class members. Each Defendant, directly and through their agents, engaged in activities affecting all states, to obtain and maintain monopolistic power in the Premium Eyewear Market and charge Plaintiffs and the Classes supra-competitive prices for Premium Eyewear, unreasonably restrained trade, and adversely affected the herein described Premium Eyewear Market and relevant submarkets. Moreover, Defendants conducted and continue to conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

## I.     Plaintiffs

11. Plaintiff **Pamela Ringgold** is a citizen and resident of New York. Ms. Ringgold purchased Ray-Ban Premium Spectacle Frames and, on information and belief, EssilorLuxottica Premium Prescription Lenses, from Davis Visionworks in Garden City, New York in approximately October 2021. Ms. Ringgold has been and continues to be in the market for Premium Eyewear and is at risk of paying artificially high prices in the absence of an injunction.

12. Plaintiff **Anthony Persuitti** is a citizen and resident of Minnesota. Mr. Persuitti is a pilot for a commercial airline and has regularly purchased Ray-Ban Premium Sunglasses during the Class Period, including purchasing Ray-Ban Premium Sunglasses from Costco in Eagan, Minnesota in approximately May 2024. Given Mr. Persuitti's unique need for Premium Sunglasses to aid in flying, Mr. Persuitti has been and continues to be in the market for Premium Eyewear and is at risk of paying artificially high prices in the absence of an injunction.

13. Plaintiff **Antoine Acosta** is a citizen and resident of Delaware. Mr. Acosta purchased Ray-Ban Premium Spectacle Frames and Crizal Premium Prescription Lenses from Wilmington Family Eye Care in Wilmington, Delaware in approximately March 2024. Mr. Acosta has been and continues to be in the market for Premium Eyewear and is at risk of paying artificially high prices in the absence of an injunction.

## II.    Defendants

14. Defendant **EssilorLuxottica S.A.** is a French joint stock company, with a registered office at 147 rue de Paris 94220, Charenton-Le-Pont, France. Defendant EssilorLuxottica S.A. was formed through a 2018 merger of Essilor International S.A.S. and Luxottica Group S.p.A. and "functions primarily as a holding company that directly or indirectly owns the companies comprising the Group."[1] EssilorLuxottica S.A. controls the direction of the EssilorLuxottica Group, which includes defendant Luxottica Group S.p.A., defendant Essilor International SAS, and GrandVision B.V., along with their subsidiaries.

15. These subsidiaries, as described herein, are under the direct ownership and control of EssilorLuxottica S.A. as they design, manufacture, distribute, and sell Premium Eyewear. Through its three main subsidiaries, EssilorLuxottica S.A. regularly conducts business throughout the United States and directly reports that it has "large operations" in the United States, including production facilities in the United States.[2]

16. Moreover, EssilorLuxottica S.A.'s leadership structure includes its Chief Executive Officer and Chief Financial Officer who are also officers of Luxottica Group S.p.A. and Essilor International S.A.S.

---

[1]    Simplified    Corporate    Chart,    EssilorLuxottica,    available    at https://www.essilorluxottica.com/en/governance/simplified-corporate-chart/.

[2]    EssilorLuxottica 2023 Universal Registration Document at p.38, available at https://www.essilorluxottica.com/en/cap/content/101696/ (hereafter "EssilorLuxottica 2023 Universal Registration Document").

17. Defendant **Luxottica Group S.p.A.** is an Italian corporation with its principal place of business at Piazzale Luigi Cadorna 3, 20123 Milan, Italy and its United States office at 4000 Luxottica Place, Mason, Ohio 45040. Luxottica Group S.p.A. is wholly owned by defendant EssilorLuxottica S.A.[3] On information and belief, Luxottica Group S.p.A. owns Premium Eyewear retailers and numerous Premium Eyewear Brands including Oakley, Alain Mikli, Oliver Peoples, Sferoflex, Arnette, Ray-Ban, Persol, Vogue Eyewear, Starck Biotech Paris, and Costa Del Mar. Moreover, Luxottica Group S.p.A. maintains exclusive licenses with many of the Fashion Houses (defined herein). Such licensing agreements may also be held by EssilorLuxottica S.A. On information and belief, Luxottica Group S.p.A. also owns entities for the manufacture of Premium Eyewear Frames.

18. Defendant **Essilor International S.A.S.** is a French simplified joint-stock company with its principal place of business at 147 rue de Paris 94220, Charenton-le-Pont, France that manufactures, distributes, and retails Premium Prescription Lenses and other optical products. On information and belief, Essilor International S.A.S. owns the EssilorLuxottica Premium Prescription Lens brands, including Crizal, Varilux, and Transitions, and the lens manufacturing and processing facilities as well as the lens processing machines that are distributed to eye care professionals, including holding numerous patents relating to lens processing.

---

[3] EssilorLuxottica 2023 Universal Registration Document at p.56, available at https://www.essilorluxottica.com/en/cap/content/101696/ (hereafter "EssilorLuxottica 2023 Universal Registration Document").

19. Defendant **EssilorLuxottica America SAS** was formerly known as Luxottica U.S. Holdings Corp., which was a Delaware corporation that has now been transferred to France and is an indirect wholly owned subsidiary of EssilorLuxottica S.A. On information and belief, this entity is responsible for the entirety of North American operations of EssilorLuxottica S.A., including the Premium Eyewear wholesale and retail business.

20. Defendant **EssilorLuxottica USA Inc.** is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware 19801. EssilorLuxottica USA Inc. is a holding company for EssilorLuxottica S.A.'s North American business. On information and belief, EssilorLuxottica USA Inc. manages EssilorLuxottica S.A.'s retail activities in the United States, including wholesale of EssilorLuxottica Premium Eyewear brands.

21. Defendant **EOA Holding Co., Inc.** is a Delaware corporation with its principal place of business at 1209 Orange Street, Wilmington, Delaware 19801. On information and belief, EOA Holding Co., Inc. holds EssilorLuxottica's United States based operations for Premium Prescription Lenses, including retail and wholesale sales and processing.

22. Defendant **Essilor of America Inc.** is a Delaware corporation with its principal place of business at 13555 North Stemmons Fwy, Dallas, Texas 75234. Essilor of America Inc. owns Essilor Laboratories of America Holding Co., Inc. and defendant Essilor Laboratories of America, Inc. Essilor of America Inc. owns and/or operates manufacturers

and distributers of Premium Prescription Lenses in the United States, including Premium Prescription Lenses under EssilorLuxottica brands such as Crizal, Varilux, and Transitions.

23. Defendant **Essilor Laboratories of America, Inc.** is a North Carolina corporation with its principal place of business at 13555 North Stemmons Freeway, Dallas, Texas 75234. Essilor Laboratories of America, Inc. manufactures, processes, and finishes Premium Prescription Lenses and optical supplies and is a wholly owned subsidiary of Essilor of America Inc.

24. Defendant **Essilor Doctor Alliances Corporation** is a Delaware corporation with its principal place of business at 23824 Highway 59 North, Kingwood, Texas 77339. Essilor Doctor Alliances Corporation provides services to independent eyecare professionals. Essilor Doctor Alliances owns Vision Source and, on information and belief, various other buying alliances. Essilor Doctor Alliances Corporation is a wholly owned subsidiary of EOA Holding Co., Inc., which is owned by EssilorLuxottica S.A.

25. Defendant **Luxottica of America Inc.** is an Ohio corporation with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040. Luxottica of America, Inc. was formerly known as LensCrafters, Inc. and Luxottica Retail North America Inc. Luxottica of America Inc. also absorbed Luxottica USA LLC. Defendant Luxottica of America Inc. is a wholly owned subsidiary of Luxottica Group S.p.A. and controls United States retail and distribution activities of EssilorLuxottica.

26. EssilorLuxottica wholly owns and/or maintains direct control over the following direct-to-consumer retail outlets, among others: Oakley stores, Ray-Ban stores, Sunglass Hut, Pearle Vision, LensCrafters, Target Optical, Oliver Peoples stores, Frames for America, For Eyes stores, arnette.com, costadelmar.com, eyebuydirect.com, framesdirect.com, glasses.com, lenscrafters.com, Oakley.com, oliverpeoples.com, pearlevision.com, persol.com, ray-ban.com, sunglasshut.com, targetoptical.com, and vogue-eyewear.com.

27. For Premium Prescription Lenses, EssilorLuxottica owns and/or maintains direct control over the following brands and manufacturers: Essilor, Varilux by Essilor, Eyezen by Essilor, Stellest by Essilor, Crizal by Essilor, Xperio by Essilor, Barberini, KODAK Lens, Nikon, Oakley, Ray-Ban, Shamir, and Transitions.

28. For Premium Sunglasses and Premium Spectacle Frames, EssilorLuxottica owns and/or maintains direct control over the following brands and manufacturers: Alain Mikli, Armani Exchange, Arnette, Brooks Brothers, Brunello Cucinelli, Burberry, Chanel, Chaps, Coach, Costa, DbyD, Dolce & Gabbana, Emporio Armani, Ferrari, Foster Grant, Giorgio Armani, Jimmy Choo, Michael Kors, Miu Miu, Moncler, Oakley, Oliver Peoples, Polo Ralph Lauren, Prada, Ralph Lauren, Ralph, Ray-Ban, Sferoflex, Starck, Swarovski, Tiffany & Co., Tory Burch, Versace, and Vogue Eyewear.

29. The anticompetitive and unlawful acts alleged against each of the Defendants in this Complaint were authorized, ordered, and/or performed by each of their officers, directors, employees, or representatives while actively engaged in the management, direction, or control of Defendants' respective businesses or affairs. Many of these officers, directors, employees, and representatives are the same from one Defendant to another, ensuring consistent decisions throughout EssilorLuxottica's structure.

30. Each of Defendants' officers, directors, employees, representatives, or shareholders operated under the explicit and apparent authority of their respective principals or within the scope of their own explicit and apparent authority, binding their respective principals.

31. Each Defendant and their respective subsidiaries, affiliates, and agents operated as a single unified entity, as evidenced by the significant overlap among Defendant's officers, agents, employees, representatives, and shareholders.

32. Moreover, various persons and/or firms not named as defendants participated as co-conspirators in one or more of the violations alleged herein and performed acts in furtherance thereof. Specifically, Defendants collectively conspired with Fashion Houses, Premium Eyewear Competitors, and Third-Party Sellers to fix prices through long-term exclusive licensing agreements, sales agreements, and distribution agreements. Through these agreements, the parties thereto were able to fix prices of Premium Eyewear at

supra-competitive levels and set a price floor, effectively eliminating competition. Various persons, businesses, and/or entities not named as defendants, including additional EssilorLuxottica-owned entities, have participated as co-conspirators in the violations alleged herein and have performed acts in furtherance thereof. These other entities have facilitated, adhered to, participated in, aided and abetted, and otherwise acted in concert with Defendants in connection with EssilorLuxottica's anticompetitive acts. Plaintiffs reserve the right to name some or all of these entities as defendants.

33. The **Fashion House Co-conspirators** include: Brooks Brothers (BBGI US, Inc.), Brunello Cucinelli S.p.A., Brunello Cucinelli, USA, Inc., Bulgari S.p.A., Bulgari Corporation of America, Burberry Group plc, Burberry Ltd., Capri Holdings Limited, Chanel Ltd., Chanel, Inc., Dolce & Gabbana USA Inc., Dolce & Gabbana S.r.l., Ferrari Group, Ferrari S.p.A., Gianni Versace S.r.l., Versace USA, Inc., Giorgio Armani S.p.A., Giorgio Armani Corporation, Michael Kors (USA), Inc., Moncler S.p.A., Prada S.p.A., Prada USA Corporation, Ralph Lauren Corporation, Swarovski, Tapestry, Inc., Tiffany & Co., and Tory Burch LLC ("**Fashion House Co-conspirators**" or "**Fashion Houses**").

34. The Fashion House Co-conspirators entered into exclusive licensing agreements whereby EssilorLuxottica as an enterprise gained complete control over the sale of their eyewear and helped maintain and create EssilorLuxottica's monopoly power in the Premium Eyewear Market. Moreover, the Fashion House Co-conspirators conspired with EssilorLuxottica to create supra-competitive pricing and reduce retail price competition.

35. The **Premium Eyewear Competitor Co-conspirators** include: Kering S.A., Kering Eyewear S.P.A., Kering Eyewear USA, Inc., LVMH Moët Hennessy Louis Vuitton SE, LVMH Moët Hennessy Louis Vuitton Inc., Marcolin S.p.A., Marcolin U.S.A. Eyewear Corp., Thelios S.p.A., and Thelios USA Inc. **("Premium Eyewear Competitors"**). These Premium Eyewear Competitors own well-known brands like Balenciaga, Celine, Chloe, Dior, Fendi, Gucci, Louis Vuitton, Maui Jim, Saint Laurant, and Tom Ford and agreed to unlawful, anticompetitive sales agreements that permit EssilorLuxottica, as an enterprise, to set retail price floors far above competitive levels and reduce retail price competition.

36. The **Third-Party Seller Co-conspirators** include third-party sellers that, under distribution agreements with one or more EssilorLuxottica-related entities, agree to adhere to EssilorLuxottica's retail pricing decisions, discount prohibitions, advertising restrictions, and otherwise reduce retail price competition ("**Third-Party Sellers**").

37. The **Captive Optometrist Groups** include EssilorLuxottica's extensive network of buying alliances such as Vision Source, Professional Eyecare Resources Cooperative/Infinity Vision Alliance ("**PERC/IVA**"), and Optiport ("**Captive Optometrist Groups**"). The Captive Optometrist Groups agree to adhere to EssilorLuxottica's retail pricing decisions, discount prohibitions, and advertising restrictions in exchange for purchasing and practice benefits.

38. On information and belief, other business entities, currently unknown to Plaintiffs, are co-conspirators with EssilorLuxottica in its unlawful conduct.

I.      **Eyewear Overview**

      **A.  History of Eyewear**

39. In 1268, Roger Bacon made the first lens for optical purposes.[4]

40. The first eyeglasses combining a spectacle frame and lenses were found in Italy as early as 1352.

41. Later, the first lenses for nearsightedness, or the inability to see far away, were seen in 1517.

42. Historically, lenses were made of rock, typically transparent quartz or beryl. Later, lenses were made from glass that was manufactured in Europe, typically Venice or Nurenberg.

43. Today, most lenses are manufactured from plastic, not glass.

44. Benajmin Franklin invented bifocals in 1784.[5]

45. Today, about two thirds of Americans wear eyeglasses (approximately 166.5 million adults).[6]

---

[4] Eyeglasses, Britannica, https://www.britannica.com/science/eyeglasses, (last visited Jan. 23, 2024).

[5] *Id.*

[6] *See* Why are these groups so much more likely to wear glasses than any others, The Washington Post (last visited June 13, 2024), https://www.washingtonpost.com/business/2023/05/05/glasses-eyes-use-rising/; *see also* Vision Council, available at https://thevisioncouncil.org/sites/default/files/assets/media/TVC_OrgOverview_sheet_2021.pdf (last visited June 13, 2024).

### B. The Manufacture of Eyewear

46. Eyewear is made of two main components, a spectacle frame and typically two prescription lenses. Sunglasses are similarly made of two main components, including a frame and lenses. Sunglass lenses, unlike prescription lenses, are designed to block the sun. Additionally, like prescription lenses, sunglass lenses can also be corrective, *i.e.*, prescription.

47. The first component, the frame, can be manufactured with various substances, but a frame is most often manufactured with metal or plastic.[7] A metal frame can be made of one type of metal, such as titanium, or an alloy, a mix of different metals. A plastic frame is typically lighter weight compared to a metal frame and generally less expensive. Regardless of the material, a frame is typically inexpensive to manufacture, often costing less than $2.50.

48. The second component of eyewear, lenses, are added to the frame. Lenses can be prescription lenses designed to correct vision problems, including near- or far-sightedness, both, or astigmatism, among other things. Non-prescription lenses, known as "plano" lenses, serve other purposes, such as to block out the sun or blue light.

49. Modern day lenses are typically manufactured in Asia, often in China, Singapore, Japan, and/or Korea.

_____

[7] *See, e.g.*, How to Choose the Glasses Frame Material That is Right For You, https://www.aao.org/eye-health/glasses-contacts/eyeglass-frame-materials (last visited Jan. 21, 2024).

50. After lenses are manufactured, they are shipped to the United States. The next steps include fabricating and edging (also known as processing).

51. The United States Food and Drug Administration ("**FDA**") classifies prescription lenses as either finished or semi-finished.[8]

52. Finished lenses are shaped to fit a specific prescription and can be in either "uncut finished" or "finished" form.[9] An uncut finished lens, also known as a "stock" lens, has been shaped to fit a specific prescription but has not yet been cut to fit a specific frame. The "finished form" is a final lens that has been both shaped to fit a specific prescription and cut to fit a specific frame. Finished lenses are for single vision or for a single prescription. Thus, they are not suitable for progressive or multi-vision lenses.

53. The second type of lens is semi-finished, also known as surfaced lenses. These are lenses that are finished on one side.

54. Semi-finished lenses, as shown below, typically begin as "pucks" or "lens blanks." The blanks are typically manufactured outside of the United States then shipped to the United States for processing.



---

[8] *See, e.g.*, FDA Guidance for Industry and FDA Staff, Impact-Resistant Lenses: Questions and Answers, issued on Sept. 2, 2010, available at https://www.fda.gov/media/71020/download (last visited Jan. 16, 2024).

[9] *Id.*; *see also* 21 C.F.R. 801.410(c)(3).

55. Pucks typically have the front surface completed or finished, but the inside surface, *i.e.*, the part through which the wearer will look, must be processed to match the patient's prescription. The puck will be resurfaced to the exact prescription ordered.

56. Semi-finished lenses and uncut finished lenses need further processing before they can be inserted into a frame.

57. The first step in processing semi-finished lenses is ordering and logistics.[10] In this step, the individual prescription and specific order is sent to the processing lab. The order is "trayed up," – where the processing lab takes the unique prescription, pulls the relevant lens blanks, the frame (if the lenses will also be edged and placed into the frame), and typically assigns the tray, or the order, a barcode to follow the lenses through the manufacturing process.[11]

58. The second step is "filming" or "taping." In this step, a worker places a protective film on the front surface of the lens so that it is not damaged during processing.[12]

59. The third step is "blocking." In this step, a metal attachment is placed on the lens so that the lens can be placed on a machine to then grind the side of the lens.

---

[10] See How lenses are made @ Essilor, June 30, 2017, available at https://www.youtube.com/watch?v=3OEaQgIxV0M (last visited Jan. 16, 2024).

[11] See, e.g., How a P.E.I. optical company turns a glass 'hockey puck' into eyewear, available at https://www.cbc.ca/news/canada/prince-edward-island/vogue-optical-lenses-1.4544919 (last visited Jan. 12, 2024).

[12] See How It's Made – Eyeglass Lenses, available at https://www.youtube.com/watch?v=xfhjWyAU9Cw (last visited Jan. 12, 2024).

60. In the fourth step, "surfacing," a machine grinds down the inside of the lens to shape it to a specific prescription.

61. Fifth, "polishing." In this step, the lens is polished to remove excess material and create a smooth, round disc.

62. Sixth, the tape is removed, and the block is removed, known as deblocking. The lens is also rinsed and cleaned.

63. Then, any special coatings or films ordered by a customer are applied to the lens.

64. At this stage, known as edging or fitting, the fully finished lens is placed into the frame. This process can be completed by the processing lab or at the optical professional's office. To place the fully finished lenses into a frame, the frame is measured, then a specialized machine edges, or cuts, the lenses to fit into the frame.

65. EssilorLuxottica is the dominant player in all aspects of the manufacture of eyewear lenses—it is the leading processor of lenses in the United States and also manufactures the equipment used to process lenses, as well as edge or fit lenses.

**C. Eyewear are Medical Devices that are Regulated by the FDA.**

66. In the United States, the FDA regulates spectacle frames, sunglasses, and lenses and their component parts because they are medical devices.[13]

---

[13] Sunglasses, Spectacle Frames, Spectacle Lens and Magnifying Spectacles, available at https://www.fda.gov/medical-devices/guidance-documents-medical-devices-and-radiation-emitting-products/sunglasses-spectacle-frames-spectacle-lens-and-magnifying-spectacles (last visited Jan. 16, 2024).

67. The FDA regulates both domestic manufacturers and "an importer for resale" as a "manufacturer." 21 C.F.R. § 810.410(g).

68. Eyeglasses, sunglasses, and lenses must be registered with the FDA and meet certain quality control standards.

69. For example, lenses must be certified to be impact resistant.[14]

### D. Prescription Eyewear Must Be Prescribed by a Licensed Professional.

70. In the United States, individuals seeking to obtain prescription eyewear are likely to encounter one of the three "O's" (ophthalmologist, optometrist, optician).

71. An ophthalmologist is a medical doctor who has completed 12-14 years of specialized training. An ophthalmologist is trained to treat underlying eye conditions in addition to conducting vision screenings and prescribing corrective lenses.

72. An optometrist provides primary vision care, including vision testing. An optometrist is not a medical doctor but has certain college education and an additional four-year degree from an optometry school. An optometrist is "licensed to practice optometry, which primarily involves performing eye exams and vision tests, prescribing and dispensing corrective lenses, detecting certain eye abnormalities, and prescribing medications for certain eye diseases in some states."[15]

---

[14] 21 C.F.R. § 801.410.

[15] What Is an Ophthalmologist vs Optometrist?, American Academy of Ophthalmology, https://www.aao.org/eye-health/tips-prevention/what-is-ophthalmologist (last visited Aug. 5, 2024).

73. An optician is a technician "trained to design, verify and fit eyeglass lenses and frames, contact lenses, and other devices to correct eyesight" but does not prescribe corrective lenses and does not perform vision tests.[16]

74. To obtain prescription lenses, an individual typically needs a prescription that will ensure the lenses are tailored to the individual's eye needs. The prescription is the result of a visual examination of the eyes by either an optometrist or an ophthalmologist.

75. Traditionally, when someone needed eyeglasses, they would see an ophthalmologist or optometrist to obtain a prescription. With that prescription, the patient typically filled it by obtaining eyeglasses at the doctor's office or through an optician. Today, many prescriptions are filled online. Thus, prescription lenses may be dispensed in brick-and-mortar stores or over the internet.

76. Any of the "three O's" may be affiliated with a vision center, such as Pearle Vision or LensCrafters, which are widely-used vision centers with locations nationwide. EssilorLuxottica owns the largest retail vision centers in the United States, including both Pearle Vision and LensCrafters. Alternatively, optometrists and ophthalmologists might be "independent," meaning they do not practice within a particular brand of vision centers. Nevertheless, EssilorLuxottica maintains control of these "independent" optometrists and ophthalmologists through its control over vision insurance and numerous buying alliances.

---

[16] *Id.*

77. Both branded vision centers and independent optometrists and ophthalmologists typically accept specific vision insurance providers. EssilorLuxottica controls this space too. EssilorLuxottica, through vision insurers it owns[17] and, on information and belief, agreements with third-party insurers giving EssilorLuxottica products preferential or exclusive treatment,[18] ensures that both optometrists and ophthalmologists prescribe and dispense primarily EssilorLuxottica branded and/or licensed products.

## II.   EssilorLuxottica's Acquisition of Monopoly Power

78. Essilor and Luxottica separately, and now together as EssilorLuxottica, have participated in a decades long merger and acquisition spree, ensuring their control over every aspect of the Premium Eyewear Market, as reflected in the following chart:



---

[17] Vision insurers have rigged the market to get you to buy their glasses, David Lazarus, https://www.latimes.com/business/lazarus/la-fi-lazarus-eyewear-vision-plans-20190319-story.html.
[18] See, e.g., Eyewear formulary for Versant Health members, https://versanthealth.com/wp-content/uploads/2021/05/Eyewear-formulary-4-15-21.pdf (including only lenses manufactured or controlled by EssilorLuxottica).

79. EssilorLuxottica has guaranteed its dominance in every aspect of the Premium Eyewear Market through carefully calculated acquisitions of and partnerships with Premium Spectacle Frame, Premium Sunglass, and Premium Prescription Lens brands, as well as acquisitions of and collaborations with retailers, competitor organizations, vision insurance companies, manufacturers, and processors.

80. EssilorLuxottica's mission to obtain a dominant position in the Premium Eyewear Market has equipped it with an arsenal of top-rated spectacle frame and sunglass brands, prescription lens brands, retailers, group purchasing organizations, a vision insurance company, and manufacturing and processing facilities. With EssilorLuxottica's diverse portfolio, it has created an illusion of choice in the Premium Eyewear Market.

81. EssilorLuxottica's illusion of choice lulls consumers into a false sense of confidence that the Premium Eyewear Market is a competitive one, when in reality, it is saturated with EssilorLuxottica products under various names.

82. The resulting lack of competition allows EssilorLuxottica to control the Premium Eyewear Market and charge consumers supra-competitive prices without fear of repercussions.

## A. Essilor and Luxottica Merged to Form the World's Largest Eyewear Conglomerate, EssilorLuxottica.

83. Essilor was established in 1849 in Paris, France and initially manufactured spectacle frames as Société des Lunetiers, or SL. In 1861, SL entered the lens manufacturing world, hoping to dominate the industry in Paris.

84. The company eventually expanded into the global market and in 1962, SL changed its name to ESSEL. ESSEL frequently partnered with the Lissac Group, which was comprised of two parts, SIL and LOR.

85. In 1969, SIL and LOR merged to become SILOR. In 1972, ESSEL merged with SILOR to create the Essilor Group.[19]

86. Luxottica was founded in 1961 by Leonardo Del Vecchio in Agordo, Italy. At its inception, the company only produced eyewear components, but Del Vecchio had his sights set on dominating the eyewear market.[20] Shortly after the company's creation, it started doing just that. After experiencing success in the production of spectacle frames, Luxottica launched into an acquisition and expansion phase that continues to this day.

87. Beginning in 1974 and continuing through the present, Luxottica, now EssilorLuxottica, vertically and horizontally integrated, acquiring wholesalers, retailers, manufacturers, brands, and other entities involved in the Premium Eyewear Market. These acquisitions are in addition to the exclusive licensing agreements that the company has entered into with a multitude of Fashion House Brands.

---

[19] Autumn Sprabary, EssilorLuxottica: The visionary marriage of two industry pioneers, All About Vision, (Aug. 11, 2021), https://www.allaboutvision.com/eyewear/essilor-luxottica-frames-eyewear-brands/#:~:text=Essilor%20was%20first%20established%20in,leading%20lens%20manufacturer%20in%20Paris.

[20] A Fascinating History, An Unstoppable Journey: A Future to be Built Day by Day, Luxottica, 2 (Dec. 1, 2023), https://www.essilorluxottica.com/en/group/history/.

88. Luxottica's expansion began with the company's acquisition of Scarrone S.p.a, an eyewear wholesaler, and continued with Luxottica acquiring most of its competition, including, but not limited to, Vogue Eyewear, Persol, LensCrafters, Ray-Ban, Sunglass Hut, Pearle Vision, Target Optical, Sears Optical, Oakley, Glasses.com, and a number of foreign eyewear companies.[21]

89. In 2018 Luxottica merged with Essilor to create the global eyewear conglomerate, EssilorLuxottica.[22]

90. With this merger, EssilorLuxottica became a behemoth in nearly every facet of the Premium Eyewear Market, describing itself as the "biggest in the industry" with a "united market structure" whose "scale disparity has increased further."[23]

91. EssilorLuxottica's acquisitions (including those of its predecessors) have allowed it to become a giant in the Premium Eyewear industry, controlling at least 80 percent of brands in the Premium Eyewear Market.[24]

---

[21] *Id.*

[22] Essilor and Delfin successfully completed the combination of Essilor and Luxottica by creating EssilorLuxottica, a global leader in the eyecare and eyewear industry, EssilorLuxottica, (Sept. 30, 2018), https://www.essilorluxottica.com/en/newsroom/press-releases/essilor-and-luxottica-combination/.

[23] See EssilorLuxottica Capital Market Day 2022, available at https://www.essilorluxottica.com/en/cap/content/101694/ (last visited Jan. 16, 2024).

[24] Ana Swanson, Meet the Four-Eyed, Eight-Tentacled Monopoly That is Making Your Glasses So Expensive, Forbes (Sept. 10, 2014), https://www.forbes.com/sites/anaswanson/2014/09/10/meet-the-four-eyed-eight-tentacled-monopoly-that-is-making-your-glasses-so-expensive/?sh=a65602a6b66b.

92. EssilorLuxottica's domination of every aspect of the Premium Eyewear Market was obtained and maintained through, among other things, acquisitions of numerous retail outlets, eyewear manufacturers, eyewear wholesalers, prescription lens processors, and other businesses that allow it to exert control over the Premium Eyewear Market, as well as contracting with some of the largest Fashion Houses in the world to produce their eyewear.

93. Because EssilorLuxottica produces most Premium Eyewear in the market and owns, operates, and/or controls the majority of Premium Eyewear retailers, consumers unknowingly have few alternatives to EssilorLuxottica. With few alternatives, EssilorLuxottica can set supra-competitive prices, and consumers have no option but to pay those prices.

**B. EssilorLuxottica Has Eliminated Competition by Systematically Acquiring Competitors in all Facets of the Premium Eyewear Market.**

94. Through EssilorLuxottica's decades long acquisition journey, it has secured control over Premium Eyewear spectacle and sunglass brands, lens brands, retail outlets, frame and lens manufacturing, lens processing, buying alliances, insurance providers, and numerous other entities.

95. Throughout the Class Period, EssilorLuxottica has exercised monopoly power in the market for Premium Eyewear and it controls most of the prescription lens processing and prescription lens fabricating equipment therein. EssilorLuxottica acquired its monopoly power by systematically acquiring its rivals and using its dominant market

position and its control of retailers and prescription lens processing to create barriers to foreclose competition in the Premium Eyewear Market.

96. Further, EssilorLuxottica has entered into exclusive licensing agreements with numerous Fashion Houses that have allowed and still allow it to be the sole Premium Eyewear producer for nearly twenty major Fashion House Brands. These agreements foreclose ready-made markets for other manufacturers.

97. Both before and after the merger that created it, EssilorLuxottica has also acquired many of the United States's largest eyewear retail locations, a vision benefits company, and group purchasing organizations that control purchasing decisions for thousands of eyecare professionals. These acquisitions further foreclose markets to potential competitors.

98. As of 2014, Luxottica and now EssilorLuxottica controlled an estimated 80% of the major Premium Eyewear Brands globally.[25] EssilorLuxottica's control of the market has further expanded since its 2018 merger.

99. EssilorLuxottica's domination among brands, retailers (both store and online), buying alliances, vision insurance, frame manufacturers, lens processing facilities, and even eyecare professional instrument manufacturers in the Premium Eyewear Market has eliminated choice and created an anticompetitive environment where supra-

---

[25] *Id.*

competitive prices reign, in direct violation of the Sherman Act and state antitrust and consumer protection laws.

100. These continued violations create an environment of false competition and require action to remedy the state of the Premium Eyewear Market for millions of impacted Class members.

1. **EssilorLuxottica Has Acquired the Majority of Premium Sunglass and Premium Spectacle Frames Brands.**

101. The top Premium Sunglass brands in the United States are as follows:

| Brand | Group |
| --- | --- |
| Ray-Ban | EssilorLuxottica |
| Oakley | EssilorLuxottica |
| Prada | EssilorLuxottica |
| Gucci | Others |
| Oliver Peoples | EssilorLuxottica |
| Dolce & Gabbana | EssilorLuxottica |
| Maui Jim | Others |
| Versace | EssilorLuxottica |
| Persol | EssilorLuxottica |
| Tom Ford | Others |
| Costa | EssilorLuxottica |
| Burberry | EssilorLuxottica |
| Ralph Lauren | EssilorLuxottica |
| Coach | EssilorLuxottica |
| Dior | EssilorLuxottica |
| Vogue | EssilorLuxottica |
| Michael Kors | EssilorLuxottica |
| Saint Laurent | EssilorLuxottica |
| Tiffany & Co. | EssilorLuxottica |
| Giorgio Armani | EssilorLuxottica |

102. Of these top twenty brands, seventeen are owned, manufactured and/or distributed under exclusive license agreements by EssilorLuxottica, specifically Luxottica Group S.p.A., including Ray-Ban which is the "the first sunglasses/eyeglasses brand I think of …" according to 90% of respondents 18-45 years old.[26]

103. The top Premium Spectacle Frames brands are as follows:

| Brand | Group |
|---|---|
| Ray-Ban | EssilorLuxottica |
| Oakley | EssilorLuxottica |
| Coach | EssilorLuxottica |
| Oliver Peoples | EssilorLuxottica |
| Vogue | EssilorLuxottica |
| Michael Kors | EssilorLuxottica |
| Burberry | EssilorLuxottica |
| Armani Exchange | EssilorLuxottica |
| Versace | EssilorLuxottica |
| Nike | Others |
| Calvin Klein | Others |
| DbyD | EssilorLuxottica |
| Ralph Lauren | EssilorLuxottica |
| Emporio Armani | EssilorLuxottica |
| Unofficial | EssilorLuxottica |
| Prada | EssilorLuxottica |
| Polo | EssilorLuxottica |
| Dolce & Gabbana | EssilorLuxottica |
| Tom Ford | Others |
| Vera Bradley | Others |

---

[26] Ray-Ban Brand Presentation, Luxottica Univ., https://visionsourceshowcase.luxottica.com/wp-content/uploads/RayBan_BrandPresentation.pdf, (last visited Aug. 5, 2024).

104. EssilorLuxottica, and specifically Luxottica Group S.p.A. owns, or is exclusively licensed to manufacture and distribute, sixteen of the top twenty Premium Spectacle Frame brands.

105. When faced with such apparent variety, customers believe they have numerous options in the Premium Eyewear Market. In reality, EssilorLuxottica owns or exclusively licenses seventeen of the twenty most popular Premium Sunglass brands and sixteen of the twenty most popular Premium Spectacle frame brands in the United States.

106. For the past few decades, EssilorLuxottica and its pre-merger entities acquired numerous well known and successful Premium Eyewear brands that previously competed against one another before being acquired by EssilorLuxottica's pre-merger entities , including:

A.    1981: Sferoflex
B.    1990: Vogue Eyewear
C.    1995: Persol
D.    1999: Ray-Ban
E.    1999: Arnette
F.    2007: Oakley
G.    2007: Oliver Peoples
H.    2013: Alain Mikli, Starck Biotech Paris
I.    2014: Costa Del Mar

107. In addition, EssilorLuxottica owns the following brands: Bolon, DbyD, Luxottica, Native, and Unofficial. These brands, along with those listed in the preceding paragraph are referred to as the "**Proprietary Brands**."

108. EssilorLuxottica has also obtained the exclusive right to design, manufacture, distribute, and sell Premium Eyewear for many luxury Fashion Houses directly to consumers through long-term exclusive licensing agreements in exchange for royalty payments on their sale.[27]

109. The length of these exclusive licensing agreements prevents actual or potential rivals from producing or distributing Premium Eyewear for the Fashion Houses.

110. EssilorLuxottica has entered into exclusive licensing agreements with the following Fashion Houses for their Premium Eyewear:

A.	1988: Giorgio Armani
B.	1992: Brooks Brothers
C.	1997: Bulgari
D.	1999: Chanel
E.	2003: Prada
F.	2003: Versace
G.	2006: Dolce & Gabbana
H.	2006: Burberry
I.	2007: Ralph Lauren
J.	2008: Tiffany & Co.
K.	2009: Tory Burch
L.	2012: Coach
M.	2015: Michael Kors
N.	2016: Ferrari
O.	2022: Swarovski
P.	2022: Brunello Cucinelli
Q.	2023: Eastman Kodak Company
R.	2023: Jimmy Choo
S.	2024: Moncler
T.	2024: Diesel

---

[27] A Fascinating History, *supra* note 21.

111. The Fashion Houses listed above that contract with EssilorLuxottica and their related brands, including Emporio Armani, Armani Exchange, Scuderia, Prada Linea Rossa, Miu Miu, Polo Ralph Lauren, Ralph Eyewear and Chaps, are referred to as the "**Fashion House Brands**."

112. Moreover, EssilorLuxottica's acquisition of brands has not slowed, including currently exploring the purchase of Marcolin, the third largest Premium Eyewear Manufacturer. Marcolin manufactures additional brands, including Tom Ford, PUCCI, and others.

113. Based on the variety of brands, consumers mistakenly believe they have options in selecting Premium Eyewear Brands. In reality, these brands are just EssilorLuxottica under a different name and therefore, there is no real choice, which allows EssilorLuxottica to continue to manipulate the Premium Eyewear Market and charge consumers supra-competitive prices.

### 2. Prescription Lens Brands.

114. EssilorLuxottica, through Essilor International S.A.S. and Essilor of America Inc., controls over 80% of the Premium Prescription Lens submarket in the United States.

115. EssilorLuxottica's overwhelmingly dominant position in the Premium Prescription Lens submarket combined with its dominant position in the Premium Spectacle Frame submarket allows it to control the Premium Eyewear Market in the United States.

116. The top Premium Prescription Lens brands are:

| Brand | Group |
|---|---|
| Eyezen | EssilorLuxottica |
| Varilux | EssilorLuxottica |
| Xperio | EssilorLuxottica |
| Transitions | EssilorLuxottica |
| Crizal | EssilorLuxottica |
| Stellest | EssilorLuxottica |
| BlueUV Filter System | EssilorLuxottica |
| KODAK Lenses | EssilorLuxottica |
| Nikon | EssilorLuxottica |
| Shamir | EssilorLuxottica |
| Barberini | EssilorLuxottica |
| Oakley | EssilorLuxottica |
| Ray-Ban | EssilorLuxottica |
| Zeiss | Others |
| Hoya | Others |
| Seiko | Others |

117. EssilorLuxottica describes itself as the "proprietary owners of the world's most iconic vision care and eyewear brands."

118. EssilorLuxottica owns the following Premium Prescription Lens brands:[28]

A.    Eyezen – single vision lenses
B.    Varilux – progressive lenses
C.    BlueUV Filter System
D.    Xperio
E.    Transitions
F.    Crizal
G.    Shamir
H.    Stellest by Essilor
I.    Ray-Ban
J.    Barberini

---

[28] Discover our Brands, https://www.essilor.com/us-en/products/ (last visited Jan. 16, 2024).

119. EssilorLuxottica also has licensing agreements with other major brands, including:

A. Kodak Lens: EssilorLuxottica has had a licensing with Kodak Lens since 2010 and describes this agreement as worldwide and "perpetual."[29]

B. Nikon:[30] Essilor and Nikon's partnership began in 2000, when the companies joined forces to conduct research, development, production, and sales. In 2009, they formed a joint venture based in Japan to expand their research and development of optics and ophthalmic materials.[31] The partnership continues to this day through EssilorLuxottica.

120. The only other major brands of Premium Prescription Lenses not owned and/or manufactured under a license by EssilorLuxottica are Zeiss, Hoya, and Seiko.

121. Similar to EssilorLuxottica's unstoppable acquisition of Premium Spectacle Frame and Premium Sunglass brands, EssilorLuxottica acquired numerous other companies in the Premium Prescription Lens realm, including Transitions Optical in 2014 and 50% control of Shamir in 2010. EssilorLuxottica acquired the remaining 50% of Shamir in August 2022.[32]

---

[29] EssilorLuxottica has held a licensing agreement with Kodak Lens since 2010. See https://www.essilorluxottica.com/en/brands/eyecare/; *see also* EssilorLuxottica 2023 Universal Registration Document at p.32.

[30] EssilorLuxottica describes this as a "joint venture." *See* https://www.essilorluxottica.com/en/brands/eyecare/.

[31] Nikon Corporation, Japan and Essilor International, France, establish a joint research center in Japan, Nikon, https://www.nikon.com/company/news/2009/0212_01.html, (last visited Jan. 23, 2024).

[32] https://www.visionmonday.com/business/international-news/article/essilorluxottica-acquires-100-percent-of-shamir-optical. Before this full acquisition, it was reported that Essilor acquired a 50% stake in Shamir Optical in 2011 for $130 million. *See* https://www.optiknow.ca/2022/08/03/reports-essilorluxottica-acquires-100-of-shamir-optics/.

122. Through these acquisitions, EssilorLuxottica obtained monopoly power in the Premium Prescription Lens market. Its other anticompetitive conduct, described herein, allowed it to maintain its monopoly power.

123. EssilorLuxottica's prominent collection of Premium Prescription Lens brands and partnerships, coupled with its heavy influence on eyecare providers, allows it to push other market participants to purchase and sell EssilorLuxottica brands, thereby forcing patients to purchase EssilorLuxottica brands, effectively eliminating a patient's prescription lens choice.

124. This illusion of choice and subsequent steering creates an uncompetitive market, allowing supra-competitive prices to go unchecked.

### 3. EssilorLuxottica's Domination of the Retail Sphere.

125. The top sixteen physical retailers in the United States are:

| Retailer | 2022 Sales ($ Millions) | 2022 Locations | EssilorLuxottica Presence |
|---|---|---|---|
| Vision Source L.P. | $2,675 | 2,994 | EssilorLuxottica Owned |
| Luxottica Retail | $2,500 | 2,173 | EssilorLuxottica Owned |
| National Vision Holdings, Inc | $2,005 | 1,354 | Sells EssilorLuxottica Frames and Lenses |
| Walmart Inc. | $1,880 | 3,422 | Sells EssilorLuxottica Lenses |
| EyeCare Partners LLC | $1,665 | 700 | Sells EssilorLuxottica Frames and Lenses |
| Costco Optical | $1,515 | 555 | Sells EssilorLuxottica Lenses |
| Capital Vision Services (MyEyeDr.) | $1,314 | 852 | Sells EssilorLuxottica Frames |
| Visionworks of America, Inc. | $1,130 | 745 | Sells EssilorLuxottica Frames and Lenses |

| | | | |
|---|---|---|---|
| Warby Parker | $598 | 200 | 0% |
| Keplr Vision | $455 | 284 | Sells EssilorLuxottica Frames and Lenses |
| AEG Vision | $450 | 350 | Sells EssilorLuxottica Frames |
| Eyemart Express | $345 | 241 | EssilorLuxottica Owned |
| Now Optics Holdings, LLC | $289 | 287 | 0% |
| Cohen's Fashion Optical | $150 | 123 | Sells EssilorLuxottica Frames and Lenses |
| Shopko Optical | $142 | 141 | Sells EssilorLuxottica Frames and Lenses |
| Texas State Optical (TSO) | $121 | 104 | Sells EssilorLuxottica Frames |

126. EssilorLuxottica, through Luxottica Group S.p.A., EssilorLuxottica USA Inc., and Luxottica of America Inc., owns three, including the top two, of the top sixteen physical retailers. EssilorLuxottica products are sold in eleven of the other top sixteen retailers. It thus has a foothold in fourteen of the top sixteen physical retailers in the United States.

127. In 1995, EssilorLuxottica, through its pre-merger predecessors, began systematically acquiring eyewear retail outlets. This systematic march has led to EssilorLuxottica's extensive retail presence in the United States today. Specifically, over time EssilorLuxottica and its predecessors have purchased numerous well-known and successful eyewear retailers, including:

A. 1995: LensCrafters;
B. 2001: Sunglass Hut;
C. 2004: Cole National, including Pearle Vision, Sears Optical, and Target Optical;
D. 2007: Oakley Stores;
E. 2009: FramesDirect.com;
F. 2014: Glasses.com; and
G. 2021: For Eyes.

128. EssilorLuxottica has not stopped with its acquisition of retailers with physical retail locations, but has continued to expand its presence into the online retail space as well.

129. Online retail eyewear purchases have increased in recent years. Consumers use this medium to compare styles, prices, and eventually to purchase their new eyewear.[33]

130. As online retailers have grown, EssilorLuxottica has expanded its reach in the Premium Eyewear Market.

131. The top ten online eyewear retailers include:

| Website | Owner | Monthly US Visitors | Market Share of Visitors |
|---|---|---|---|
| www.zennioptical.com | Independent | 5,843,867 | 15.30% |
| eyebuydirect.com | EssilorLuxottica Retail | 5,579,748 | 14.61% |
| warbyparker.com | Warby Parker | 4,070,499 | 10.66% |
| glassesusa.com | Sells EssilorLuxottica | 2,954,928 | 7.74% |
| ray-ban.com | EssilorLuxottica Retail | 2,851,168 | 7.47% |
| americasbest.com | National Vision Holdings - Sells EssilorLuxottica | 2,588,186 | 6.78% |
| Oakley.com | EssilorLuxottica Retail | 2,230,107 | 5.84% |
| lenscrafters.com | EssilorLuxottica Retail | 2,155,313 | 5.64% |
| visionworks.com | Sells EssilorLuxottica | 1,458,612 | 3.82% |
| sunglasshut.com | EssilorLuxottica Retail | 1,042,524 | 2.73% |

---

[33] Everyday Life & Culture, EyeMed, https://eyemed.com/en-us/blog/everyday-life-culture/how-retail-eyewear-shopping-trends-are-shaping-vision-benefits-38354#:~:text=Retail%20eyewear%20spending%20keeps%20trending%20up&text=In%202020%2C%20the%20Vision%20Council's,22%25%20just%203%20years%20earlier.&text=Consumers%20aren't%20just%20window%20shopping%20(though%20many%20are), (last visited Jul. 3, 2024).

132. EssilorLuxottica, through Luxottica Group S.p.A., EssilorLuxottica USA Inc., and Luxottica of America Inc., own five of the top ten online retailers, and three of the remaining online retailers sell EssilorLuxottica products.

133. EssilorLuxottica also owns the following online eyewear retailers:

A.    OliverPeoples.com;
B.    Clearly;
C.    VisionDirect;
D.    Lenstore;
E.    FramesDirect.com;
F.    Glasses.com;
G.    Foreyes.com; and
H.    Glasses direct.

134. Thus, whether shopping in retail stores or shopping online, consumers are presented with many retailers, creating an appearance of choice. This is all an illusion because EssilorLuxottica owns or is affiliated with most of the retail stores and online retailers. EssilorLuxottica's expansive reach effectively strips consumers of the choice they believe they have.

### 4.    Spectacle Frame and Prescription Lens Manufacturing.

135. EssilorLuxottica, through EOA Holding Co., Inc., Luxottica Group S.p.A., and Essilor International S.A.S. continues to establish its dominance in the Premium Eyewear Market by acquiring Premium Eyewear manufacturing resources.

136. Through its acquisition of manufacturers, EssilorLuxottica now largely owns and/or maintains control of both Premium Prescription Lens and Premium Spectacle Frame manufacturing.

137. Before and since Essilor and Luxottica's merger, EssilorLuxottica has continually purchased numerous eyewear manufacturers, including:

A.     1995: Gentex Optics;
B.     2003: OPSM;
C.     2008: Satisloh;
D.     2013: Xiamen Yarui Optical Co., Ltd., d/b/a Bolon;
E.     2014: Transitions Optical;
F.     2018: Fuki Megan (manufacturer, 67% stake); and
G.     2019: Barberini (manufacturer).

138. Through these acquisitions, EssilorLuxottica has obtained the ability to control the Premium Prescription Lens and Premium Spectacle Frame manufacturing arena, meaning it has the power to control who can produce Premium Prescription Lenses and Premium Spectacle Frames.

139. By controlling the means through which a brand can enter or maintain a presence in the Premium Eyewear Market, EssilorLuxottica has the ability to eliminate competition.

140. Through EssilorLuxottica's control of Premium Eyewear manufacturing, it controls what brands have the opportunity to be on the market, further limiting consumer choice.

**5.  Lens Processing**

141. In addition to owning over 80% of the Premium Prescription Lens brands and controlling a majority of Premium Prescription Lens manufacturing, EssilorLuxottica, through Essilor International SAS, EOA Holding Co., Inc., and Essilor of America Inc.,

controls a significant portion of Premium Prescription Lens processing in the United States by controlling the Premium Prescription Lens processing facilities, or laboratories.

142. The top prescription lens processing labs include the following:



Sales by Supplier Owned Labs

143. Of the top labs, EssilorLuxottica by far maintains the highest sales.

144. In keeping with its strategy of total dominance, EssilorLuxottica has continued to acquire other, previously independent, prescription lens processing facilities, including:

A. Walman Optical – March 2022[34]
B. Expert Optics – October 2018[35]
C. U.S. Optical – July 2016[36]

---

[34] EssilorLuxottica Closes Acquisition of Walman Optical, https://www.essilorluxottica.com/cap/content/104460/.

[35] Essilor of America Acquires Expert Optics, Vision Monday, https://www.visionmonday.com/latest-news/article/essilor-of-america-acquires-expert-optics, (last visited Jan. 23, 2024).

[36] https://www.visionmonday.com/latest-news/article/essilor-of-america-acquires-us-optical-second-largest-independent-lab-1/. At the time, this was the second largest independent optical lab in the United States.

145. Prescription lens processing facilities are important as retailers and eyecare professionals typically do not have the ability to process their own prescription lenses. With EssilorLuxottica owning 3 mass production lens plants, 22 industrial lens production facilities, and 103 proximity lens production facilities,[37] EssilorLuxottica has a significant say in what and when prescription lenses are processed.

146. Some eyecare professionals have stated that if they do not request EssilorLuxottica products, their orders may not be processed, forcing them to order EssilorLuxottica products to ensure their business can continue operating.

147. When eyecare professionals are required to order and stock EssilorLuxottica items, they are likely to steer their customers toward EssilorLuxottica products, yet again eliminating consumer choice.

148. By obtaining control over the prescription lens processing capacity in the United States, EssilorLuxottica has ensured its domination over the Premium Eyewear Market.

**6.  EssilorLuxottica's Acquisition of Buying Alliances.**

149. Through Essilor Doctor Alliances Corporation and Essilor of America Inc., EssilorLuxottica also owns several optometric buying alliances, comprised of so-called independent optometrists. Membership in one of EssilorLuxottica's buying alliances provides eyecare professionals with buying power, networking opportunities, and

---

[37] EssilorLuxottica 2023 Universal Registration Document at p.34.

practice assistance, but also allows EssilorLuxottica to control many aspects of their business and prevents these eyecare professionals from truly being independent.

150. EssilorLuxottica maintains significant power in the buying alliance arena, owning some of the largest alliances, including Vision Source LP (2015); PERC/IVA (2015); and Optiport (2016).

151. These alliances have thousands of members and locations, including Vision Source's membership of over 3,000 optometric practices in the Vision Source network,[38] PERC/IVA's membership of over 10,000 optometrists in over 5,800 locations,[39] and Optiport's membership of over 400 offices.[40]

152. Vision Source is the leading optical retailer.

153. Thus, although consumers may believe they have diverse eyecare professional location options and that they have options when selecting their eyecare professional, EssilorLuxottica's ownership of three of the top buying alliances further demonstrates their influence over "independent" eyecare professionals and shows consumers' assumption of choice is inaccurate.

---

[38] Exceptional Eye Care That Goes Beyond Your Eyes, Vision Source, https://visionsource.com/, (last visited Aug. 5, 2024).

[39] PERC, Facebook, https://www.facebook.com/PERCalliance/, (last visited Aug. 5, 2024).

[40] Essilor Acquires Opti-Port Alliance, Vision Monday, Apr. 25, 2016, https://www.visionmonday.com/business/dba/article/essilor-acquires-optiport-alliance#:~:text=Opti%2DPort%2C%20based%20in%20St,400%20offices%20throughout%20the%20country.

### 7. EssilorLuxottica's Ownership and Control of Vision Insurers

154. EssilorLuxottica maintains a wholly owned subsidiary, EyeMed, that is one of the largest vision benefits companies in the United States.[41]

155. EyeMed claims to be America's fastest growing vision benefits company.

156. EyeMed touts its "independent" provider network, which includes LensCrafters, Pearle Vision, and Target Optical, all of which are subsidiaries of EssilorLuxottica.[42]

157. On information and belief, EyeMed requires or incentivizes its in-network providers to market or sell EssilorLuxottica's Premium Eyewear to consumers.

158. EyeMed directly markets EssilorLuxottica's Premium Eyewear to consumers.

159. Further, on information and belief, EssilorLuxottica partners with additional vision insurance companies who in turn require or incentivize their in-network providers to market or sell EssilorLuxottica's Eyewear to consumers.

160. EssilorLuxottica's dominance in the vision insurance industry forecloses competition and provides consumers with few options.

---

[41] Vision benefits for every pair of eyes, EyeMed (Dec. 4, 2023), https://www.eyemed.com/en-us.

[42] *Id.*

## III. EssilorLuxottica's Monopoly Power

161. EssilorLuxottica maintains control over all aspects of the Premium Eyewear Market as a vertically and horizontally integrated, multinational conglomerate that designs, manufactures, distributes, and sells Premium Eyewear and provides vision benefits to consumers through its subsidiary, EyeMed, and partners with independent optometrists through Vision Source, Opti-Port, and PERC. EssilorLuxottica provides eyecare professionals with essential office equipment through Essilor Instruments. The extent of its control gives it enormous market power in the Premium Eyewear Market.

162. EssilorLuxottica touts its vertical integration as the "key pillar" of its business and that it "owes its extraordinary destiny to a well-designed global manufacturing and distribution network."[43]

163. EssilorLuxottica's horizontal and vertical integration "covers the industry's entire value chain." Indeed, "it is the combination of two highly complementary and inspiring companies, one in advanced lens technology and the other in the craftsmanship of iconic eyewear, which leveraged their individual strengths to revolutionize the industry...."[44]

---

[43] EssilorLuxottica 2023 Universal Registration Document at p.18.

[44] *Id.* at p.21.

164. The below chart outlines the scope of EssilorLuxottica's vertical integration and shows that "with the combination of Essilor and Luxottica in 2018 came the creation of a fully integrated, all-round champion in the eyewear industry combining lenses and frames under the same roof."[45]



165. EssilorLuxottica now controls significant players in the Premium Eyewear Market, owns and controls the most popular retailers, maintains a presence in the vision insurance arena, and controls significant portions of Premium Eyewear and prescription lens manufacturing.

166. EssilorLuxottica's extensive control of the Premium Eyewear Market creates a perception of choice in the Premium Eyewear Market. Unfortunately, this choice is nothing more than an illusion accomplished by EssilorLuxottica's varied portfolio. In reality, EssilorLuxottica controls the majority of the market including Premium Eyewear

---

[45] *Id.*

brands, retailers, buying alliances, vision insurance, frame manufacturers, lens processing facilities, and eyecare professional instrument manufacturers.

## IV. EssilorLuxottica's Horizontal and Vertical Restraints on Trade and Anticompetitive Conduct.

167. EssilorLuxottica has used its numerous acquisitions to flood the market with its products and used its dominant position to control other brands and independent entities.

168. EssilorLuxottica maintains this control through a variety of anticompetitive agreements restraining trade, including exclusive licensing agreements, sales agreements with other Premium Eyewear Competitors' brands, and distribution agreements that include most favored nation agreements.

169. Flooding the Premium Eyewear Market with its various branded products to give the appearance of consumer choice and utilizing its products and brands as leverage to force other entities into anticompetitive agreements allows EssilorLuxottica's control of the market to go unchallenged.

170. With a lack of competition, consumers are faced with little to no other options in the Premium Eyewear market and are thereby forced to pay astronomically higher prices than would be seen absent EssilorLuxottica's anticompetitive conduct.

### A. Agreements Restraining Trade

171. Luxottica Group S.p.A., and EssilorLuxottica as a whole, use numerous agreements to further their anticompetitive scheme, including entering into licensing

agreements with Fashion Houses, entering into sales agreements with other Premium Eyewear Competitors, and ensuring Third Party Sellers maintain agreed upon pricing with most favored nation and distribution agreements.

## 1. Long-Term Exclusive Licensing Agreements with Fashion House Brands

172. In addition to EssilorLuxottica's Proprietary Brands, it also has exclusive license to design, manufacture, distribute, and sell a number of luxury Fashion House Brands. The length and exclusivity of these exclusive licensing agreements prevent actual or potential rivals from acquiring rights to produce or distribute for the Fashion House Brands.

173. EssilorLuxottica's exclusive licensing agreements with the Fashion House Brands are "exclusive, global contracts," often 10-15 years in length.[46]

174. Many of these deals have been renewed after their original signing and sometimes far in advance of their expiration, including, but not limited to:

A.    Armani: Armani Group and Luxottica initially entered into an exclusive licensing agreement on January 1, 2013. On September 14, 2022, Armani and

---

[46] EssilorLuxottica 2022 Universal Registration Document at p.36.

EssilorLuxottica agreed to renew their licensing agreement for an additional 15 years. This agreement took effect on January 1, 2023.[47]

B.  Burberry: Luxottica and Burberry originally entered into an exclusive licensing agreement that began on January 1, 2006.[48] This initial agreement was to last for 10 years, expiring in 2015. Luxottica and Burberry renewed the agreement for an additional 10 years, and if an extension is not negotiated, the renewed agreement is set to expire on December 31, 2025.[49]

C.  Chanel: Luxottica and Chanel renewed their exclusive licensing agreement effective through December 31, 2024, with the option of a 3-year extension.[50]

D.  Coach: According to Tapestry, Coach's parent company, Luxottica and Coach entered into their first global license agreement in 2010 with the agreement set to begin on January 1, 2012.[51] In June of 2021, an extension of EssilorLuxottica and Coach's

[47] EssilorLuxottica and the Armani Group announce 15-year licensing renewal, EssilorLuxottica, https://www.essilorluxottica.com/en/newsroom/press-releases/15-year-licensing-renewal-armani/.

[48] Luxottica Signs New 10-Year Eyewear License with Burberry, Vision Monday, https://www.visionmonday.com/latest-news/article/luxottica-signs-new-10-year-eyewear-license-with-burberry.

[49] Luxottica and Burberry renew eyewear license agreement, Fashion Network, https://ww.fashionnetwork.com/news/luxottica-and-burberry-renew-eyewear-license-agreement,555423.html.

[50] Luxottica renews eyewear license contract with Chanel, Fashion Network, https://ww.fashionnetwork.com/news/Luxottica-renews-eyewear-licence-contract-with-chanel,1150868.html#ifm-bachelor-of-arts.

[51] Coach Signs Multi-Year Global License Agreement With Luxottica For Coach Eyewear, Tapestry, https://tapestry.gcs-web.com/news-releases/news-release-details/coach-signs-multi-year-global-license-agreement-luxottica-coach.

exclusive license agreement was announced. The agreement is set to expire on June 30, 2026, with the potential for a 5-year extension.[52]

E.     Dolce & Gabbana: Dolce & Gabbana originally granted Luxottica an exclusive license in 2006. The companies signed another agreement allowing EssilorLuxottica to maintain its exclusive license for Dolce & Gabbana Premium Sunglasses and Premium Spectacle Frames through December 31, 2039.[53] The amended agreement was not set to expire until December 31, 2029,[54] locking Dolce & Gabbana into an agreement 5-years before the original was even set to expire.

F.     Ferrari: Beginning in 2016, Luxottica partnered with Ferrari to design, produce, and market Premium Eyewear that featured the Scuderia Ferrari and Ray-Ban brands. On December 15, 2022, EssilorLuxottica and Ferrari renewed and expanded the agreement. EssilorLuxottica was also permitted to design, produce, and market the first collection of monobrand eyewear featuring Ferrari's trademarked Prancing Horse.[55]

---

[52] EssilorLuxottica and Coach renew global license agreement, EssilorLuxottica, https://www.essilorluxottica.com/en/newsroom/press-releases/essilorluxottica-and-coach-renew-global-license-agreement/.

[53] EssilorLuxottica and Dolce&Gabbana Announce 16-year Licensing Renewal, https://www.essilorluxottica.com/en/newsroom/press-releases/essilorluxottica-dolcegabbana-16-year-licensing-renewal/.

[54] Edoardo Meliado, Dolce & Gabbana renews eyewear license deal with Luxottica until 2029, Fashion Network, https://ww.fashionnetwork.com/news/Dolce-gabbana-renews-eyewear-licence-deal-with-luxottica-until-2029,1198988.html.

[55] EssilorLuxottica extends its partnership with Ferrari, new license agreement for Prancing Horse brand, EssilorLuxottica, https://www.essilorluxottica.com/en/newsroom/press-releases/license-agreement-with-ferrari/.

48

G.      Michael Kors: In April 2015, Luxottica and Michael Kors announced that beginning in 2015, they would be entering into a 10-year exclusive licensing agreement. Marchon Eyewear previously held the exclusive licensing agreement with Michael Kors, but Michael Kors chose not to renew.[56] As of February 2024, EssilorLuxottica and Michael Kors have decided to renew their agreement, which will take effect on January 1, 2025, and cover a 5-year period with an option for a 5-year extension.[57]

H.      Polo by Ralph Lauren: In 2007, Polo by Ralph Lauren first entered into an exclusive licensing agreement with Luxottica to design, produce, and distribute Polo branded Premium Sunglass and Premium Spectacle Frames.[58] In 2017, the companies renewed their partnership for an additional 10 years. With this renewal, Luxottica maintained its exclusive ability to design, produce, and distribute Premium Sunglass and Premium Spectacle Frames for Polo by Ralph Lauren.[59]

---

[56] Luxottica Signs New Eyewear License With Michael Kors, Vision Monday, https://www.visionmonday.com/latest-news/article/luxottica-signs-new-eyewear-license-with-michael-kors-1.

[57] EssilorLuxottica and Michael Kors Announce Extended Licensing Partnership, EssilorLuxottica, https://www.essilorluxottica.com/en/newsroom/press-releases/essilorluxottica-michael-kors-extended-licensing-partnership/.

[58] POLO RALPH LAUREN ENTERS INTO LICENSING AGREEMENT WITH LUXOTTICA GROUP, S.P.A., Ralph Lauren Investor Relations, https://investor.ralphlauren.com/news-releases/news-release-details/polo-ralph-lauren-enters-licensing-agreement-luxottica-group-spa.

[59] Nicola Mira, Luxottica renews license agreement for Ralph Lauren eyewear for 10 years, Fashion Network, https://us.fashionnetwork.com/news/Luxottica-renews-licence-agreement-for-ralph-lauren-eyewear-for-10-years,782887.html.

I.      Prada: On May 14, 2015, Prada and Luxottica announced they renewed their exclusive licensing agreement for an additional 10-years. The agreement grants Luxottica the exclusive right to design, produce, and distribute Premium Spectacle Frames and Premium Sunglasses under the Prada and Miu Miu brands.[60]

J.      Tiffany & Co.: On December 15, 2017, Luxottica and Tiffany & Co. renewed their exclusive licensing agreement that allows Luxottica to develop, manufacture, and distribute Premium Sunglasses and Premium Spectacle Frames under the Tiffany & Co. brand. This agreement expires on December 31, 2027.[61]

K.      Tory Burch: Luxottica and Tory Burch entered into their first exclusive licensing agreement in 2009.[62] In June 2021, EssilorLuxottica and Tory Burch renewed their exclusive licensing agreement. The terms of the agreement allow EssilorLuxottica to develop, produce, and distribute Premium Sunglasses and Premium Spectacle Frames

---

[60] Luxottica Group and Prada Group renew eyewear license agreement, EssilorLuxottica, https://www.luxottica.com/sites/luxottica.com/files/luxottica_group_and_prada_group_renew_license_agreement_14.05.15.pdf.

[61] Tiffany & Co. Strengthens Eyewear Offering With Renewed Luxottica, Tiffany & Co., https://press.tiffany.com/tiffany-co-strengthens-eyewear-offering-with-renewed-luxottica-license-agreement/?pdf=3212.

[62] Luxottica and Tory Burch Sign Global License Agreement, Vision Monday, https://www.visionmonday.com/latest-news/article/luxottica-and-tory-burch-sign-global-license-agreement-12140.

under the Tory Burch brand. The renewal is for 10-years and is set to expire on December 31, 2030.[63]

      L.      Versace: In 2003, Versace first gave Luxottica the exclusive license to design, produce, and distribute Premium Eyewear for the Versace Group. The original agreement was to last 10 years,[64] but the partnership between the two companies has continued to this day. Most recently, they renewed their exclusive licensing agreement for another 10 years, meaning the agreement is now set to expire on December 31, 2029.[65]

175. Under these exclusive licensing agreements with the Fashion Houses, EssilorLuxottica pays royalties on net sales ranging from 6% to 13%.[66] Thus, on information and belief, EssilorLuxottica sets and/or maintains the prices of the Fashion House Premium Eyewear.

176. The duration of these exclusive licensing agreements is a per se barrier to competitors or entrants into the Premium Eyewear Market because potential competitors

---

[63] EssilorLuxottica and Tory Burch renew license agreement, EssilorLuxottica, https://www.essilorluxottica.com/en/newsroom/press-releases/essilorluxottica-and-tory-burch-renew-license-agreement/.

[64] Sunglasses firm Luxottica makes deal with Versace, FashionUnited, https://fashionunited.uk/news/fashion/sunglasses-firm-luxottica-makes-deal-with-versace/2003011638280.

[65] Luxottica Group and Versace renew license agreement, EssilorLuxottica, https://www.luxottica.com/sites/luxottica.com/files/en_2020_4_10_luxottica_versace_renewal.pdf.

[66] EssilorLuxottica 2022 Universal Registration Document at p.56; *see also* Luxottica Group S.p.A. 2016 Annual Report at p.39.

cannot even attempt to contract with the Fashion House Brands to manufacture, distribute, or sell their Premium Eyewear.

177. Moreover, but for the exclusive licensing agreements, the Fashion Houses could design, produce, and sell their own Premium Eyewear, making them horizontal competitors with each other and with EssilorLuxottica. By entering into exclusive licensing agreements with EssilorLuxottica, however, the Fashion Houses have agreed not to compete with each other or with EssilorLuxottica in the Premium Eyewear Market and to cede that market to EssilorLuxottica.

178. With EssilorLuxottica's extensive portfolio of Proprietary Brands in addition to its exclusive licensing agreements with the Fashion Houses, it has broad control over Premium Eyewear brands.

## 2. Sales Agreements with Premium Eyewear Competitors

179. In addition to EssilorLuxottica's Proprietary Brands and the products Defendants have access to under exclusive licensing agreements, EssilorLuxottica, through EssilorLuxottica USA Inc., Luxottica Group S.p.A., and Luxottica of America Inc., also sells products from other manufacturers, owners, license holders, and the Premium Eyewear Competitors in its retail outlets.

180. EssilorLuxottica and the Premium Eyewear Competitors enter into agreements to allow EssilorLuxottica to control the sale and pricing of the Premium Eyewear Competitors' brands in EssilorLuxottica's retail outlets.

181. These brands are sold through EssilorLuxottica's 200 e-commerce platforms and extensive global retail network of more than 18,000 stores, including stores both owned and not owned by EssilorLuxottica.

182. These Premium Eyewear Competitors would be considered horizontal competitors with EssilorLuxottica but under the agreements into which the parties enter, EssilorLuxottica controls the sale and sales price of the Premium Eyewear Competitors' Premium Eyewear sold in EssilorLuxottica stores.

183. Because EssilorLuxottica controls the prices of the Premium Eyewear Competitors' products in its retail stores, as well as the prices of Defendants' Proprietary Brands, EssilorLuxottica has completely eliminated the possibility for competition, allowing it to maintain its supra-competitive prices.

### 3. Most Favored Nation Agreements

184. EssilorLuxottica eliminates consumers' ability to obtain a better price from alterative sellers by distributing its Proprietary Brands and Fashion House Brands to Third Party Sellers under distribution agreements that include price restrictions, such as most favored nation clauses, that prevent Third Party Sellers from discounting the brands. The most favored nation agreements prevent price competition and allow EssilorLuxottica to charge higher prices.

185. Most favored nation agreements are common within monopolies as they allow the monopoly to lock down the market and block competition by preventing potential competitors from undercutting them on price.

186. The exclusive licensing agreements, sale agreements, and most favored nation agreements allow EssilorLuxottica to set unfair and supra-competitive prices.

187. EssilorLuxottica does not inform consumers that EssilorLuxottica is an exclusive licensee, manufacturer, and/or distributor of most of the Premium Eyewear it sells or that EssilorLuxottica has entered into a number of agreements that allow it to control pricing, effectively eliminating competition in the Premium Eyewear Market.

188. Moreover, EssilorLuxottica implements "brand protection efforts," including Minimum Advertised Price policies that "prohibit[] all advertising or marketing activities that may damage the brand equity of the Group's eyewear brands…."[67]

189. EssilorLuxottica has used Minimum Advertised Prices, also known as "MAP," since at least 2016 to "protect the reputation" of EssilorLuxottica brands. These MAP policies apply to both wholesale and retail businesses. Further, EssilorLuxottica is clear that EssilorLuxottica may "unilaterally cease its business" with a retailer who violates this MAP policy.[68]

---

[67] EssilorLuxottica 2023 Annual Registration Document at p.31.

[68] Bringing an Expertise in Systems and Detail to a Customer-Centric Business, Vision Monday, https://www.visionmonday.com/business/suppliers/article/bringing-an-expertise-in-systems-and-detail-to-a-customercentric-business

190. EssilorLuxottica also touts its "GLOW" policy, or Guaranteed Luxottica Origin Worldwide, that is a "traceability system based on RFID technology that verifies the authenticity of eyewear products" and, critically, "suitability of resellers through a sensor (RFID Tag) embedded in the frame, with the device containing key information to precisely identify each pair of glasses, from production to sales destination." Thus, EssilorLuxottica exerts monolithic control over its products, down to the exact retailer that is authorized to sell EssilorLuxottica products and, presumably, ensuring the retailer is in compliance with EssilorLuxottica's anticompetitive and restrictive agreements.[69]

191. By selling its products through Third-Party Sellers, EssilorLuxottica leads consumers to believe that they have the opportunity to shop around for Premium Eyewear, potentially obtaining a lower price at one of the many retailers supplying it. Through its use of exclusive licensing agreements, sale agreements, and distribution agreements entailing most favored nation agreements, however, EssilorLuxottica eliminates this possibility by removing the opportunity for competition between Third-Party Sellers, Fashion Houses, and Premium Eyewear Competitors. Therefore, prices for Premium Eyewear remain at supra-competitive levels.

---

[69] EssilorLuxottica 2023 Annual Registration Document at p.31; *see also* Luxottica Group S.p.A. 2016 Annual Report at p.38.

### B. Control and Restraints on "Independent" Eyecare Professionals

192. EssilorLuxottica not only exerts control over other retailers, but also over independent eyecare professionals through its ownership and management of buying alliances, vision insurance, and lens processing and manufacturing.

193. Through their control, EssilorLuxottica is able to steer trusted eyecare professionals to recommend its products to patients. When a patient is receiving such referrals, they are likely to pursue them, effectively eliminating their choice of Premium Eyewear and allowing EssilorLuxottica to remain unchallenged and supra-competitive prices to remain in place.

### 1. Buying Alliances

194. EssilorLuxottica, through Essilor of America Inc. and Essilor Doctor Alliances Corporation, owns three of the largest optometric buying alliances in the United States, comprised of so-called independent optometrists. These buying alliances include Vision Source LP, PERC/IVA, and Optiport. Members in one of EssilorLuxottica's optometric buying alliances gain a variety of benefits but grant EssilorLuxottica control over much of their business.

195. Through membership in one of EssilorLuxottica's buying alliances, independent optometrists provide EssilorLuxottica the right to make product selections, set pricing, provide advertising, and so on.

196. Through Vision Source, EssilorLuxottica incentivizes eyecare professionals to dispense its products. For example, EssilorLuxottica offers Vision Source "exclusive" and "high profit margin" Ray-Ban options. It then tells independent eyecare professionals how they should "leverage exclusivity" to "maximize your margin."

197. EssilorLuxottica, through Vision Source, also suggests an "ideal assortment" of EssilorLuxottica Proprietary Brands and Fashion House Brands, as seen below, that eyecare providers should stock in order to maximize their business.[70]



198. The "suggestions" laid out in an "ideal assortment" provide eyecare providers with an easy way to stock their stores, without having to browse catalogs and do market research, while also allowing EssilorLuxottica to ensure its products are well stocked in stores across the country.

---

[70] Build The Ideal Giorgio Armani Assortment to Maximize Your Business, Giorgio Armani, https://visionsourceshowcase.luxottica.com/wp-content/uploads/AR_Ideal-Assortment.pdf.

199. EssilorLuxottica also forces its "brand standards" that require Vision Source members to purchase a certain number of products and/or stock required numbers of products for EssilorLuxottica's Premium Proprietary Brands and Fashion House Brands to maintain an active account and to "properly display the depth of the brand to your end consumers." This control ensures consumers always have access to EssilorLuxottica products while limiting their access to competitor products. Moreover, these "brand standards" further illustrate the scope of EssilorLuxottica's power over the Fashion House Brands and that EssilorLuxottica's role is not limited to merely manufacturing and distributing the Fashion House Brands.

200. For example, EssilorLuxottica requires Vision Source members to maintain at least 24 pairs of COSTA Premium Sunglasses,[71] at least 30 Tiffany & Co. Premium Spectacle Frames,[72] and 18 Premium Spectacle Frames for Versace to maintain an active account.[73]

201. Moreover, Vision Source "recommends" pricing for EssilorLuxottica's Proprietary Brands and Fashion House Brands. These "recommendations," in addition to restrictions on sales, limit what an eyecare professional can charge in their own store.

---

[71] Brand Standards, COSTA, https://visionsourceshowcase.luxottica.com/wp-content/uploads/Costa_Brand_Standards.pdf.

[72] Brand Standards, Tiffany & Co., https://visionsourceshowcase.luxottica.com/wp-content/uploads/TIFFANY_Tiffany-Co._Brand-Standard.pdf.

[73] Brand Standards, Versace, https://visionsourceshowcase.luxottica.com/wp-content/uploads/VERSACE_VE_-Brand-Standards.pdf.

With a lack of price competition, consumers are forced to pay supra-competitive prices for the Premium Eyewear they require for day-to-day life.

202. Further, Premium Eyewear brands including, but not limited to, COSTA, Oakley, and Tiffany & Co. require eyecare professionals to maintain stock of certain products in order to access other products. For example, in order to carry COSTA Premium Spectacle Frames, eyecare professionals must stock COSTA Premium Sunglasses.[74] Similarly, to access Oakley Premium Sunglasses, eyecare professionals must carry Oakley Premium Spectacle Frames.[75] Eyecare professionals also must maintain a stock of at least 30% Tiffany & Co. Premium Spectacle Frames in addition to Tiffany & Co. Premium Sunglasses.[76]

203. Through the purported "brand standards," that include an "ideal assortment," specific stock to be maintained, suggested prices, and tying access to a product with the purchase of another product, EssilorLuxottica limits an eyecare professional's ability to stock both competitor eyewear and competitively priced eyewear. Thus, consumers are limited in their choice of Premium Eyewear and are faced with only EssilorLuxottica products.

---

[74]    *See*                         https://visionsourceshowcase.luxottica.com/wp-content/uploads/Costa_Brand_Standards.pdf.

[75]    Brand    Standards,    Oakley,    https://visionsourceshowcase.luxottica.com/wp-content/uploads/Oakley_BrandStandards.pdf.

[76]    *See*    https://visionsourceshowcase.luxottica.com/wp-content/uploads/TIFFANY_Tiffany-Co._Brand-Standard.pdf.

### 2. Vision Insurance

204. In addition to EssilorLuxottica's wholly owned subsidiary, EyeMed, that is one of the largest vision benefits companies in the United States, upon information and belief, EssilorLuxottica also participates in agreements with other vision insurance companies such as Versant, MetLife, Spectera and United.

205. Said agreements include limitations on what frames and/or lenses the insurer may cover. The covered frames and/or lenses are often only EssilorLuxottica brands, therefore providing a consumer no choice but to pursue the brand that is covered by their insurance provider.

206. EssilorLuxottica's presence and dominance in the vision insurance market permits it to steer customers toward EssilorLuxottica products and retailers. EssilorLuxottica's ability to steer customers directly to its Premium Eyewear and associated retailers or affiliated eye care professionals eliminates any potential for choice that a consumer may have had otherwise.

### 3. Lens Processing as a Means to Control Independent Eyecare Professional

207. Through Essilor International S.A.S, Essilor of America Inc., and Essilor Laboratories of America, Inc., EssilorLuxottica owns and controls a vast majority of lens processing.

208. By controlling lens processing, EssilorLuxottica can limit what products eyecare professionals have access to.

209. If an independent eyecare professional fails to abide by EssilorLuxottica's requirements, EssilorLuxottica will withhold products or services, thereby forcing independent eyecare professionals to comply. Due to EssilorLuxottica's forced compliance, consumers are faced with a multitude of EssilorLuxottica brands.

210. Believing they have a choice, due to the variety of brands, consumers ultimately choose an EssilorLuxottica brand, unbeknownst to them. With the lack of variety, consumers do not truly have a choice, and therefore EssilorLuxottica does not truly have competition.

211. Due to the lack of competition, EssilorLuxottica's dominance goes unchallenged and it is able to perpetuate supra-competitive pricing for its Premium Eyewear.

### 4. Essilor Instruments

212. EssilorLuxottica through Essilor International S.A.S. and Essilor of America Inc. has even acquired the primary manufacturers of tools that eyecare professionals need for their practice. Specifically, Essilor Instruments is "a leader in the development of modern solutions and technologies for eye care professionals throughout the world."[77]

213. Essilor Instruments describes itself as the number one worldwide in finishing and measuring devices with more than 50,000 devices and 1,200 "collaborators" around the world.

---

[77] What We Do And Who We Are, Essilor Instruments (last visited Jan. 23, 2024), https://www.essilorinstrumentsusa.com/about-us/.

214. Essilor Instruments includes multiple options, including consultation and diagnostic equipment, refraction and prescription, lens selection and fitting, edging and mounting, and connectivity and productivity.

215. Through Essilor Instruments, EssilorLuxottica provides the products eyecare professionals need to continue to prescribe and sell EssilorLuxottica products. For example, Essilor Instruments provides edging equipment that allows independent eyecare professionals to use an EssilorLuxottica lens and cut it to shape a particular frame. Moreover, EssilorLuxottica, through Essilor Instruments, sells exam room chairs and vision testing equipment as eyecare professionals' "partner for a successful practice."[78] And, of course, when an eyecare professional is successful, EssilorLuxottica is successful.

---

[78]    EssilorLuxottica, Essilor Instruments Brochure, available at https://d9uftyu80252g.cloudfront.net/wp-content/uploads/2023/04/Ophthalmic-Product-Overview-email-04-2023.pdf (last visited June 14, 2024).

Indeed, the below graphic shows exactly how eyecare professionals can benefit by using EssilorLuxottica's equipment.[79]



216. Through these additional instruments, EssilorLuxottica is further engrained in the entire Premium Eyewear chain, including through the patient prescription process, lens selection, and even practice management.

217. By furnishing eyecare professionals with EssilorLuxottica tools that create a cohesive business environment with EssilorLuxottica products, EssilorLuxottica again steers eyecare professionals to utilize EssilorLuxottica products. This leads the eyecare professionals to steer the consumer toward EssilorLuxottica frames and/or lenses. Through this carefully calculated process, EssilorLuxottica strips the consumer of their choice and forces its overly expensive products into the consumer's hand.

---

[79] https://d9uftyu80252g.cloudfront.net/wp-content/uploads/2023/06/In-Office-Finishing-eBlast-06-06-23.pdf.

**5. EssilorLuxottica uses EssilorPRO and its Accompanying Programs to Reward and Incentivize Eyecare Professionals to Dispense its Products.**

218. In addition to its presence and control in the buying alliance sphere, EssilorLuxottica, through Essilor of America Inc. and Luxottica of America Inc., offers "EssilorPRO" and accompanying programs to independent eyecare professionals. Although ostensibly loyalty programs, each is nothing more than an agreement between EssilorLuxottica (supplier) and eyecare professionals (retailers) to steer consumers to EssilorLuxottica's Premium Eyewear.

219. As EssilorLuxottica describes it, EssilorPRO is "dedicated to supporting our independent eyecare professionals with everything you need to help your business grow. From educational programs and promotional materials to innovative patient tools and more, we're here for you."[80]

220. Through EssilorPRO, EssilorLuxottica provides independent eyecare practitioners with various resources that are broadly designed to maximize sales of EssilorLuxottica products.

221. For example, EssilorPRO utilizes SmartBook – "a patient relationship management system that makes it easy for eyecare professionals to focus on patient

---

[80] EssilorPro, https://www.essilorpro.com/, (last visited Jan. 23, 2024).

care."[81] The purpose of SmartBook is to bring in patients and to "build loyalty and encourage purchases." These purchases, of course, are designed to benefit EssilorLuxottica by encouraging eyecare professionals to steer patients to purchase EssilorLuxottica products. SmartBook is provided without charge to Vision Source, PERC, Opti-Port, and EssilorLuxottica 360 Essilor Experts.[82] As one testimonial describes, the "branded patient communications help plant the seeds before the patient even comes in, which cuts down on the amount of time my opticians and I have to spend educating patients on the importance of premium products."[83]

222. EssilorPRO also offers "Essilor Experts" that rewards eyecare practitioners because "the more you partner with Essilor, the more benefits you unlock to help your practice grow."[84] Essilor Experts touts that Essilor Experts' practices "perform better" and experience "2.8x Average Lens Selling Price growth." As Essilor Experts defines it, the "Capture Rate = total lenses divided by total exams." This means, as intended, eyecare professionals who are part of the EssilorPRO program sell more Essilor branded lenses.

---

[81] SmartBook Goes Beyond Standard Online Book & Patient Engagement, EssilorPro https://www.essilorpro.com/programs-services/smartbook#how (last visited Jan. 23, 2024).

[82] *See* SmartBook brochure, available at https://www.essilorpro.com/content/dam/essilor-pro/smartbook/SmartBook_Brochure.pdf.

[83] *See id.*

[84] Join Essilor Experts, EssilorExperts (last visited Jan. 23, 2024), https://www.essilorpro.com/programs-services/essilor-experts.

223. Essilor Experts provides a multi-tiered level of rewards for both Premium Prescription Lenses and Premium Spectacle Frames. For Premium Prescription Lenses, EssilorLuxottica offers the Essilor Preferred Rewards® Program, which is a "loyalty program designed to reward select practices for their business with Essilor" and has been in effect since at least April 1, 2018.[85] Through this program, eyecare professionals earn points for purchasing EssilorLuxottica Premium Prescription Lenses from participating labs. Although at first glance the rewards are for gift cards, apparel, and electronics, on closer examination, the frequently asked questions reveal that the rewards are also for rebates – payments kicked back to independent eyecare professionals whenever they select EssilorLuxottica lenses over competitors' products.[86]

224. The Rewards Program allows eyecare practitioner to redeem points for cash rebates or gifts, including a three-day trip to various Fairmont properties, an ultimate NASCAR Driving Experience, Tumi luggage, and branded office gear.

225. For Premium Spectacle Frames, EssilorLuxottica offers EssilorLuxottica 360 that provides frame rebates of 3-5%, thus encouraging eyecare practitioners to dispense EssilorLuxottica frames. Assuming a frame costs $300, this means EssilorLuxottica pays

---

[85] A New Way to Get Rewarded, Essilor (last visited Jan. 23, 2024), https://rewards.essilorusa.com/program.

[86] Essilor Preferred Rewards Program FAQ, Essilor, https://rewards.essilorusa.com/faq, (last visited Jan. 23, 2024).

supposedly independent eyecare professionals $9 to $12 as a kickback for selling an EssilorLuxottica frame.

226. The financial implications of EssilorLuxottica's frame and lens "rebates" each year could easily be in the thousands of dollars per eyecare professional.

227. Further, through Essilor Experts, eyecare providers have access to the "Dashboard" that, among other things, helps users increase their average lens selling price by at least $23.[87]

228. At bottom, Essilor PRO is designed to maximize EssilorLuxottica's sales by incentivizing independent eyecare providers to prescribe and dispense EssilorLuxottica products. Indeed, EssilorLuxottica describes EssilorLuxottica 360, part of EssilorPRO, as a "program designed to drive total practice growth for independent eye care professionals" that when deployed "drive[es] value for both lenses and frames."[88]

229. Essilor PRO further eliminates consumer choice by incentivizing trusted eyecare professionals to steer patients toward EssilorLuxottica products.

## V.      History of Anticompetitive Conduct

230. EssilorLuxottica is all too familiar with anticompetitive conduct. It has been subject to investigations and even heavy fines for its abuse of market power in multiple countries.

---

[87] *Supra* note 77.

[88] EssilorLuxottica 2023 Universal Registration Document at p.44.

## A. The French Competition Authority Fined Luxottica in 2021.

231. On July 22, 2021, the French Competition Authority found that EssilorLuxottica was limiting the pricing freedom of its retailers. EssilorLuxottica was releasing "recommended" pricing to its retailers and prohibiting discounts or special offers. If any of the opticians failed to cooperate with the "recommended" pricing, the opticians were subject to retaliation, such as delaying or suspending deliveries to their stores. These measures left both the opticians and their customers vulnerable and created significant damage to the economy. In addition to the "recommended" pricing, EssilorLuxottica prohibited online sales of sunglasses and glasses frames by opticians. This prevented opticians and consumers from accessing a sales channel that generally provides competitive prices.[89]

232. Not only was EssilorLuxottica limiting the pricing freedom of its retailers, but it concealed its unlawful conduct. For example, during the French Competition Authority investigation, the Commercial Director of Luxottica France was directing an employee, Philippe, to "contact the optician on this point ONLY BY TELEPHONE [,]" and then to "PLEASE DELETE ALL YOUR EMAILS ON THIS SUBJECT IMMEDIATELY."[90]

---

[89] Bertille Gauthier, Several eyewear brands and manufacturers fined for imposing selling prices and restrictions on online sales, Autorité de la concurrence (July 23, 2021), https://www.autoritedelaconcurrence.fr/en/communiques-de-presse/several-eyewear-brands-and-manufacturers-fined-imposing-selling-prices-and.

[90] French Competition Authority Decision 21-D-20, *in toto* (July 22, 2021) ("FCA 21-D-20"), (emphasis in original) (Machine translated by Google).

233. EssilorLuxottica was fined €125,174,000 for price fixing and reducing competition.[91]

## B. The French Competition Authority Fined EssilorLuxottica in 2022.

234. The following year on October 6, 2022, the French Competition Authority once again completed an investigation into EssilorLuxottica and found EssilorLuxottica guilty of unfair practices. This time, the French Competition Authority found that Essilor and eventually EssilorLuxottica was implementing discriminatory practices to hinder the development of the online distribution channel for Premium Eyewear. The French Competition Authority seized internal communications and documents from EssilorLuxottica, noting that as early as 2008, Essilor expressed concerns that online sales in France would result in declining prices for Premium Eyewear.

235. The French Competition Authority found that, against the advice of its own in-house counsel, EssilorLuxottica engaged in a multi-year scheme to avoid online sales in France. One part of the scheme involved falsely representing that online optical sales were not allowed under French law. Another part of the scheme involved developing a monitoring system to detect and report any website that displayed the words "Essilor" or "Varilux"—one of Essilor's principal lens brands. Yet another part of the scheme was to deny requests from online optical distributors to sell Essilor products. Still another part

---

[91] *Id.*

of the scheme was to modify its standard terms and conditions such that warranties only applied for in-person product sales and not to eyewear purchased online.

236. The French Competition Authority concluded that "Essilor has not provided any evidence capable of establishing that its conduct was not likely to affect competition between physical opticians and online sales sites and, in doing so, to harm the interests of consumers." The French Competition Authority found this particularly harmful as it impacted the public health sector.[92]

237. Due to EssilorLuxottica's unfair trade practices, Essilor International S.A.S. was fined €81,067,400, and EssilorLuxottica S.A. was separately fined €15,400,000.[93]

238. After it was forced to sell products online in France, Essilor continued its anti-competitive conduct by purchasing many of its online optical distributors, including FramesDirect, EyeBuyDirect, Coastal, MyOptiqueGroup, VisionDirect, and Brille GmbH.

---

[92] French Competition Authority, Decision No. 22-D-16 Oct. 6, 2022 (translated by a licensed professional), https://www.autoritedelaconcurrence.fr/sites/default/files/integral_texts/2022-11/22d16.pdf; Maxene Lepinoy, Optical lenses sector: the Autorité de la concurrence hands out fines worth 81 067 400 euros to Essilor International S.A.S. and its parent company EssilorLuxottica SA for discriminatory trade practices, Autorité de la concurrence (Nov. 8, 2022), https://www.autoritedelaconcurrence.fr/en/press-release/optical-lenses-sector-autorite-de-la-concurrence-hands-out-fines-worth-81-067-400.
[93] *Id.*

### C. EssilorLuxottica Has Faced Regulatory Scrutiny in Other Jurisdictions.

239. The Turkish Competition Authority ("**TCA**") opened an investigation into EssilorLuxottica in November of 2021 for violations of a merger remedy package agreed to by the parties in 2018 in order to clear the merger.

240. Under the remedy package, EssilorLuxottica agreed not to bundle its products for three years after closing, but the TCA found that it had bundled its ophthalmic lenses with ophthalmic devices, constituting an "abuse of dominant position."[94]

241. EssilorLuxottica was also found to have restricted competition by disincentivizing ophthalmologists from purchasing competing products. The TCA imposed a fine of 492,191,132 Turkish Lira (about 15,000,000 USD as of 5/21/24) for the abuse of dominant position.[95]

242. EssilorLuxottica is also currently under an investigation started in 2022 by the Greek Competition Authority in relation to "local commercial practices" according to EssilorLuxottica's 2023 Universal Registration Document.[96]

### D. EssilorLuxottica Has Faced Scrutiny in the United States.

243. In May 2016, a relator filed a *qui tam* action against Essilor Laboratories of America, Inc. and others alleging they violated the Insurance Frauds Prevention Act of

---

[94] https://www.pymnts.com/wp-content/uploads/2024/01/EU-Column-January-2024-2-Full.pdf.

[95] https://www.rekabet.gov.tr/Dosya/essilorluxottica-nihai.pdf.

[96] https://www.essilorluxottica.com/en/cap/content/101696/ at 74, 253.

the California Insurance Code. In April 2021, the California Department of Insurance intervened and filed a superseding complaint.

244. The suit alleged that then Essilor provided illegal kickbacks to eye care providers by paying providers thousands of dollars up front if they promised to send business to Essilor. The suit also claimed that Essilor was providing more kickbacks with its "PracticeBuilder" program that gave providers cash payments for using Essilor lenses and laboratory services.[97]

245. The kickbacks that Essilor was providing to eye care providers violated the Insurance Frauds Prevention Act because the incentives influenced medical decision making, taking away a patient's choice and driving them to pay for more expensive goods and services.

246. The parties settled out of court, with Essilor agreeing to pay $23.8 million.

247. The U.S. Department of Justice also alleged that Essilor violated the False Claims Act by causing claims to be submitted to both Medicare and Medicaid that were a result of violations of the Anti-Kickback Statute.[98]

---

[97] Department of Insurance investigation leads to $23.8 million settlement with Essilor Laboratories of America, Inc., California Department of Insurance (Dec. 5, 2022), https://www.insurance.ca.gov/0400-news/0100-press-releases/2022/release084-2002.cfm.

[98] Office of Public Affairs, Essilor Agrees to Pay $16.4 Million to Resolve Alleged False Claims Act Liability for Paying Kickbacks, Office of Public Affairs U.S. Department of Justice (Aug. 23, 2022), https://www.justice.gov/opa/pr/essilor-agrees-pay-164-million-resolve-alleged-false-claims-act-liability-paying-kickbacks.

248. The United States alleged that Essilor knowingly paid remuneration to eye care providers to induce the providers to order and purchase Essilor products for its patients, including patients receiving Medicare or Medicaid.

249. Similar to the California lawsuit, the purpose of the Anti-Kickback Statute was to prevent doctors from making medical decisions for their patients based on financial incentives, rather than their patients' best interests.

250. Essilor again chose to settle, agreeing to pay $16.4 million to resolve the allegations in 2022.[99]

RELEVANT MARKET

251. The eyewear market is generally divided into two segments, premium products and non-premium, or value focused, products.

252. The relevant product market here is the retail market for Premium Eyewear, including three submarkets for (1) Premium Spectacle Frames, (2) Premium Sunglasses, and (3) Premium Prescription Lenses (the "**Premium Eyewear Market**").

253. The first submarket is **Premium Spectacle Frames**. Premium Spectacle Frames refers to the device into which prescription lenses, whether premium or non-premium, are placed to create eyeglasses designed to correct customers' vision.

254. The second submarket is **Premium Sunglasses**. Sunglasses are eyeglasses with colored or tinted lenses that are designed to protect human eyes from sun damage.

---

[99] *Id.*

Sunglasses can be manufactured with plano, non-prescription, or prescription lenses. This submarket includes Premium Sunglasses with both plano and prescription lenses. Moreover, Premium Sunglasses are not a substitute for Premium Spectacle Frames because Premium Spectacle Frames are designed to provide vision correction while Premium Sunglasses are designed to provide protection from sun damage.

255. The third submarket is **Premium Prescription Lenses**. Premium Prescription Lenses are manufactured and inserted into a spectacle frame, whether premium or not, to provide vision correction. This submarket includes semi-finished prescription lenses that are designed to correct complex prescriptions and finished prescription lenses that are typically designed to correct simple eyesight problems. This submarket does not include plano lenses. Consumers would not switch from Premium Prescription Lenses to plano lenses because plano lenses do not provide vision correction. Moreover, the Premium Prescription Lenses submarket does not include non-prescription reading glasses. Customers would not switch from Premium Prescription Lenses to non-prescription reading glasses because Premium Prescription Lenses are tailored to an individual's prescription.

256. The Premium Eyewear Market distinguishes itself from the non-premium eyewear market because Premium Eyewear is meant to be high-end and constitute

"desirable fashion accessories that enable self-expression and enhance self-confidence[],"[100] as opposed to solely being a functional purchase.

257. The Premium Eyewear Market differs from the non-premium eyewear market because the non-premium, affordable consumer eyewear market focuses on providing consumers with eyewear in a budget-friendly functional manner, rather than based on the desirability of the accessory.[101]

258. Indeed, EssilorLuxottica acknowledges there are two separate markets in its investor filings and describes these markets as "premium" or "high-end" compared to "affordable" eyewear.[102] Further, EssilorLuxottica credits Luxottica with creating this distinctive Premium Eyewear Market by transforming eyewear from a medical device to a fashion statement such that "an entirely new 'eyewear' category was born."[103]

259. Moreover, EssilorLuxottica's competitors similarly recognize and intentionally seek to compete in the Premium Eyewear Market. For example, Kering Eyewear, which includes premium eyewear brands such as Maui Jim, Gucci, Cartier, Saint Laurent, and others, describes itself as a "luxury" eyewear company in the "high-end eyewear

---

[100] Eyewear, EssilorLuxottica, https://www.essilorluxottica.com/en/brands/eyewear/, (last visited Jan. 16, 2024).

[101] For example, EssilorLuxottica describes its Foster Grant brand as part of its "affordable eyewear." *See* EssilorLuxottica 2023 Universal Registration Document at p.35.

[102] *See* EssilorLuxottica 2022 Registration Document at p.28.

[103] *EssilorLuxottica and the Armani Group announce 15-year licensing renewal*, EssilorLuxottica, last visited Dec. 21, 2023, at 5:01 p.m., https://www.essilorluxottica.com/en/newsroom/press-releases/15-year-licensing-renewal-armani/.

segment."[104] Similarly, Safilo, describes its products as "high-quality" that, similar to EssilorLuxottica, allows people to "express their personality."[105] Finally, Thelios, LVMH Eyewear Excellence, describes its eyewear as "luxury" and "high-end."[106] Thus, the Premium Eyewear Market includes luxury and "premium" products as these terms are used synonymously within the eyewear industry and are consistent with consumers' understanding and purchasing habits.

260. Due to the differences in the two markets, Premium Eyewear manufacturers compare their pricing to other Premium Eyewear Brands to set pricing rather than to manufacturers of non-premium consumer eyewear. Because of this, Premium Eyewear is typically hundreds of dollars more than non-premium eyewear.

261. Because of their differences, consumers of Premium Eyewear are not in the market for non-premium, affordable consumer eyewear and are unlikely to switch. The market for Premium Eyewear has a distinct customer base who do not consider non-premium, affordable consumer eyewear to be a reasonable substitute for Premium Eyewear. Indeed, the value segment of the eyewear market is wholly separate from the Premium Eyewear Market. For example, America's Best operates 900 retail stores within the United States and leads with its offer of an eye examination plus two pairs of glasses

---

[104] https://www.kering.com/en/houses/others/kering-eyewear/ (last visited June 10, 2024).

[105] *See* Safilo, Our Brands, https://www.safilogroup.com/en/product/brands.

[106] *See, e.g.*, https://www.thelios.com/en-us/manifattura (last visited June 10, 2024); *see also* Thelios, About Us, https://www.thelios.com/en-us/about-us.

for $79.95.[107] This is part of its goal to deliver "eyewear at low prices America deserves.…"

Nonetheless, customers may "upgrade" to "designer eyeglass frames like Ray-Ban.…"[108]

262. Critically, consumers do not view value-priced eyewear to be a reasonable substitute for Premium Eyewear. Eyecare professionals know they must sell Premium Eyewear brands such as Ray-Ban, Oakley, and Armani because if they do not, customers will simply switch to a different eyewear professional, rather than to a non-premium eyewear product. Indeed, EssilorLuxottica tells eyecare professionals that Ray-Ban is the number one eyecare brand in the world and that 90% of consumers say "Ray-Ban is the first sunglasses/eyeglasses brand I think of.…"[109] Moreover, EssilorLuxottica touts that Ray-Ban is "one of the most recognizable brands in the world ... right up there with Apple, Coca-Cola and Google as one of the most loved brands, especially among Millennials."[110]

263. Moreover, products in the Premium Eyewear Market products are not interchangeable with other products, including other non-premium eyewear products. Premium Eyewear and value produced eyewear are not equivalent to one another and

---

[107] America's Best, https://www.americasbest.com/.

[108] About America's Best, https://www.americasbest.com/about-us.

[109] RayBan_BrandPresentation.pdf (luxottica.com) (last visited Jun. 17, 2024).

[110] https://www.visionmonday.com/business/suppliers/article/bringing-an-expertise-in-systems-and-detail-to-a-customercentric-business.

they are not interchangeable. There is not positive cross-price elasticity of demand between the Premium Eyewear Market and the non-premium eyewear market.

264. Products that are not within the Premium Eyewear Market are often marketed as "affordable." For EssilorLuxottica, for example, this includes its Foster Grant line that it describes as "affordable." Similarly, the second largest optical retailer in the United States, National Vision Holdings, that owns America's Best and Eyeglass World, describes its business as "making eyecare and eyewear affordable and accessible"[111] and that it is in the "value segment of the U.S. optical retail industry."[112]

265. The retail price of value, or non-premium eyewear, is significantly lower than Premium Eyewear. National Vision Holdings echoes this describing its $79.95 two pairs of eyeglasses as "significantly lower than the competition."[113] Yet, consumers remain willing to pay for Premium Eyewear and do not view affordable value-priced eyewear as interchangeable. In fact, EssilorLuxottica's revenues have continued to increase despite the rise in value-priced eyewear such as National Vision or Warby Parker.

---

[111] *See* NationalVision.com, available at https://www.nationalvision.com/ (last visited Jun. 17, 2024).

[112] National Vision 2023 10-K at p.6.

[113] National Vision 2023 10-K at p.8.

266. EssilorLuxottica's continually increasing North American revenue is evidenced by its public financial statements, summarized by the chart below:

**EssilorLuxottica Revenue by Fiscal Year (North America)**

| Fiscal Year: | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|---|
| Revenue in North America (in millions of Euros) | 8,556 | 8,433 | 9,146 | 7,901 | 9,868 | 11,492 | 11,637 |
| Change at Constant Currency Rates from Prior FY | | +2.6% | +3.1% | -11.8% | +12.7% (compared to 2019) | +4.0% | +4.2% |

267. The Premium Eyewear Market does not include contact lenses because contact lenses are not a reasonably interchangeable substitute for Premium Spectacle Frames, Premium Sunglasses, or Premium Prescription Lenses for Premium Spectacle Frames and Premium Sunglasses. Consumers do not and would not switch from Premium Spectacle Frames or Premium Sunglasses to contact lenses because of a small but significant increase in price. There are a number of reasons for this difference, including consumer preference and health reasons that may prevent a consumer from wearing contact lenses, such as inability to wear contact lenses. Moreover, contact lenses do not provide protection from the sun and thus are not a reasonable substitute for Premium Sunglasses.

268. The Premium Eyewear Market does not include corrective vision surgery, such as LASIK. Consumers would not switch from Premium Spectacle Frames or Premium Prescription Lenses to having surgery because of a small but significant increase in price. For example, corrective vision surgery does not reduce brightness, some consumers may

not wish to undergo surgery, some consumers may not be eligible for surgery for medical reasons, and some consumers wear Premium Eyewear as a fashion statement.

269. The relevant geographic market for the Premium Eyewear Market, including the three submarkets, is the United States. Consumers nationwide obtain Premium Eyewear and EssilorLuxottica distributes and sells its Premium Eyewear throughout the United States in nationwide networks of brick-and-mortar stores and online through retail channels.

270. At all relevant times, EssilorLuxottica has had monopoly power in the Premium Eyewear Market, including each submarket, because it had the power to control, raise, and/or maintain the price of Premium Eyewear.

## EssilorLuxottica Has Monopoly Power in the Premium Eyewear Market

### I.     There is Evidence of EssilorLuxottica's Market and Monopoly Power

271. EssilorLuxottica has market power in the Premium Eyewear Market because it has the ability to raise prices above those that would be charged in the competitive market. Moreover, EssilorLuxottica has monopoly power because it has the power to control prices and to exclude competition in the Premium Eyewear Market.

272. EssilorLuxottica's monopoly power is not fleeting but is ongoing and long lasting. Indeed, EssilorLuxottica has locked down every segment of the Premium Eyewear Market, allowing it to continue to expand its monopoly power. To the extent EssilorLuxottica's monopolization has not continued at exponential speed, it is only

because EssilorLuxottica has created such a monopoly in the Premium Eyewear Market that there is little else for it to devour.

## II. EssilorLuxottica Has Prima Facie Market Power in the Premium Eyewear Market

273. EssilorLuxottica's conduct as alleged herein affected billions of dollars of commerce during the Class Period.

274. The Premium Eyewear Market is valued at $65 Billion as of 2023.[114]

275. Defendants had and have market power in the Premium Eyewear Market, and its submarkets, controlling approximately 80% of the brands in the Premium Eyewear Market.

276. For Premium Prescription Lenses, EssilorLuxottica owns or controls approximately 80% of the Premium Prescription Lenses in the Premium Eyewear Market.

277. EssilorLuxottica owns or controls a significant portion of the Premium Spectacle Frame submarket of the Premium Eyewear Market.

278. EssilorLuxottica owns or controls approximately 70% of the Premium Sunglasses submarket of the Premium Eyewear Market.

279. Further, EssilorLuxottica owns or controls approximately 80% of the premium brands in the global eyewear industry.

---

[114] Global Premium Eyewear Market Outlook Thriving Worldwide Report, Linkedin, International Business Insight, https://www.linkedin.com/pulse/global-premium-eyewear-market-outlook-thriving-5b9kc?trk=organization_guest_main-feed-card_feed-article-content.

280. Thus, EssilorLuxottica has market power in the Premium Eyewear Market, including the power to exclude competitors and to set, maintain, and/or control prices throughout the United States.

281. EssilorLuxottica has obtained and continues to obtain its monopoly power in the Premium Eyewear Market through a panoply of anticompetitive actions, including, but not limited to, acquiring competitor retail locations, acquiring competitor Premium Eyewear brands, entering into exclusive licensing agreements with competitive brands, acquiring lens manufacturing and processing facilities, acquiring group purchasing organizations, and acquiring vision insurance companies.

282. EssilorLuxottica says it best, describing itself as the "only end-to-end player in the industry with leading presences across all geographies, all business segments and all trade channels, partnering with every player.…"[115]

### III. There is Direct Evidence of EssilorLuxottica's Monopoly Power

283. Direct evidence of monopoly power includes the ability to profitably raise prices above competitive levels, exclude competitors, and/or restrict output.

284. First, for pricing, EssilorLuxottica has raised prices to record heights above marginal costs. EssilorLuxottica can manufacture Premium Spectacle Frames for less than

---

[115] 2023 EssilorLuxottica Universal Registration Document at p.2.

$5, yet it sells those frames *wholesale* for $60-$70, or more.[116] This is at least a 1,100% increase that is far in excess of otherwise competitive prices. Similarly, EssilorLuxottica sells its Premium Sunglasses *wholesale* for even more, often from $70-$100 per pair.[117] This is at least a 1,300% increase that is far in excess of otherwise competitive prices. Premium Prescription Lenses are no different than frames, typically, a lens can be manufactured for less than $2. Yet, once shaped and inserted into the frame, it is sold for $100, if not more. This is at least a 4,900% increase that is far in excess of otherwise competitive prices.

285. EssilorLuxottica sets prices at its thousands of corporate-owned retail stores and through its influence on purchasing, including through Vision Source, controls pricing at thousands of additional stores through partnerships with independent optometrists.

286. Second, EssilorLuxottica has exercised its power to reduce output in the Premium Eyewear Market. For example, after acquiring Ray-Ban in 1999, EssilorLuxottica withdrew Ray-Bans from its retail stores and dramatically raised prices. Similarly, after Oakley refused to sell to them to Luxottica in 2001, Luxottica stopped selling Oakley brands at Sunglass Hut, causing Oakley's prices to plummet.[118]

---

[116] EssilorLuxottica Ray-Ban Assortment (to Vision Source), available at RayBan_Assortment.pdf (luxottica.com) (last visited Jun. 17, 2024); *see also* EssilorLuxottica Tory Burch Collection Overview (to Vision Source), available at TY-N1-23-Collection-Overview.pdf (luxottica.com) (last visited Jun. 17, 2024).

[117] EssilorLuxottica Ray-Ban Assortment (to Vision Source), available at RayBan_Assortment.pdf (luxottica.com) (last visited June 17, 2024).

[118] Sam Knight, *The Spectacular Power of Big Lens*, The Guardian (May 10, 2018), https://www.theguardian.com/news/2018/may/10/the-invisible-power-of-big-glasseseyewear-industry-essilor-luxottica.

287. Third, by acquiring competitors, EssilorLuxottica has excluded competition in all facets of the Premium Eyewear Market. In both the Premium Spectacle Frames and Premium Sunglasses submarkets, EssilorLuxottica has entered into long-term, exclusive licensing agreements. By design, this means there is no competition for those brands. In the Premium Prescription Lens submarket, EssilorLuxottica has similarly entered into long-term exclusive licensing agreements and has acquired the majority of prescription lens processing in the United States. For the Premium Eyewear Market more generally, EssilorLuxottica has acquired the majority of eyewear retailers and has acquired purchasing organizations for independent eyecare providers. All of these actions have led to EssilorLuxottica excluding competition in the Premium Eyewear Market.

## IV. There is Indirect Evidence of EssilorLuxottica's Monopoly Power

288. In addition to the direct evidence of EssilorLuxottica's market power, to the extent it needs to be proven, there is indirect evidence of EssilorLuxottica's market power, i.e., that EssilorLuxottica has a high market share of the Premium Eyewear Market and there are significant barriers to entry in the Premium Eyewear Market.

289. Based on economic analysis, the markets for Premium Prescription Lenses and Premium Sunglasses are highly concentrated and EssilorLuxottica possesses an extremely high market share.

290. The Herfindahl-Hirschman Index ("**HHI**") is one of the leading metrics used by economists and by federal agencies, like the Department of Justice and the Federal Trade

Commission, for determining the concentration of power in a given market.[119] HHI measures market concentration by adding together the squares of each firm's market share.[120] For example, if a market has four firms, all with a 25 percent market share, the HHI for that market would be 2500 (because $25^2 + 25^2 + 25^2 + 25^2 = 2500$).

291. HHI is measured on a scale from 0 to 10,000, with numbers approaching 0 representing highly competitive markets and 10,000 representing a market with a single firm that has 100 percent of the market share.[121] Markets with an HHI between 1,000 and 1,800 are considered to be concentrated markets by the Department of Justice and the Federal Trade Commission, and markets with an HHI over 1,800 are considered to be highly concentrated.[122] These agencies also presume that a firm with a market share of 30 percent or greater tends to lessen competition or create a monopoly.[123]

292. Here, there is evidence of EssilorLuxottica's market power in the Premium Eyewear Market. For example, in the Premium Prescription Lenses submarket, the initial HHI estimate is 7,952. This greatly exceeds the 1,800 point threshold that federal agencies advise is indicative of a highly concentrated market.

---

[119] U.S. Department of Justice, "Herfindahl-Hirschman Index" (updated January 17, 2024). https://www.justice.gov/atr/herfindahl-hirschman-index.

[120] *Id.*

[121] *Id.*

[122] *See* U.S. Department of Justice & FTC, *Merger Guidelines* at 5-6 (2023). https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf.

[123] *Id.* at 6.

293. The markets for Premium Sunglasses are similarly situated. The HHI estimate is 5,097. Again, this greatly exceeds the 1,800 point threshold that federal agencies advise is indicative of a highly concentrated market.

294. The Department of Justice notes that the higher the HHI is over this threshold, "the greater the risk to competition suggested by this market structure analysis."[124] The HHI numbers in the relevant Premium Eyewear Markets demonstrate the high risk of anticompetitive behavior in these markets, especially given the significant market share held by EssilorLuxottica.

## V.        EssilorLuxottica's Market Power is Durable

295. EssilorLuxottica's market power is durable.

296. Indeed, it is substantial and sustained as evidenced by EssilorLuxottica's own investor filings demonstrating its pricing *continues* to increase.[125]

297. Thus, EssilorLuxottica's market power survives efforts from other competitors or market expansion. As the Premium Eyewear Market has continued to expand, so too has EssilorLuxottica's market share.

## VI.       There Are Significant Barriers to Entry in the Premium Eyewear Market

298. The Premium Eyewear Market, including the three submarkets, have high barriers to entry that were reinforced and bolstered by the Scheme to eliminate and

---

[124] *Id.*
[125] *See* para. 266.

control EssilorLuxottica's competition in all aspects of the Premium Eyewear Market (the "Scheme") as alleged herein.

299. For the Premium Eyewear Market, participants must have access to capital to source materials, design, manufacture, market, distribute, and/or generally sell Premium Eyewear. Moreover, participants in the Premium Eyewear Market must have styles and brands that appeal to consumers to sell Premium Eyewear. Because EssilorLuxottica's reach into all facets of the Premium Eyewear Market is so substantial, new entrants face extreme barriers to entry.

300. First, to enter the Premium Eyewear Market, participants must ensure they create products that meet FDA specifications because they are medical products. Thus, as even an initial step, a potential market participant must ensure it registers with the FDA and creates appropriate medical products.

301. Second, potential market participants must create designs that appeal to consumers. EssilorLuxottica boasts that it holds more than 13,000 patents and designs.[126] Potential market participants would need to invest substantial resources and time to obtain similar patents and designs for Premium Eyewear, thus this intellectual property creates a substantial barrier to entry.

302. Moreover, new companies would need to gain access to and then create brand awareness as Premium Eyewear. EssilorLuxottica owns or controls more than 80% of

---

[126] 2022 EssilorLuxottica Universal Registration Document at p.8.

Premium Eyewear brands, effectively choking out other brands. Customers are likely to choose brands they recognize. EssilorLuxottica makes clear it is "drawing on its heritage of exceptional craftsmanship.…" To create this same heritage that would potentially appeal to consumers, a potential competitor would need to spend decades investing in and creating a similar heritage of craftsmanship. Further, potential competitors would not be able to access the brands that EssilorLuxottica controls because of the lengthy exclusive licensing agreements.

303. A potential competitor in the Premium Eyewear Market would also need to have sufficient manufacturing capabilities and distribution channels to ensure its products were delivered to customers and retailers in a timely manner. EssilorLuxottica owns the majority of the prescription lens processing capacity in the United States. Indeed, EssilorLuxottica has more than 125 proximity or mass production lens facilities in the United States.[127] Thus, even if a new entrant were to manufacture and distribute its own prescription lenses, it would still face challenges in having those lenses processed.

304. On the retail side, EssilorLuxottica has thousands of retail locations that allow it to consolidate power in the Premium Eyewear Market. Indeed, in the United States, EssilorLuxottica operates more than 3,800 retail stores.[128] In these stores, EssilorLuxottica

---

[127] EssilorLuxottica 2023 Universal Registration Document at p.34.

[128] EssilorLuxottica 2023 Universal Registration Document at p.12.

sells its own brands and the brands of its licensed Fashion Houses and can (and does) set prices at supra-competitive levels.

305. Moreover, EssilorLuxottica's wholesale business, described as Professional Solutions, provides EssilorLuxottica products to thousands of independent opticians, distributors, and retail chains across the United States. These long-standing relationships with even non-EssilorLuxottica owned locations erect yet further barriers to entry into the Premium Eyewear Market.

ANTICOMPETITIVE EFFECTS ON CONSUMERS

306. EssilorLuxottica's anticompetitive acts have significantly impacted competition in the Premium Eyewear Market and have resulted in Plaintiffs and members of the Classes paying overly inflated prices for all EssilorLuxottica brands and Fashion House Brands.

307. The distribution channel for EssilorLuxottica's Premium Eyewear is not complex as evidenced by EssilorLuxottica's consistent touting of its complete vertical integration. Rather, there is typically only one intermediary between EssilorLuxottica and the Direct Purchasers because EssilorLuxottica directly distributes its Premium Eyewear to the Direct Purchasers who then sell to the Indirect Purchasers. This streamlined and highly controlled distribution channel is among EssilorLuxottica's highly acclaimed efficiencies.

308. Indeed, EssilorLuxottica describes its distribution network as part of its Strategy Partnership Program for Wholesale Customers, or the STARS program.[129] This program includes more than 14,000 worldwide "partner stores" that "helps independent opticians, optical chains, travel retailer operators [i.e. duty free stores] and e-retailers …" Through this program, EssilorLuxottica provides direct support and distribution of its products, including automatic replenishment.

309. Moreover, EssilorLuxottica's Premium Sunglasses are not component parts of larger consumer products but are separate products that remain unaltered as they pass from EssilorLuxottica to distributors or retailers, then to customers.

310. EssilorLuxottica's Premium Spectacle Frames are not component parts because they retain their unaltered form in original packaging as they pass from EssilorLuxottica to distributors or retailers, then to consumers.

311. EssilorLuxottica's Premium Prescription Lenses are also not component parts because they are typically sold separately from Premium Spectacle Frames. Alterations to include prescriptions or other coatings do not impact traceability because they are still sold through EssilorLuxottica's owned distribution chain.

312. The below graphic from EssilorLuxottica's 2023 Universal Registration Document demonstrates the distribution process for Premium Prescription Lenses.

<hr />

[129] STARS: A Strategic Partnership Program for Wholesale Customers, available at STARS: A Strategic Partnership Program for Wholesale Customers | EssilorLuxottica (last visited Aug. 5, 2024).

EssilorLuxottica owns the production plants, distribution centers, and the prescription laboratories who then finish the Premium Prescription Lenses. They are then sent to independent professionals who sell them to the Indirect Purchasers. Thus, while even the Premium Prescription Lens supply chain appears complicated, at bottom, the entire process is owned and managed by EssilorLuxottica up until the Premium Prescription Lenses are provided to the independent eyecare professionals.



313. Therefore, EssilorLuxottica's anticompetitive conduct resulted in Direct Purchasers being overcharged for EssilorLuxottica's Premium Eyewear and such overcharges were passed on by Direct Purchasers to Plaintiffs and the Classes because Plaintiffs and the Classes paid these overcharges to their eyecare professionals and/or non-EssilorLuxottica owned retail or online outlets.

314. Moreover, the chain of commerce for EssilorLuxottica's Premium Eyewear allows for tracing of these overcharges that have passed through the chain of commerce to Plaintiffs and the Classes. For example, EssilorLuxottica plants a small chip, as part of its RFID program, into certain Premium Eyewear to confirm it is only sold at authorized retailers.

315. With little to no retail price competition, EssilorLuxottica has been able to coordinate and maintain retail pricing floors at supra-competitive levels, resulting in supra-competitive pricing on all Premium Eyewear in the United States.

316. Some estimates indicate that EssilorLuxottica has marked up the retail price of its Proprietary Brands and Licensed Fashion House Brands by at least 1,000 percent, if not more.[130] Despite the fact that industry professionals note that good frames can be made anywhere from $4 - $15,[131] EssilorLuxottica is able to sell frames anywhere from $200 – $1,000+. Moreover, EssilorLuxottica is able to sell lenses that cost as little as $1.25 a pair to make for more than $200.[132]

317. EssilorLuxottica is able to accomplish these markups through its monopoly power as described herein.

---

[130] Chavie Lieber, Glasses can have a markup of 1,000%. Two former LensCrafters executives revealed why, Vox (Mar. 6, 2019), https://www.vox.com/the-goods/2019/3/6/18253555/eyeglasses-cost-lenscrafters-essilor-luxottica.

[131] *Id.*

[132] *Id.*

318. EssilorLuxottica is also able to accomplish these markups through its exclusive licensing agreements with the Fashion Houses that prevent the Fashion Houses from wholesaling their own Premium Eyewear to third party retailers who could compete with EssilorLuxottica, therefore foreclosing the Premium Eyewear Market significantly to potential competitors.

319. EssilorLuxottica is further able to accomplish these markups through sales agreements with Premium Eyewear Competitors and third-party distribution agreements with Third-Party Sellers because these agreements often have price requirements, as was seen in the French Competition Authority action,[133] and do not allow retailers to discount the product at all. Therefore, EssilorLuxottica effectively sets the retail price floor and eliminates all forms of competition, allowing EssilorLuxottica to be solely responsible for pricing.

320. EssilorLuxottica further is able to accomplish its lens markups through its dominance of the Premium Prescription Lens submarket, capturing the majority of lens processing, and incentivizing eyecare practitioners to prescribe EssilorLuxottica Premium Prescription Lenses.

321. Thus, EssilorLuxottica has harmed competition by limiting competitors' ability to compete with EssilorLuxottica for the retail price of Premium Eyewear through the use of exclusive licensing agreements, sales agreements, and distribution agreements and

---

[133] Gauthier, *supra* note 82.

further limited competitors' ability to compete with EssilorLuxottica for the price of prescription lenses.

322. Consumer choice has also been limited by this conduct because, while there are many brands, the choice between these brands is an illusion due to EssilorLuxottica's intricate web of agreements that all lead back to EssilorLuxottica and its products.

323. EssilorLuxottica's Scheme has eliminated and impaired rivals in the Eyewear Market and blocked the entry and growth of other potential competitors. As a result, the number, size, and significance of other eyewear brands, lens manufacturers, and lens processors has been reduced.

324. There are no legitimate procompetitive justifications or efficiencies for the anticompetitive conduct alleged herein. Any arguably procompetitive justifications or efficiencies are far outweighed by the anticompetitive effects of this conduct, as alleged herein.

325. Due to EssilorLuxottica's anticompetitive conduct, through each Defendant's conduct and the collective enterprise, it has unlawfully eliminated and/or reduced competition in the Premium Eyewear Market and coordinated its efforts to maintain the retail price of Premium Eyewear at supra-competitive levels.

326. Plaintiffs bring this action individually and on behalf of all others similarly situated under Federal Rules of Civil Procedure 23(a) and (b)(2), as representatives of a Class of indirect purchasers seeking injunctive relief ("Injunctive Relief Class") defined as follows:

> Any person in the United States who indirectly purchased Premium Eyewear of any of EssilorLuxottica's Proprietary Brands or any of the Fashion House Brands from January 24, 2020 to the date of trial.

327. Plaintiffs bring this action individually and on behalf of all others similarly situated under Federal Rules of Civil Procedure 23(a), 23(b)(3), and/or 23(c)(4) as representatives of a Class seeking damages for violations of various state antitrust and consumer protection laws ("State Law Damages Class"), defined as:

> Any person in the United States who indirectly purchased Premium Eyewear of any of EssilorLuxottica's Proprietary Brands or any of the Fashion House Brands during the Class Period, in Arizona, Arkansas, California, Colorado, the District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.[134]

---

[134] Direct purchases from any wholly owned Defendant are excluded from the proposed Classes. Also excluded from the Classes are Defendants, their parent companies, subsidiaries and affiliates, officers, executives, and employees; defendants' attorneys in this case; federal government entities and instrumentalities, states or their subdivisions; and all judges assigned to this case.

For purposes of defining the Class Period for the State Law Damages Class, the Class Period will extend back to the relevant statute of limitation for the respective state claim.

328. The Classes are so numerous that joinder of all members would be impracticable. While the exact number of Class members is unknown, given the commerce at issue and EssilorLuxottica's significant market share, there are likely millions of Class members.

329. Plaintiffs' claims are typical of those of the Classes.

330. Plaintiffs will fairly and adequately protect and represent the interests of the Classes. The interests of the Plaintiffs are in accordance with those of the Classes.

331. Questions of law and fact common to the members of the Classes will prevail over questions, should they arise, that may be specific to individual Class members because Defendants have acted on grounds generally applicable to the Classes.

332. Questions of law and fact common to the Classes include, but are not limited to:

    A.    Whether the United States Premium Eyewear Market constitutes a relevant market, including its relevant submarkets;

---

For the antitrust claims, the Class Period will be January 24, 2021 to the date of trial for Kansas, Mississippi, and Tennessee; January 24, 2020 to the date of trial for Arizona, California, District of Columbia, Hawaii, Illinois, Iowa, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Utah, and West Virginia; January 24, 2019 to the date of trial for Arkansas; and, January 24, 2018 to the trial for Maine and Wisconsin.

For the consumer protection claims, the Class Period will be January 24, 2023 to the date of trial for Arizona and West Virginia; January 24, 2022 to the date of trial for Idaho, Montana and Utah; January 24, 2021 to the date of trial for Colorado, District of Columbia, Illinois, Kansas, New York, South Carolina, and Wisconsin; January 24, 2020 to the date of trial for California, Florida, Hawaii, Massachusetts, Nebraska, Nevada, New Mexico, and North Carolina; January 24, 2019 to the date of trial for Arkansas, Missouri, and Tennessee; January 24, 2018 to the date of trial for Maine, Minnesota, North Dakota, and Vermont; and, January 24, 2014 to the date of trial for Rhode Island.

B.      Whether EssilorLuxottica possesses monopoly power in the Premium Eyewear Market and submarkets;

C.      Whether the relevant geographic market is the United States;

D.      Whether Defendants engaged in a conspiracy in violation of the antitrust laws;

E.      Whether EssilorLuxottica monopolized, conspired to monopolize, or attempted to monopolize the Premium Eyewear Market;

F.      Whether Defendants engaged in unfair methods of competition, and unfair and deceptive acts, in violation of state consumer protection laws;

G.      Whether EssilorLuxottica engaged in unlawful exclusionary conduct to impair the opportunities of actual or potential rivals in the Premium Eyewear Market and thereby foreclosed substantial competition in that market;

H.      Whether EssilorLuxottica's exclusive licensing agreements constitute anticompetitive conduct intended to maintain EssilorLuxottica's monopoly in the Premium Eyewear Market;

I.      Whether EssilorLuxottica's exclusive licensing agreements, sales agreements, and distribution agreements constitute a conspiracy to monopolize the Premium Eyewear Market;

J.      Whether EssilorLuxottica's exclusive licensing agreements and sales agreements constitute a conspiracy or collusion to fix, raise, maintain, or stabilize the retail price of its Proprietary Brands, Fashion House Brands, and the brands of Premium Eyewear Competitors or otherwise restrain trade in the United States;

K.      Whether EssilorLuxottica's conduct caused Plaintiffs and members of the Classes to pay supra-competitive prices for Premium Eyewear and thereby suffer antitrust injuries;

L.      The appropriate declaratory and injunctive relief for the Classes; and

M.      The measure of damages sustained by Plaintiffs and the Classes.

## CAUSES OF ACTION

### COUNT I: INJUNCTIVE RELIEF
### For Violations of the Sherman Act, 15 U.S.C. §§ 1, 2
### (On Behalf of the Nationwide Injunctive Relief Class)

333. Plaintiffs incorporate each prior paragraph as if set forth herein.

334. The relevant market is the Premium Eyewear Market.

335. The relevant geographic location for the Premium Eyewear Market is the United States.

336. At all relevant times, Defendants controlled the Premium Eyewear Market and prices in the Premium Eyewear Market. Defendants, however, are horizontal competitors with the Fashion Houses, Premium Eyewear Competitors, and Third-Party Sellers.

337. During the conspiracy, the exact dates being unknown to Plaintiffs, Defendants engaged in a continuing agreement, understanding, and conspiracy in an unreasonable and unlawful restraint of trade to artificially fix, depress, suppress, or stabilize the price of Premium Eyewear in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Defendants' conspiracy is a per se violation of federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

338. Defendants' price fixing conspiracy deprived market participants in the Premium Eyewear Market of the benefit of price competition.

339. Defendants' conspiracy and the resulting impact on Premium Eyewear prices purchased by consumers occurred in and affected U.S. interstate commerce.

340. Moreover, Defendants acted in concert and have obtained, enhanced, and maintained monopoly power in the Premium Eyewear Market through the Scheme alleged herein, which conduct is continuing. Defendants have substantially foreclosed competition and have abused and continue to abuse their power to maintain and enhance market dominance in the Premium Eyewear Market through their Scheme, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

341. Defendants have engaged in a continuing Scheme with respect to the Premium Eyewear Market in an unreasonable restraint of trade and commerce, with the purpose and effect of acquiring, enhancing, and maintaining monopoly power in the Premium Eyewear Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

342. As a material and proximate result of Defendants' unlawful conduct, Plaintiffs suffered injury to Plaintiffs' property. These injuries include, but were not limited to, paying supra-competitive prices for Premium Eyewear. Plaintiffs were also deprived of the benefits of free and open competition.

343. Plaintiffs are threatened with future injury to their property unless Defendants are enjoined from further unlawful conduct.

344. Plaintiffs accordingly seek equitable and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and other applicable laws, to correct for the anticompetitive market effects caused by Defendants' unlawful conduct and to assure that similar anticompetitive conduct and effects do not continue or reoccur in the future.

## COUNT II: VIOLATIONS OF STATE ANTITRUST LAWS
### (On Behalf of the State Law Damage Class)

345. Plaintiffs incorporate each prior paragraph as if set forth herein.

346. In addition to violating Sections 1 and 2 of the Sherman Act, Defendants intentionally and wrongfully maintained, attempted to maintain and/or conspired to maintain monopoly power in the Premium Eyewear Market through their ongoing exclusionary Scheme.

347. By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in conduct, a combination, or conspiracy in restraint of trade in violation of the following state antitrust laws:

A. Ariz. Rev. Stat. §§ 44-1401, *et seq.*, with respect to purchases of Premium Eyewear in Arizona by Class members and/or Arizona residents.

B. Ark. Code Ann. §§ 4-75-208, *et seq.*, with respect to purchases of Premium Eyewear in Arkansas by Class members and/or Arkansas residents.

C. Cal. Bus. & Prof. Code §§ 16700, et seq., with respect to purchases of Premium Eyewear in California by Class members and/or California residents.

D. D.C. Code §§ 28-4501, *et seq.*, with respect to purchases of Premium Eyewear in the District of Columbia by Class members and/or District of Columbia residents.

E. Haw. Rev. Stat §§ 480-1, *et seq.*, with respect to purchases of Premium Eyewear in Hawaii by Class members and/or Hawaii residents.

F. 740 Ill. Comp. Stat. Ann. 10/3(1), *et. seq.*, with respect to purchases of Premium Eyewear in Illinois by Class members and/or Illinois residents.

G. Iowa Code §§ 553.1, *et seq.*, with respect to purchases of Premium Eyewear in Iowa by Class members and/or Iowa residents.

H.      Kan. Stat. Ann. §§ 50-101, *et seq.*, with respect to purchases of Premium Eyewear in Kansas by Class members and/or Kansas residents.

I.      Me. Rev. Stat. Ann. Tit. 10, §§ 1101, *et seq.*, with respect to purchases of Premium Eyewear in Maine by Class members and/or Maine residents.

J.      Mich. Comp. Laws §§ 445.772, *et seq.*, with respect to purchases of Premium Eyewear in Michigan by Class members and/or Michigan residents.

K.      Minn. Stat. §§ 325D.49, *et seq.*, with respect to purchases of Premium Eyewear in Minnesota by Class members and/or Minnesota residents.

L.      Miss. Code Ann. §§ 74-21-1, *et seq.*, with respect to purchases of Premium Eyewear in Mississippi by Class members and/or Mississippi residents.

M.      Neb. Rev. Stat. §§ 59-801, *et seq.*, with respect to purchases of Premium Eyewear in Nebraska by Class members and/or Nebraska residents

N.      Nev. Rev. Stat. Ann. §§ 598A.010, *et seq.*, with respect to purchases of Premium Eyewear in Nevada by Class members and/or Nevada residents.

O.      N.H. Rev. Stat. Ann. Tit. XXXI, §§ 356, *et seq.*, with respect to purchases of Premium Eyewear in New Hampshire by Class members and/or New Hampshire residents.

P.      N.M. Stat. Ann. §§ 57-1-1, *et seq.*, with respect to purchases of Premium Eyewear in New Mexico by Class members and/or New Mexico residents.

Q.      N.Y. Gen. Bus. Law §§ 340, *et seq.*, with respect to purchases of Premium Eyewear in New York by Class members and/or New York residents.

R.      N.C. Gen. Stat. §§ 75-1, *et seq.*, with respect to purchases of Premium Eyewear in North Carolina by Class members and/or North Carolina residents.

S.      N.D. Cent. Code §§ 51-08.1, *et seq.*, with respect to purchases of Premium Eyewear in North Dakota by Class members and/or North Dakota residents.

T. Or. Rev. Stat. §§ 646.705, *et seq.*, with respect to purchases of Premium Eyewear in Oregon by Class members and/or Oregon residents.

U. R.I. Gen Laws §§ 6-36-1, *et seq.*, with respect to purchases of Premium Eyewear in Rhode Island by Class members and/or Rhode Island residents.

V. S.D. Codified Laws §§ 37-1-3.1, *et seq.*, with respect to purchases of Premium Eyewear in South Dakota by Class members and/or South Dakota residents.

W. Tenn. Code §§ 47-25-101, *et seq.*, with respect to purchases of Premium Eyewear in Tennessee by Class members and/or Tennessee residents.

X. Utah Code Ann. §§ 76-10-911, *et seq.*, with respect to purchases of Premium Eyewear in Utah by Class members and/or Utah residents.

Y. W. Va. Code §§ 47-18-1, *et seq.*, with respect to purchases of Premium Eyewear in West Virginia by Class members and/or West Virginia residents.

Z. Wis. Stat. Ann. §§ 133.01(1), *et seq.*, with respect to purchases of Premium Eyewear in Wisconsin by Class members and/or Wisconsin residents.

348. Plaintiffs and Class members seek damages as permitted by law for their injuries caused by Defendants' violations of the respective statutes.

**COUNT III: VIOLATIONS OF STATE CONSUMER PROTECTION LAWS**
**(On Behalf of State Law Damage Class)**

349. Plaintiffs incorporate each prior paragraph as if set forth herein.

350. By engaging in the unfair and unlawful conduct alleged in this Complaint with respect to purchases in the below respective States and/or purchases made by residents of the below States, Defendants violated the following state consumer protection laws:

A.　　Ariz. Rev. Stat. §§ 44-1521, *et seq.*, with respect to purchases of Premium Eyewear in Arizona by Class members and/or Arizona residents.

B.　　Ark. Code §§ 4-88-101, *et seq.*, with respect to purchases of Premium Eyewear in Arkansas by Class members and/or Arkansas residents.

C.　　Cal. Bus. & Prof. Code §§ 17200, *et seq.*, with respect to purchases of Premium Eyewear in California by Class members and/or California residents.

D.　　Colo. Rev. Stat. §§ 6-1-101, *et seq.*, with respect to purchases of Premium Eyewear in Colorado by Class members and/or Colorado residents.

E.　　D.C. Code §§ 28-3901, *et seq.*, with respect to purchases of Premium Eyewear in the District of Columbia by Class members and/or District of Columbia residents.

F.　　Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases of Premium Eyewear in Florida by Class members and/or Florida residents.

G.　　Haw. Rev. Stat. §§ 481-1, *et seq.*, with respect to purchases of Premium Eyewear in Hawaii by Class members and/or Hawaii residents.

H.　　Idaho Code Ann. §§ 48-601, *et seq.*, with respect to purchases of Premium Eyewear in Idaho by Class members and/or Idaho residents.

I.　　815 Ill. Comp. Stat. Ann. 505/1, *et seq.*, with respect to purchases of Premium Eyewear in Illinois by Class members and/or Illinois residents.

J.      Kan. Stat. Ann. §§ 50-623, *et seq.*, with respect to purchases of Premium Eyewear in Kansas by Class members and/or Kansas residents.

K.      Me. Stat. Tit. 5, §§ 205-A, *et seq.*, with respect to purchases of Premium Eyewear in Maine by Class members and/or Maine residents.

L.      Mass. Gen. Laws Ch. 93A §§ 1, *et seq.*, with respect to purchases of Premium Eyewear in Massachusetts by Class members and/or Massachusetts residents.

M.      Minn. Stat. §§ 325F.68, *et seq.*, and Minn. Stat. §§ 8.31, et seq., with respect to purchases of Premium Eyewear in Minnesota by Class members and/or Minnesota residents.

N.      Mo. Rev. Stat. §§ 407.010, *et seq.*, with respect to purchases of Premium Eyewear in Missouri by Class members and/or Missouri residents.

O.      Mont. Code §§ 30-14-103, *et seq.*, and Mont. Code §§ 30-14-201, et seq., with respect to purchases of Premium Eyewear in Montana by Class members and/or Montana residents.

P.      Neb. Rev. Stat. §§ 59-1602, *et seq.*, with respect to purchases of Premium Eyewear in Nebraska by Class members and/or Nebraska residents.

Q.      Nev. Rev. Stat. §§ 598.0903, *et seq.*, with respect to purchases of Premium Eyewear in Nevada by Class members and/or Nevada residents.

R.      N.M. Stat. Ann. §§ 57-12-1, *et seq.*, with respect to purchases of Premium Eyewear in New Mexico by Class members and/or New Mexico residents.

S.      N.Y. Gen. Bus. Law §§ 349, *et seq.*, with respect to purchases of Premium Eyewear in New York by Class members and/or New York residents.

T.      N.C. Gen. Stat. §§ 75-1.1, et seq., with respect to purchases of Premium Eyewear in North Carolina by Class members and/or North Carolina residents.

U.      N.D. Cent. Code §§ 51-10, *et seq.,* with respect to purchases of Premium Eyewear in North Dakota by Class members and/or North Dakota residents.

V.   R.I. Gen. Laws 6-13.1-1, *et seq.*, with respect to purchases of Premium Eyewear in Rhode Island by Class members and/or Rhode Island residents

W.   S.C. Code Ann. §§ 39-5-10, *et seq.*, with respect to purchases of Premium Eyewear in South Carolina by Class members and/or South Carolina residents.

X.   Tenn. Code Ann. §§ 47-18-101, *et seq.*, with respect to purchases of Premium Eyewear in Tennessee by Class members and/or Tennessee residents.

Y.   Utah Code Ann. §§ 13-11-1, *et seq.*, with respect to purchases of Premium Eyewear in Utah by Class members and/or Utah residents.

Z.   Vt. Stat. Ann. Tit. 9, §§ 2453, *et seq.*, with respect to purchases of Premium Eyewear in Vermont by Class members and/or Vermont residents.

AA.   W. Va. Code §§ 46A-6-101, *et seq.*, with respect to purchases of Premium Eyewear in West Virginia by Class members and/or West Virginia residents.

BB.   Wis. Stat. §§ 100.20, *et seq.*, with respect to purchases of Premium Eyewear in Wisconsin by Class members and/or Wisconsin residents.

351. On behalf of themselves and the State Law Damages Class, Plaintiffs seek all appropriate relief provided for under the above statutes.

## RELIEF SOUGHT

352. Plaintiffs request judgment including the following relief:

A.   A determination that this action may be maintained as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel of record as Class Counsel.

B.  Permanent injunctive relief invalidating EssilorLuxottica's exclusive licensing agreements with the Fashion Houses.

C.  Permanent injunctive relief invalidating all price coordination or price delegation clauses contained in EssilorLuxottica's sales agreements with Premium Eyewear Competitors and distribution agreements with Third Party Sellers.

D.  Damages under the relevant state antitrust and/or consumer protection statutes for Defendants' wrongful conduct as alleged herein.

E.  Plaintiffs' and the Class' costs, expenses, and reasonable attorneys' fees.

F.  Such other relief in equity or at law as this Court may deem just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiffs request a trial by jury of all issues so triable.

Dated: August 6, 2024

Respectfully Submitted,

PAUL LLP

/s/ Sahil S. Koul
Sahil S. Koul (NY Bar No. 5932439)
15 Crest Wood Circle
Pittsford, New York 14534
Telephone: (917) 484-0608
Sahil@PaulLLP.com

PAUL LLP
Richard M. Paul III (*pro hac vice*)
Laura C. Fellows (*pro hac vice*)
601 Walnut Street, Suite 300
Kansas City, Missouri 64106
Telephone: (816) 984-8100
Rick@PaulLLP.com
Laura@PaulLLP.com

BASSFORD REMELE
*A Professional Association*
Daniel R. Olson (#0389235)
Jeffrey D. Klobucar (#0389368)
Casey D. Marshall (#0395512)
Aram V. Desteian (#0396021)
100 South Fifth Street, Suite 1500
Minneapolis, Minnesota 55402
Telephone: (612) 333-3000
dolson@bassford.com
jklobucar@bassford.com
cmarshall@bassford.com
adesteian@bassford.com

**COUNSEL FOR PLAINTIFFS AND THE
PROPOSED INDIRECT PURCHASER CLASS**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies on August 6, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

/s/  Sahil S. Koul