UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE EYEWEAR ANTITRUST
LITIGATION

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: ___9/26/2025___

1:24-cv-4826 (MKV)

OPINION AND ORDER
GRANTING
MOTION TO DISMISS

MARY KAY VYSKOCIL, United States District Judge:

After a series of procedural antics, including conduct just shy of "outright . . . forum shopping" [ECF No. 121 at 26], two putative classes of plaintiffs filed two separate amended complaints in this Court, in violation of an Order directing the plaintiffs to file one, consolidated amended complaint [ECF No. 166]. In their separate and different pleadings, the two sets of plaintiffs each name a different mix of entities as defendants. Both sets of plaintiffs lump all of the defendants together under the name "EssilorLuxottica" [ECF No. 197 (the "Direct Purchasers Complaint" or "DP") ¶ 40; ECF No. 198 (the "Indirect Purchasers Complaint" or "IP") at 1], which entity the plaintiffs accuse of a decades-long anticompetitive scheme. Astonishingly, however, the different plaintiffs cannot agree on the market or markets that the mix of entities they call EssilorLuxottica allegedly dominates.

According to one set of plaintiffs, the "Indirect Purchasers," there is only one "relevant product market here," the "retail market for Premium Eyewear." IP ¶ 252. These plaintiffs allege that the so-called "Premium Eyewear Market" is a single market that consists of "premium prescription lenses, premium spectacle frames, and premium sunglasses," including both prescription sunglasses and non-prescription sunglasses. IP ¶ 1.

The other set of plaintiffs disagrees. According to these plaintiffs, the "Direct Purchasers," "there are two relevant product markets": the Premium Eyewear Market and the "Custom Lens

Market." DP ¶ 157; *see id.* ¶¶ 2, 3, 157–175. These plaintiffs allege that what they call the Premium Eyewear Market consists of "two submarkets: (i) the submarket for premium spectacle frames and (ii) the submarket for premium sunglasses," including both prescription sunglasses and non-prescription sunglasses. DP ¶¶ 2, 3. According to these plaintiffs, there is a distinct Custom Lens Market "for the retail sale of custom optical lenses," which is not alleged to be a market for only "premium" lenses. DP ¶ 157; *contra* IP ¶ 1 (alleging that the market EssilorLuxottica allegedly dominates includes "premium prescription lenses").

Both sets of plaintiffs allege that EssilorLuxottica dominates the so-called Premium Eyewear Market by using an implausible and contrived definition of the market. As the Second Circuit has explained, a relevant market for antitrust purposes must consist of products that are "reasonably interchangeable by consumers for the same purposes.'" *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). As both sets of plaintiffs acknowledge, however, eyeglasses and sunglasses are not reasonably interchangeable. *See* DP ¶ 170 (alleging that "[s]unglasses and spectacle eyewear serve two distinct purposes"); IP ¶ 254 ("Premium Sunglasses are not a substitute for Premium Spectacle Frames"). Moreover, as both sets of plaintiffs acknowledge, lenses obviously are not interchangeable with either spectacle frames or sunglasses. *See* DP ¶¶ 2, 157, 173–175; IP ¶¶ 46, 48, 52. Indeed, the Direct Purchasers expressly allege that lenses occupy a separate market. DP ¶ 2.

Neither set of plaintiffs offers a plausible explanation for why they allege the existence of two separate markets (or, in the Indirect Purchasers Complaint, submarkets), for the "two main components" of eyeglasses (*i.e.*, spectacle frames and lenses) but one single submarket for fully-assembled sunglasses, including prescription sunglasses, even though "[s]unglasses are similarly made of two main components, including a frame and lenses." IP ¶ 46; *see also* DP ¶¶ 168–171.

Both sets of plaintiffs implausibly allege that "[b]oth non-prescription and prescription sunglasses fall into the same relevant submarket," even though prescription sunglasses serve the purpose of "vision correction" and non-prescription sunglasses do not.  DP ¶ 170; *see* IP ¶ 254.  As such, prescription and non-prescription sunglasses are not "reasonably interchangeable by consumers for the same purposes."  *Geneva Pharms. Tech. Corp.*, 386 F.3d at 496.

As both sets of plaintiffs allege, and Defendants do not disagree, "EssilorLuxottica" owns a number of different, popular eyewear brands, including Ray-Ban, Oakley, Alain Mikli, Oliver Peoples, Native, Unofficial, and others ("Proprietary Brands").  DP ¶ 27; IP ¶¶ 106–107.  It also licenses the rights to manufacture and sell the eyewear brands of Ralph Lauren, Chanel, Prada, Tory Burch, Coach, Brooks Brothers, Michael Kors, and many others ("Fashion House Brands").  DP ¶ 27; IP ¶¶ 110–111.  It is not illegal for a business to be enormous, and enormously successful, so long as it does not engage in anticompetitive conduct.  *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

In respect of the contrived nature of the plaintiffs' market definition, the Court notes that the EssilorLuxottica Proprietary Brands and Fashion House Brands conspicuously span a wide range of retail prices.  However, both sets of plaintiffs expressly exclude from the alleged Premium Eyewear Market "some well-known" and admittedly "popular" eyewear brands that retail within the same range of prices.  DP ¶ 166; *see* IP ¶ 265.  In particular, both plaintiffs allege that Warby Parker, "a very successful company," is not part of the market.  DP ¶ 166; *see* IP ¶ 265.  Thus, according to both sets of plaintiffs, the Premium Eyewear Market that Defendants are alleged to dominate includes, for example "a $195 pair of Ralph Lauren sunglasses" (an EssilorLuxottica Fashion House Brand) but excludes a similar-looking "$195 pair of Warby Parker sunglasses" [ECF No. 216 at 4, 43 n.24; ECF No. 228 at 16].

Moreover, as plaintiffs' own pleadings make clear, Defendants compete with other major eyewear companies such as Kering (which licenses, for example, Gucci, Balenciaga, Chloé, Bottega Veneta, Maui Jim, Saint Laurent, and Puma), Marcolin (which licenses, for example, Tom Ford, Pucci, Max Mara, Tod's, and Ermenegildo Zegna), LVHM/Thélios (which licenses, for example, Dior, Fendi, Celine, Loewe, Givenchy, and Bulgari), and Safilo (which licenses, for example, Boss, Carolina Herrera, Isabel Marant, Missoni, Moschino, Etro, and Under Armour). DP ¶ 160; IP ¶ 259.  In arguing that EssilorLuxottica dominates the Premium Eyewear Market, both sets of plaintiffs expressly and unselfconsciously argue that the Premium Eyewear Market includes "several 'brand' categories" of EssilorLuxottica eyewear (including "lifestyle," "sport," "high-end," *and* "luxury") but is strictly limited to the brands its competitors identify as "luxury" brands [ECF No. 225 ("Opp.") at 16].  DP ¶ 159.  Thus, according to the plaintiffs, the Premium Eyewear Market includes Oakley sport sunglasses (an EssilorLuxottica Proprietary Brand) but excludes similar looking and similarly priced Under Armour sport sunglasses (made by Safilo) [ECF No. 248 at 15–16].  This market definition defies common sense.

There are numerous other problems with the plaintiffs' pleadings, as the Court explains below.  Accordingly, Defendants' motion to dismiss is GRANTED.  This case is dismissed without prejudice and with leave to replead by filing ***one*** second amended consolidated complaint.

## I.    BACKGROUND

### A.  The Parties

As noted above, there are two sets of plaintiffs in this litigation.  Kelly Brown, Isha Fathmath, Tara Foster, Rebecca Froehlich, Sally A. Jaroszynski, Jenny Jeltes, Monet Jonas, Michelle Morgan, Alan Peterson, Frederick Rozo, and Maureen Schmidt call themselves the "Direct Purchaser Plaintiffs" [ECF No. 197 (the "Direct Purchasers Complaint" or "DP") at 112].

These eleven individuals hail from six different states: Minnesota, New York, Illinois, California, Arizona, and Pennsylvania. DP ¶¶ 12–22. The Direct Purchasers purport to represent a nationwide class of plaintiffs who have purchased alleged "goods in the Relevant Markets" from a retail outlet allegedly owned by Defendants. *See* DP ¶¶ 12–22.

The Direct Purchasers name as defendants: (1) EssilorLuxottica S.A.; (2) Luxottica Group S.p.A.; (3) Luxottica of America Inc., which, the Direct Purchasers allege, does business as LensCrafters, Pearle Vision, Target Optical, Sunglass Hut, Oakley retail stores, and Ray-Ban retail stores; (4) Essilor International SAS; (5) Essilor of America Inc.; (6) Essilor Laboratories of America, Inc.; (7) EyeMed Vision Care, LLC; (8) Vision Source, LLC; (9) Grand Vision B.V.; and (10) For Eyes Optical Company. *See* DP ¶¶ 23–39. The Direct Purchasers allege that these entities, as well as "other" unnamed entities, "operate as a single unit," which the Direct Purchasers refer to "collectively" as "EssilorLuxottica" throughout their pleading. DP ¶¶ 40, 41.

Pamela Ringgold, Anthony Persuitti, and Antoine Acosta call themselves the "Indirect Purchasers" [ECF No. 198 ("the Indirect Purchasers Complaint" or "IP") ¶¶ 3, 4]. Acosta, a citizen of Delaware, allegedly "purchased Ray-Ban Premium Spectacle Frames," a frame brand the Indirect Purchasers allege is owned by Luxottica S.p.A., and "Crizal Premium Prescription Lenses," an "EssilorLuxottica Premium Prescription Lens brand[,]" from a third party that is not owned by or affiliated with any defendant. IP ¶¶ 13, 17, 18. Ringgold, a citizen of New York, allegedly "purchased Ray-Ban Premium Spectacle Frames and, *on information and belief*, EssilorLuxottica Premium Prescription Lenses" from an unaffiliated third party. IP ¶ 11 (emphasis added). Persuitti, a citizen of Minnesota, allegedly purchased "Ray-Ban Premium Sunglasses" from an unaffiliated third party. IP ¶ 12. The Indirect Purchasers purport to represent a nationwide

class and, separately, a "State Law Damages Class" of consumers in 33 states and the District of Columbia. IP ¶¶ 3, 326, 327.

The Indirect Purchasers name six of the same defendants as the Direct Purchasers and four different entities. Specifically, the Indirect Purchasers name as defendants: (1) EssilorLuxottica S.A.; (2) Luxottica Group S.p.A.; (3) Luxottica of America Inc.; (4) Essilor International SAS.; (5) Essilor of America Inc.; (6) Essilor Laboratories of America, Inc.; (7) EssilorLuxottica America SAS; (8) EssilorLuxottica USA Inc.; (9) EOA Holding Co., Inc.; and (10) Essilor Doctor Alliances Corporation. IP ¶¶ 14–25. The Indirect Purchasers refer to this different mix of entities collectively as "EssilorLuxottica." IP at 1.

Both the Direct Purchasers and the Indirect Purchasers allege that EssilorLuxottica S.A., a French company, is the parent of three "main" subsidiaries, Luxottica Group S.p.A., Essilor International SAS, and GrandVision B.V. DP ¶ 23; IP ¶¶ 14, 15. While both sets of plaintiffs name Luxottica Group S.p.A. and Essilor International SAS as defendants, the Indirect Purchasers do not name GrandVision B.V. (or For Eyes Optical Company, which the Direct Purchasers allege is a subsidiary of GrandVision B.V.) as a defendant.

The Direct Purchasers offer this chart of the relationships among the defendants named in the Direct Purchaser Complaint:



**Figure 2**

Both sets of plaintiffs contend, "[u]pon information and belief," that the various entities they name as defendants are "controlled by" and "alter egos" of EssilorLuxottica S.A.  DP ¶ 41, 46; *see* IP ¶¶ 14, 15.

**B.  The Alleged Markets**

**1.   The Direct Purchaser Market Allegations**

The Direct Purchasers allege that "EssilorLuxottica" has engaged in an "anticompetitive scheme to monopolize" two different "Relevant Markets": the "Premium Eyewear Market" and the "Custom Lens Market."  DP ¶ 2; *see id.* ¶¶ 157–175.

According to the Direct Purchasers, the Premium Eyewear Market is comprised of "two submarkets: (i) the submarket for premium *spectacle frames* and (ii) the submarket for premium

sunglasses."  DP ¶ 157 (emphasis added); *see id.* ¶¶ 8, 168–171.  The "submarket for premium sunglasses" includes "[b]oth non-prescription and prescription sunglasses."  DP ¶ 170.

In other words, the Direct Purchasers allege that spectacle frames (without lenses), non-prescription sunglasses (with "plano" lenses), and prescription sunglasses (with "ophthalmic lenses") are all part of a single "Eyewear" market.  DP ¶¶ 157, 170, 171.  Yet the Direct Purchasers allege in their own pleading that "[s]unglasses and spectacle eyewear serve two distinct purposes" (while alleging, by contrast, albeit implausibly, that "all premium sunglasses," whether "non-prescription [or] prescription," are "reasonably interchangeable").  DP ¶¶ 170, 171.  The Direct Purchasers allege that sunglasses and spectacle eyewear are not interchangeable because "sunglasses serve the purpose of protecting eyes from the harmful effects of ultraviolet light while spectacle eyewear is the frame device that holds corrective lenses."  DP ¶ 171.  The Direct Purchasers allege that, by contrast, "non-prescription and prescription sunglasses" are reasonably interchangeable because "a person needing vision correction may order prescription lenses to be inserted into sunglass frames." DP ¶ 170.

The Direct Purchasers allege that "*Premium* Eyewear" is not reasonably interchangeable with "affordable, value-priced, or otherwise non-premium-branded" eyewear.  DP ¶ 165 (emphasis added).  However, the Direct Purchasers specifically allege that their definition of Premium Eyewear is not limited to EssilorLuxottica "luxury" brands.  On the contrary, according to the Direct Purchasers, the market for Premium Eyewear includes "several 'brand' categories" of EssilorLuxottica eyewear: "lifestyle brand (Ray-Ban), sport and performance (Oakley, Costa, Bliz, and Native), high-end (Persol, Oliver Peoples, and Alain Mikli), streetstyle (Arnette), and fashion and luxury (Vogue, Molsion, Bolon, and other licensed Fashion House Brands)."  DP ¶ 159

(emphasis added). These brands conspicuously span a broad range of "[r]etail price point[s]" [ECF No. 248 ("Tr.") at 34:17–35:1].

Yet, the Direct Purchasers allege, their definition of the market for Premium Eyewear does not include "some well-known" eyewear brands that retail within that broad range of prices. DP ¶ 166. In particular, the Direct Purchasers exclude the admittedly "*popular* eyewear retailer" Warby Parker because, the Direct Purchasers allege, Warby Parker is not considered a "luxury" brand by "EssilorLuxottica [and] its primary competitors." DP ¶ 166 (emphasis added). Moreover, Plaintiffs expressly and unselfconsciously maintain that, although their definition of the Premium Eyewear Market includes the various categories of *EssilorLuxotica* brands listed above (lifestyle, sport and performance, high-end, streetstyle, and luxury), the market is strictly limited to the "luxury" brands owned and licensed by competitors of EssilorLuxotica, such as Marcolin, Safilo, and Kering [ECF No. 225 ("Opp.") at 16]. Meanwhile, the only EssilorLuxottica brand that the Direct Purchasers exclude from the Premium Eyewear Market is "EssilorLuxottica's Foster Grant brand," which is "specifically marketed as 'affordable' eyewear." DP ¶ 165.

Thus, as the Direct Purchasers define the Premium Eyewear Market, a "$195" pair of sunglasses "is in the market" if "it's Ralph Lauren," one of the Fashion House Brands licensed by EssilorLuxotica. Tr. at 15:9–12. However, a similar "$195" pair of sunglasses "is outside of the market" if it is manufactured and sold by Warby Parker. Tr. at 15:9–12. Further, while the Direct Plaintiffs specifically allege that EssilorLuxottica's Oakley sport sunglasses are in the Premium Eyewear market, similarly priced and similar-looking "Under Armour . . . sports sunglasses," which are manufactured by EssilorLuxottica's competitor Safilo, are "outside of the market." Tr. at 15:21–16:7; *see* DP ¶¶ 159, 160; Opp. at 16.

The Direct Purchasers expressly allege that the Custom Lens Market is a different market from the Premium Eyewear Market. *See* DP ¶¶ 2, 157–175. According to, the Direct Purchasers, this distinct Custom Lens Market consists of "optical lenses" for vision-correction that can be "inserted into both premium and non-premium branded eyewear." DP ¶¶ 157, 173–175. With respect to lenses, the Direct Purchasers do not allege that the relevant market is limited to so-called premium products. *See* DP ¶¶ 173–175.

## 2. The Indirect Purchasers Market Allegations

The Indirect Purchasers allege that there is only one "relevant product market here," the "retail market for Premium Eyewear." IP ¶ 252.

The Indirect Purchasers allege that the Premium Eyewear Market includes "premium prescription lenses, premium spectacle frames, and premium sunglasses," including "Premium Sunglasses with both plano and prescription lenses." IP ¶¶ 1, 254.

The Indirect Purchasers further allege that "Premium Eyewear Market products are not interchangeable with other products, including . . . non-premium," or "value," eyewear products. IP ¶ 263. The Indirect Purchasers specifically allege that "[t]here is not positive cross-price elasticity of demand between the Premium Eyewear Market and the non-premium eyewear market." IP ¶ 263.[1] With respect to pricing, the Indirect Purchasers allege that "EssilorLuxottica is able to sell frames anywhere from $200–$1,000+" whereas a value brand sells, for example, "two pairs of glasses for $79.95." IP ¶¶ 261, 316. Yet the Indirect Purchasers join the Direct Purchasers in alleging that Warby Parker products do not fall within the Premium Eyewear market.

---

[1] "Two products are reasonably interchangeable where there is 'sufficient cross-elasticity of demand'—that is, where 'consumers would respond to a slight increase in the price of one product by switching to another product.'" *Regeneron Pharms., Inc. v. Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 201–202 (2d Cir. 2001)).

IP ¶ 265 (describing "Warby Parker" as a "value-priced eyewear"); *but see* Opp. at 11 (conceding that Warby Parker prices "overlap" with Premium Eyewear prices). The Indirect Purchasers also join the Direct Purchasers in arguing that numerous brands owned and licensed by competitors of EssilorLuxottica, such as Safilo, Marcolin, Kering, and LVMH, are excluded from the Premium Eyewear Market because the competitor does not expressly "identif[y]" the brand "as 'luxury' eyewear." Opp. at 16. Meanwhile, the alleged Premium Eyewear Market includes a number of non-luxury categories of brands owned and licensed by EssilorLuxottica, excluding only the "Foster Grant line that it describes as 'affordable.'" IP ¶ 264.

Turning to lenses, unlike the Direct Purchasers, the Indirect Purchasers allege that the relevant products are "*Premium* Prescription Lens." IP ¶ 255 (emphasis added). Although the Indirect Purchasers list the alleged "top Premium Prescription Lens brands," they do not allege what differentiates Premium Prescription Lenses from other prescription lens brands beyond generally alleging that "Premium Eyewear is meant to be high-end." IP ¶¶ 116, 256; *see id.* ¶¶ 118–120, 255.

### C. The Alleged Anticompetitive Conduct

Using their particular, and fundamentally different, definitions of the Premium Eyewear Market, the Direct Purchasers and Indirect Purchasers allege that EssilorLuxottica (which group of entities the two sets of plaintiffs also define differently, as explained above) has monopoly power over the Premium Eyewear Market. *See* DP ¶¶ 180–190; IP ¶¶ 161–166. The Direct Purchasers also, separately, allege that EssilorLuxottica has monopoly power over the Custom Lens Market. *See* DP ¶¶ 191–195.

In particular, relying on a website called "Statista," the Direct Purchasers allege that, in 2022, "EssilorLuxottica captured 80 percent" of "retail revenue in Premium Eyewear sales" in the

United States.  DP ¶ 188.  Using a different supposed measure of alleged monopoly power, the Indirect Purchasers allege that EssilorLuxottica "control[s] approximately 80% of the *brands* in the Premium Eyewear Market" (defined as the brands that Indirect Purchasers allege count as Premium Eyewear).  IP ¶ 275 (emphasis added).  With respect to the Custom Lens Market, the Direct Purchasers allege that, in 2023, "EssilorLuxottica branded lenses generated at least 52 percent of all custom lens retail revenue in the United States."  DP ¶ 195.  On this topics, the Indirect Purchasers allege only that EssilorLuxottica "control[s] a *majority* of Premium Prescription Lens manufacturing" and "a *significant portion* of Premium Prescription Lens processing."  IP ¶ 141 (emphases added).

While the details may vary slightly between the pleadings, both sets of plaintiffs allege that EssilorLuxottica has engaged in a decades-long, global scheme to monopolize eyewear and lenses through alleged: (1) acquisitions, beginning in 1981, of brands that make spectacle frames and sunglasses, including Alain Mikli, Oliver Peoples, Ray-Ban, Oakley, Vogue Eyewear, Unofficial, Native, and other "Proprietary Brands," DP ¶¶ 69–71; IP ¶¶ 78, 106; (2) long-term, exclusive licenses to manufacture and distribute "Fashion House Brands" of spectacle frames and sunglasses, including Chanel, Prada, Versace, Dolce & Gabbana, Ralph Lauren, Tiffany, Tory Burch, Coach, Brooks Brothers, Michael Kors, and others, DP ¶¶ 101–108; *see* IP ¶ 34, 172–176; (3) acquisitions, beginning in 1995, of eyewear retailers, including LensCrafters, Sunglass Hut, Pearle Vision, Target Optical, FramesDirect.com, Glasses.com, and others, DP ¶¶ 72–80; IP ¶ 78; (4) entering into sales agreements with "Premium Eyewear Competitors," such as Kering (which licenses, for example, Gucci, Saint Laurent, Bottega Veneta, Balenciaga, Chloé, Maui Jim, and Cartier), Marcolin (which licenses, for example, Tom Ford, Pucci, Max Mara, Tod's, and Ermenegildo Zegna), and LVHM (which licenses, for example, Dior, Fendi, Celine, Loewe, and Bulgari) to sell

their brands at EssilorLuxottica retailers, DP ¶¶ 109–111; IP ¶¶ 10, 160, 180; (5) acquisitions of "vision benefits" companies, including, in 1998, EyeMed, which later acquired another firm, DP ¶ 81; IP ¶ 204; (6) acquisitions of lens manufacturers and laboratories, DP ¶¶ 82–86; IP ¶ 207; and (7) acquisitions of Vision Source, an "optometry group" comprised of "3,000 locally-owned optometric practices," and one or more other such "group purchasing organization[s]," DP ¶¶ 87–89; IP ¶¶ 161, 194.

Both sets of plaintiffs contend that EssilorLuxottica uses its market dominance to charge "supracompetitive" prices. DP ¶ 11; *see id.* ¶¶ 180–185; IP ¶ 2. Specifically, Plaintiffs allege that, with respect to the eyewear brands that EssilorLuxottica owns and licenses, it imposes "retail price floors as part of so-called 'brand protection guidelines.'" DP ¶ 114; *see id.* ¶ 188 (clarifying that these allegations are about "Minimum Advertised Price" policies); IP ¶¶ 188, 189. The Direct Purchasers characterize EssilorLuxottica's Minimum Advertised Price policies as "pricing agreements" with third-party sellers. DP ¶ 115. Both sets of plaintiffs allege that EssilorLuxottica may enforce its policies by withdrawing authorization to sell EssilorLuxottica products. DP ¶ 116; IP ¶ 189 ("EssilorLuxottica may unilaterally cease its business with a retailer who violates this MAP policy") (internal quotation marks omitted). Plaintiffs further allege that EssilorLuxottica enters into "anticompetitive sales agreements" with its competitors (including Kering, Marcolin, LVHM, and Safilo) which, Plaintiffs allege, "permit EssilorLuxottica to establish retail price floors" for competitors' eyewear brands that are sold at EssilorLuxottica retail outlets. DP ¶¶ 53, 109–111; *see* IP ¶ 180–182. This means, for example, that an EssilorLuxottica entity sets the price Sunglass Hut charges for a pair of competitor Kering's Saint Laurent sunglasses.

Plaintiffs further allege that EssilorLuxottica engages in various forms of "steering." DP ¶¶ 128–134; IP ¶¶ 147, 193. In particular, the Direct Purchasers allege that EssilorLuxottica "has

implemented policies to steer EyeMed's patients to lenses owned by EssilorLuxottica, manufactured in EssilorLuxottica's facilities, finished at EssilorLuxottica's lens laboratories, or some combination thereof." DP ¶ 129.  The Direct Purchasers further allege that "EyeMed steers patients to EssilorLuxottica's wholly-owned eyecare providers such as LensCrafters, Pearle Vision, Target Optical," and others.  DP ¶ 130.  The Direct Purchasers also allege that "EyeMed drives patients to eyecare professionals with contractual obligations to offer, sometimes exclusively, EssilorLuxottica products and services," and, in such cases, the independent eyecare professionals ("IECPs") "accept certain reimbursement rates from EyeMed."  DP ¶¶ 130, 131.

With respect to alleged steering, the Indirect Purchasers allege that EssilorLuxottica offers eyecare professionals certain "tools," "resources," and "loyalty programs" that "are broadly designed to maximize sales of EssilorLuxottica products."  IP ¶¶ 212–229.  The Indirect Purchasers further allege that EssilorLuxottica requires, as part of its "brand standards," Vision Source members (a group of locally-owned optometric practices) to stock EssilorLuxottica eyewear brands.  IP ¶¶ 199, 200.

Plaintiffs broadly allege that EssilorLuxottica creates an "illusion" of consumer choice when, in reality, ostensible competitors are owned by EssilorLuxottica.  DP ¶ 1; IP ¶ 166.

### D.  Procedural History

The plaintiffs originally initiated different actions in various courts [*see* ECF Nos. 4, 11, 25, 26, 121 at 4–7].  They later coordinated amongst themselves to moot a motion to transfer the actions to the Judicial Panel on Multidistrict Litigation [ECF No. 121 at 7].  *See* Tr. at 26:19–27:22, 29:4–8.  Thereafter, Plaintiffs unsuccessfully opposed a motion to transfer this litigation from Plaintiffs' preferred forum in Minnesota, where they "perceived [an] advantage in litigating," to

this District [ECF No. 121 at 26].[2]

After the case was transferred to this District, the Court directed the parties to submit a joint letter describing the status of this case [ECF No. 126]. In their joint letter, the parties noted that they had reached a number of stipulations about how the case should proceed, including that the "two tracks" of plaintiffs would file amended *complaints* before the defendants filed their contemplated motion to dismiss [ECF No. 157]. The Court, however, did not endorse that letter. Rather, the Court issued an Order directing Plaintiffs to "file *an* amended, *consolidated* complaint" and setting a briefing schedule for a contemplated motion to dismiss by Defendants [ECF No. 166 (emphasis added)]. However, Plaintiffs proceeded to file two separate amended complaints, naming different defendants and alleging different, indeed conflicting, market definitions, as outlined above [ECF No. 197 (the "Direct Purchasers Complaint" or "DP"); ECF No. 198 (the "Indirect Purchasers Complaint" or "IP")].

The two sets of plaintiffs also assert different claims. The Direct Purchasers assert nine federal claims: (1) an "overarching anticompetitive scheme" in alleged violation of Section 2 of the Sherman Act, DP ¶¶ 226–33; (2) monopolization of the Premium Eyewear Market in violation of Section 2 of the Sherman Act, DP ¶¶ 234–40; (3) conspiracy to monopolize the Premium Eyewear Market in violation of Section 2 of the Sherman Act, DP ¶¶ 241–50; (4) attempted monopolization of the Premium Eyewear Market in violation of Section 2 of the Sherman Act, DP ¶¶ 251–56; (5) exclusive dealing in the Premium Eyewear Market in violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, DP ¶¶ 257–65; (6) "unlawful minimum retail price maintenance" in the Premium Eyewear Market in violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act, DP ¶¶ 266–71; (7) agreements in restraint of trade

---

[2] The judge in Minnesota stopped short of ruling that Plaintiffs had engaged in "outright . . . forum shopping" [ECF No. 121 at 26].

for Premium Eyewear in violation of Section 1 of the Sherman Act, DP ¶¶ 272–79; (8) monopolization of the Custom Lens Market in violation of Section 2 of the Sherman Act, DP ¶¶ 280–86; and (9) attempted monopolization of the Custom Lens Market in violation of Section 2 of the Sherman Act, DP ¶¶ 287–92.

The Indirect Purchasers purport to assert three "counts" in which they appear to group together many different purported claims. In Count One, the Indirect Purchasers seek injunctive relief for alleged violations of Section 1 and Section 2 of the Sherman Act, invoking Section 16 of the Clayton Act. IP ¶¶ 333–344. In Counts Two and Three, the Indirect Purchasers assert 54 state antitrust and consumer protection claims arising under the laws of 33 states and the District of Columbia. *See* IPP ¶¶ 345–351.

After the filing of the amended complaints, Defendants filed a motion to dismiss [ECF Nos. 215, 216 ("Mem.")]. Plaintiffs filed a joint opposition [ECF No. 225 ("Opp.")]. Defendants filed a reply brief in further support of their motion to dismiss [ECF No. 228]. The Court later held oral argument [ECF No. 248 ("Tr.")].

## II.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must allege "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The allegations must raise "more than a sheer possibility that a defendant has acted unlawfully." *Id*. A court must accept as true "well-pleaded *factual* allegations" and draw reasonable inferences in the plaintiff's favor. *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 320–1 (2d Cir. 2021) (emphasis in original).

However, the court need not accept mere conclusory assertions. *Id.* at 321; *see Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013). Furthermore,

even at the pleading stage, a court is not required to accept assertions that are "contradicted by more specific allegations" in the complaint or "documentary evidence" that is properly before the court. *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011). Beyond the four corners of the complaint, "a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference, matters of which judicial notice may be taken, or documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks, ellipses, and citation omitted).

## III.    DISCUSSION

As noted above, the plaintiffs assert claims for, among other things, monopolization and attempted monopolization in violation of Section 2 of the Sherman Act and agreements in restraint of trade in violation of Section 1 of the Sherman Act. To state a claim under either section of the Sherman Act, or the Clayton Act, the plaintiffs must first define the relevant "market in which the anticompetitive" conduct is alleged. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 55 (2d Cir. 2019); *see Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) ("Without a definition of that market there is no way to measure [the defendant's] ability to lessen or destroy competition."); *Xerox Corp. v. Media Scis. Int'l, Inc.*, 511 F. Supp. 2d 372, 383 (S.D.N.Y. 2007). As explained below, after noting several deficiencies with the plaintiffs' two pleadings, the Court dismisses the Indirect Purchasers Complaint in its entirety for failure to allege a plausible market definition.[3] The Court dismisses the Direct Purchasers' claims with respect to

---

[3] More precisely, the Court dismisses the federal claims in the Indirect Purchasers Complaint for failure to allege a plausible market definition and declines to exercise supplemental jurisdiction over the extraordinary number of state law claims the Indirect Purchasers assert. *See* 28 U.S.C. § 1367(c)(3); *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 121–122 (2d Cir. 2006); *see also Primetime 24 Joint Venture v. Nat'l Broad., Co.*, 219 F.3d 92, 104 (2d Cir. 2000).

the alleged Premium Eyewear Market for the same reason. The Court also dismisses the Direct Purchasers' claims with respect to the Custom Lens Market for failure to adequately allege market power. *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002).

## A. Applicable Law

### 1. Section 2 of the Sherman Act

Under Section 2 of the Sherman Act, it is illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. "[T]o state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must establish '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *PepsiCo, Inc.*, 315 F.3d at 105 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)); *see Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 61 (2d Cir. 1997).

"To state an attempted monopolization claim, a plaintiff must establish '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *PepsiCo, Inc.*, 315 F.3d at 105 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

### 2. Section 1 of the Sherman Act

Section 1 of the Sherman Act bans "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "The crucial question in a Section 1 case is therefore whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Mayor & City Council of*

*Baltimore, Md.*, 709 F.3d at 135 (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (alteration omitted)).

### 3. The Clayton Act

Section 3 of the Clayton Act prohibits, in pertinent part, a "contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade." 15 U.S.C. § 3. "A proper pleading of a Section 3 violation must allege that the lease, sale or contract for sale of goods be conditioned on the purchaser not using or dealing in the goods of the seller's competitors." *H. L. Moore Drug Exch., Div. of/& Levitt Indus., Inc. v. Eli Lilly & Co.*, No. 76-cv-2817, 1977 WL 1412, at *2 (S.D.N.Y. June 1, 1977). "The law is well settled that a manufacturer's termination of an agreement or refusal to deal with a retailer does not itself violate § 3 of the Clayton Act." *Id.*; *see also Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*, 510 F.2d 1140, 1144 (2d Cir. 1975) (explaining that tying goods and services is permissible). Section 16 of the Clayton Act permits "any person" to obtain injunctive relief "against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26.

### B. Plaintiffs Improperly Filed Two Separate Complaints.

As noted above, after this case was transferred to this District, the Court ordered Plaintiffs to file one "*consolidated* [amended] complaint" [ECF No. 166 (emphasis added)]. Yet Plaintiffs proceeded to file two separate amended complaints in defiance of a court order [ECF Nos. 197, 198]. In their separate pleadings, the two sets of plaintiffs name different sets of defendants and offer competing market definitions and different factual allegations.

Plaintiffs are, of course, entitled plead alternative, even inconsistent, legal "theories." *Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339, 343 (2d Cir. 1994). However, in this posture, the Court is not required to accept broad factual contentions that are

"contradicted by more specific allegations" in either pleading. *L-7 Designs, Inc.*, 647 F.3d at 422.

To rule otherwise would allow Plaintiffs to benefit from pleading alternative and inconsistent *facts*,

in contrast with theories, in violation of a court order.

## C.  Plaintiffs Engage in Impermissible Group Pleading.

Each set of plaintiffs names ten defendants, and, while there is overlap, each set of plaintiffs

names a different mix of entities as defendants.  *See* DP ¶¶ 23–39; IP ¶¶ 14–25.  Yet, throughout

their separate pleadings, their joint brief, and at oral argument, Plaintiffs admittedly "lump[ed] all

the defendants together" under the name EssilorLuxottica.  *Atuahene v. City of Hartford*, 10 F.

App'x 33, 34 (2d Cir. 2001); *see* DP ¶ 41; IP at 1.  In their pleadings, Plaintiffs contend, "[u]pon

information and belief," that the various entities they name as defendants are "controlled by" and

"alter egos" of EssilorLuxottica S.A.  DP ¶ 41, 46; *see* IP ¶¶ 14, 15.  In their brief, Plaintiffs defend

lumping the defendants together under the name EssilorLuxottica on the ground that "Plaintiffs

have alleged that all of the Defendant entities act with 'unified and integrated' purpose" and "are

operated by a single group of executives."  Opp. at 51–52 n.28 (quoting DP ¶ 43).  Such assertions,

however, are not sufficient to allege that various distinct legal entities, several layers removed from

EssilorLuxottica S.A. and each other, are mere alter egos.  *See Fletcher v. Atex, Inc.*, 68 F.3d 1451,

1458 (2d Cir. 1995).  As such, the Court would be within its discretion to dismiss the amended

complaints, pursuant to Rule 8 of the Federal Rules of Civil Procedure, for impermissible group

pleading.  *See Atuahene*, 10 F. App'x at 34.

## D.  Plaintiffs Fail To Allege Plausible Definitions of the Premium Eyewear Market.

Plaintiffs fail to plausibly define the market that Defendants allegedly monopolize, attempt

to monopolize, and illegally combine with others to restrain.  Market definition is a threshold issue.

"The first step" of an antitrust analysis "requires the identification" of the relevant "market in

which the anticompetitive" conduct is alleged to have occurred.  *US Airways, Inc.*, 938 F.3d at 55.

As noted above, it is well established that, in an antitrust case, "[t]he relevant market is defined as

all products 'reasonably interchangeable by consumers for the same purposes.'"  *Geneva Pharms.*

*Tech. Corp.*, 386 F.3d at 496 (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S.

377, 395 (1956)); *see In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F.

Supp. 3d 187, 226 (S.D.N.Y. 2019) (stressing "consumer perspective").

Here, the two sets of plaintiffs advance different market definitions that conflict with each

other.  The Direct Purchasers allege that there is: (1) a market for Premium Eyewear, which consists

of two submarkets for (a) premium spectacle frames, and (b) premium sunglasses, including both

prescription and non-prescription sunglasses; and, separately, (2) a market for Custom Lenses.  *See*

DP ¶¶ 8, 157–172.  The Indirect Purchasers, by contrast, allege one "Premium Eyewear Market"

that includes "premium prescription lenses, premium spectacle frames, and premium sunglasses,"

including both prescription and non-prescription sunglasses.  IP ¶ 1.

The Indirect Purchasers' definition of the "Premium Eyewear Market" is so manifestly

implausible, under established precedent, that even the Direct Purchasers effectively allege that

the Indirect Purchasers improperly conflate separate markets.  *See* DP ¶ 173 (alleging that "the

market for custom lenses" is a separate "relevant market").  There simply is no consumer for whom

"prescription lenses" are reasonably interchangeable with either spectacle frames or sunglasses.

IP ¶ 1; *see Geneva Pharms. Tech. Corp.*, 386 F.3d at 496; *In re Keurig Green Mountain Single-*

*Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d at 226.

In alleging that lenses must be considered a distinct "relevant market," DP ¶ 173, the Direct

Purchasers highlight the implausibility of their own definition of the Premium Eyewear Market.

The Direct Purchasers implausibly contend that a single "relevant market" includes spectacle

21

frames (without lenses), sunglasses with non-prescription lenses, and sunglasses with prescription lenses. *See* DP ¶¶ 2, 3. However, as the Direct Purchasers acknowledge in their own pleading, "[s]unglasses and spectacle eyewear serve two distinct purposes." DP ¶¶ 170, 171. As such, the Direct Purchasers admit, spectacle frames are not "reasonably interchangeable" with sunglasses. *See Geneva Pharms. Tech. Corp.*, 386 F.3d at 496; *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d at 226.

Similarly, from a "consumer perspective," prescription sunglasses are not reasonably interchangeable with non-prescription sunglasses. *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d at 226. As the Direct Purchasers acknowledge in their pleading, prescription sunglasses serve the purpose of "vision correction" and non-prescription sunglasses do not. DP ¶ 170. The Direct Purchasers implausibly allege that "[b]oth non-prescription and prescription sunglasses fall into the same relevant submarket" because both serve "the purpose of protecting one's eyes from the sun," and a "person needing vision correction may order prescription lenses to be inserted into sunglass frames." DP ¶ 170. In other words, a consumer who "need[s] vision correction" has to change the product to use the product for the identified purpose. DP ¶ 170. Moreover, consumers with clear vision cannot use prescription sunglasses for any purpose.

Plaintiffs argue in their brief that market definition is fact-intensive and, therefore, failure to plead a relevant market is a disfavored basis for dismissal at the pleading stage. Opp. at 5–6. In this Circuit, however, there is "no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001); *see Concord Assocs., L.P. v. Ent. Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016) (affirming dismissal where alleged market was "inherently implausible"). Here, no fact intensive process is

required to conclude what Plaintiffs themselves allege: spectacle frames, non-prescription sunglasses with "pre-inserted" lenses, prescription sunglasses that have been "fitted with" lenses ordered by the consumer, and prescription lenses themselves are not "products 'reasonably interchangeable by consumers for the same purposes.'" *Geneva Pharms. Tech. Corp.*, 386 F.3d at 496 (quoting *E.I. du Pont de Nemours & Co.*, 351 U.S. at 395); *see* DP ¶¶ 2, 157, 168–175; IP ¶¶ 46, 48, 52, 254. Both sets of plaintiffs fail to allege a plausible definition, under settled precedent, of the Premium Eyewear Market.

Plaintiffs argue that dismissal for failure to allege a plausible Premium Eyewear Market is not warranted because they identify the various categories of non-interchangeable products as "submarkets." Opp. at 6. As Plaintiffs point out, the Supreme Court has noted that "within [a] broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). However, neither *Brown Shoe*, nor any of the other cases Plaintiffs cite stands for the proposition that a plaintiff may cobble together a "broad[er] market" from supposed submarkets of different products that are not reasonably interchangeable. *Id.*

Rather, the "relevant market" for antitrust purposes is, in all events, "defined as all products 'reasonably interchangeable by consumers for the same purposes.'" *Geneva Pharms. Tech. Corp.*, 386 F.3d at 496 (quoting *E.I. du Pont de Nemours & Co.*, 351 U.S. at 395). Indeed, Plaintiffs' own cited cases explain that "[m]arket definition is guided by the 'narrowest market' principle," which requires defining the market "narrowly to exclude any other product" that "only a limited number of buyers" would consider interchangeable. *Fed. Trade Comm'n v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 353 (S.D.N.Y. 2024). As explained above, and as Plaintiffs acknowledge, no consumer would consider spectacle frames, sunglasses, or lenses reasonably interchangeable. *See*

DP ¶¶ 168–175; IP ¶¶ 46, 48, 52, 254.  As such, those products cannot comprise a "relevant market" for antitrust purposes.  *Geneva Pharms. Tech. Corp.*, 386 F.3d at 496.

Plaintiffs' definition of what counts as *premium* also strikes the Court as implausibly contrived.  Market definition is a threshold issue because "[w]ithout a definition of that market there is no way to measure [EssilorLuxottica's] ability to lessen or destroy competition."  *Walker Process Equip., Inc.*, 382 U.S. at 177 (1965).  For example, Plaintiffs allege that EssilorLuxottica has market power because it "control[s] approximately 80% of the *brands* in the Premium Eyewear Market."  IP ¶ 275 (emphasis added).  However, Plaintiffs have assiduously defined the Premium Eyewear Market to include EssilorLuxottica brands and exclude competitors' brands in ways that defy the consumer perspective and common sense.

Specifically, as explained above, Plaintiffs allege that the Premium Eyewear Market includes multiple "'brand' categories" of EssilorLuxottica eyewear, including "lifestyle," "sport," "high-end," *and* "luxury" eyewear.  DP ¶ 159.  At the same time, Plaintiffs argue that the Premium Eyewear Market does not include competitors' brands that are not specifically identified as "luxury" brands.  Opp. at 16.  Thus, Plaintiffs define the *Premium* Eyewear Market to *include* EssilorLuxottica's Oakley *sport* sunglasses but *exclude* Safilo's similar looking and similarly priced Under Armour sport sunglasses.  *See* Tr. at 15:21–16:7.  Having contrived this definition, Plaintiffs decry EssilorLuxottica's dominance of the Premium Eyewear Market.

Similarly, while the Premium Eyewear Market includes EssilorLuxottica's multiple brand categories, Plaintiffs allege that Warby Parker is outside of the Premium Eyewear Market.  DP ¶ 166; IP ¶ 265.  Plaintiffs admit that Warby Parker is a "well-known" and "popular eyewear retailer."  DP ¶ 166; *see* IP ¶¶ 125 (alleging that Warby Parker is among the top nine "physical retailers"), 131 (ranking Warby Parker *third* among "online eyewear retailers").  Yet, according to

Plaintiffs, this fact has no bearing on Defendants' alleged monopoly power because Plaintiffs simply take the position that Warby Parker is not part of the relevant market.  *See* Opp. at 11, 19. Plaintiffs' principal justification for this position is that, the Direct Purchasers allege, a Kering executive once dismissed Warby Parker as having "little to do with luxury."  Opp. at 8–9; DP ¶ 166.  Yet Plaintiffs simultaneously and expressly maintain that *premium* eyewear is not limited to *luxury* eyewear when it comes to EssilorLuxottica brands.  *See* DP ¶ 159.

Moreover, Plaintiffs conceded at oral argument that, contrary to their allegations, Warby Parker eyewear retails for the same price as eyewear within the alleged Premium Eyewear Market. The Indirect Purchasers Complaint implausibly groups Warby Parker with "value-priced eyewear such as National Vision," which sells two pairs of eyeglasses for $79.95 (ignificantly less than the cost of one pair of Warby Parker glasses).  IP ¶ 78.  At oral argument, however, counsel for the Indirect Purchasers conceded "[t]he overlap in retail price between Warby Parker and premium eyewear."  Tr. at 34:19–21.  Counsel responded only that this fact "does not negate the *industry* recognition that Warby Parker is not part of the premium market."  Tr. at 34:21–22 (emphasis added).  However, Plaintiffs fail to offer any nonconclusory allegations that, from a *consumer* perspective, a $195 pair of Warby Parker sunglasses is not reasonably interchangeable with a pair of $195 sunglasses from any of EssilorLuxottica's many categories of Proprietary Brands and Fashion House Brands.  *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d at 226.  Plaintiffs' implausibly contrived definition of the Premium Eyewear Market weighs in further support of dismissal.  *See Concord Assocs., L.P.*, 817 F.3d at 53.

Accordingly, the Indirect Purchaser Complaint is dismissed for failure to allege a plausible market definition.[4]  The Direct Purchasers' claims with respect to the alleged Premium Eyewear

---

[4] As noted above, the Court dismisses the federal antitrust claims in the Indirect Purchaser Complaint and declines to exercise supplemental jurisdiction to reach the state law claims.

Market are likewise dismissed.

**E.  The Direct Plaintiffs Fail To State a Claim as to the Custom Lens Market.**

The Direct Purchasers also assert claims for monopolization and attempted monopolization of the Custom Lens Market in violation of Section 2 of the Sherman Act.  *See* DP ¶¶ 280–92.  The Second Circuit has squarely held that "a 64 percent market share is insufficient to infer monopoly power" without other evidence of market power "such as an ability to control prices or exclude competition."  *PepsiCo, Inc.*, 315 F.3d at 109; *see Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998); *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir. 1945) ("it is doubtful whether sixty or sixty-four percent would be enough").  Here, the Direct Purchasers allege that EssilorLuxottica controls a bare majority of the purported Custom Lens Market.  *See* DP ¶ 195 (alleging that, "in 2023, EssilorLuxottica branded lenses generated at least 52 percent of all custom lens retail revenue in the United States"); *see also* IP ¶ 141 (alleging only that EssilorLuxottica "control[s] a majority" of "Premium Prescription Lens manufacturing" and "a significant portion of Premium Prescription Lens processing").  As such, the Direct Purchasers' market share allegations with respect to the Custom Lens Market are insufficient, by themselves, to infer monopoly power.  *See PepsiCo, Inc.*, 315 F.3d at 109.

The Direct Purchasers also fail to offer non-conclusory allegations that Defendants have the ability to control prices or exclude competition with respect to the Custom Lens Market.  The Direct Purchasers allege, for example, that EssilorLuxottica "marks up" lenses far "above marginal cost."  DP ¶¶ 192–93.  However, as the Second Circuit has explained, "deviations between marginal cost and price" are not necessarily "evidence of market power."  *United States v. Eastman Kodak Co.*, 63 F.3d 95, 109 (2d Cir. 1995).  Thus, "the test for the existence of market power is

the ability to control price or exclude competition, not simply pricing a product above marginal cost." *In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d 403, 422 (S.D.N.Y. 2005).

Furthermore, the Direct Purchasers offer no factual allegations to support their conclusory assertion that EssilorLuxottica "can impose supracompetitive price[s]." DP ¶ 192. Instead, the Direct Purchasers simply assert that EssilorLuxottica controls prices "[b]ecause" it "dominates" the market. DP ¶ 192. However, the Direct Purchasers must instead allege specific facts from which the Court can reasonably infer that EssilorLuxottica controls prices. *See In re Wireless Tel. Servs. Antitrust Litig.*, 385 F. Supp. 2d at 422. In addition, while the Direct Purchasers allege that "EssilorLuxottica owns, or owns the exclusive rights to, sixteen of the most popular lens brands," they do not allege specific facts from which the Court can reasonably infer that EssilorLuxottica excludes competition. *See PepsiCo, Inc.*, 315 F.3d at 109. Thus, because the Direct Purchasers fail to offer non-conclusory allegations of an ability to control prices or exclude competition, the Court cannot infer that EssilorLuxottica has monopoly power in the Custom Lens Market. *See PepsiCo, Inc.*, 315 F.3d at 109.

With respect to the claim for attempted monopolization, the Direct Purchasers' "steering" allegations, *supra* at 13–14, might support an inference of "a specific intent to monopolize," but a claim for attempted monopolization also requires "a dangerous probability of achieving monopoly power," *PepsiCo, Inc.*, 315 F.3d at 105. The Direct Purchasers do not offer allegations to show such a dangerous probability. Indeed, while the Direct Purchasers assert that there are high barriers to entry for competitors, they allege in their own pleading that Warby Parker recently built a $16 million "optical lab in New York." DP ¶ 196.

Accordingly, the Direct Purchasers' claims with respect to the Custom Lens Market are dismissed.

**F. Plaintiffs Allege Stale and Foreign Conduct.**

Having dismissed all of the claims on the other grounds, the Court simply notes that Plaintiffs include decades-old acquisitions in their allegations that the groups of entities they call EssilorLuxottica have engaged in anticompetitive conduct. *See supra* at 11–12. Most of the alleged acquisitions fall far outside the four-year statute of limitations. *See* 15 U.S.C. § 15b. In defense of these apparently stale allegations, Plaintiffs invoke the continuing violations doctrine. *See* Opp. at 48–49. That doctrine, however, is "heavily disfavored" in the Second Circuit. *Chalmers v. National Collegiate Athletic Association*, 2025 WL 1225168, at *8 (S.D.N.Y. Apr. 28, 2025); *see Stouter v. Smithtown Cent. Sch. Dist.*, 687 F. Supp. 2d 224, 230 (E.D.N.Y. 2010) (collecting cases).

In order to invoke the doctrine, a plaintiff must show "an overt act . . . characterized by two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68 (2d Cir. 2019). Plaintiff argue that they sufficiently allege new acts within the limitations period, including the acquisition of Grand Vision B.V. and renewals or renegotiations of licenses. Opp. at 48 & n.26. It is far from clear, however, that Plaintiffs allege any new injury from the acquisition of Grand Vision B.V., a Dutch company with little presence in the United States, *see* Reply at 5–6, which the Indirect Purchasers do not even name as a defendant in their pleading. Moreover, renewals and renegotiations of licenses may be mere reaffirmations of previous acts that cannot support a continuing violations theory. *See US Airways, Inc.*, 938 F.3d at 68.

Somewhat relatedly, Plaintiffs allege, as they must, that the relevant market for their federal antitrust claims is the U.S. market. *See* DP ¶ 2; *see also* IP ¶ 2. Yet the pleadings are filled with

allegations about EssilorLuxottica's global market power and conduct. *See, e.g.*, DP ¶¶ 82, 195 ("global market share"); IP ¶¶ 91 n.24, 98 n.25, 162. Plaintiffs also cite European investigations into EssilorLuxottica, but U.S. regulators have approved some of the transactions alleged in the plaintiffs' pleadings, and European countries have different laws. *Cf. In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007).

## IV.    CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is GRANTED. Plaintiffs' Amended Complaints are dismissed with leave to replead. Plaintiffs may file **one** second amended complaint by October 17, 2025. **Plaintiffs are on notice that this is their final opportunity to amend their pleading in this action to cure the deficiencies in their claims.**

The Clerk of Court respectfully is requested to terminate the motion at docket entry 215.

**SO ORDERED.**

Date:  **September 26, 2025**
       **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**